# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>XEROX CORPORATION, URSULA M. BURNS, LUCA MAESTRI, KATHRYN A. MIKELLS, LYNN R. BLODGETT, ROBERT K. ZAPFEL, DAVID H. BYWATER, and MARY SCANLON,<br><br>Defendants. | Case No. 1:16-cv-08260-PAE<br><br>Hon. Paul A. Engelmayer<br><br>**CLASS ACTION**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477


*Liaison Counsel for the Class*

KESSLER TOPAZ MELTZER
 & CHECK LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056


*Lead Counsel for Lead Plaintiff
and the Class*

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................. 2

II.     JURISDICTION AND VENUE ........................................................................... 13

III.    THE PARTIES ..................................................................................................... 13

        A.     Lead Plaintiff .......................................................................................... 13

        B.     Defendants .............................................................................................. 14

        C.     Relevant Non-Parties ............................................................................. 17

               1.      Cognizant Business Services Corporation ................................. 17

               2.      Confidential Witnesses .............................................................. 17

IV.     FACTUAL ALLEGATIONS .............................................................................. 18

        A.     Company Background and Reporting-Segment Information ............... 18

        B.     Xerox Seeks to Become a Services Company and Acquires ACS ....... 19

        C.     Background on Medicaid, MMIS, and Xerox's Health Enterprise
               Product .................................................................................................... 22

        D.     Xerox Contracts with States to Implement Health Enterprise ............. 24

               1.      New Hampshire .......................................................................... 25

               2.      North Dakota .............................................................................. 25

               3.      Alaska ......................................................................................... 29

               4.      Montana ...................................................................................... 33

               5.      California .................................................................................... 36

               6.      New York .................................................................................... 41

V.      DEFENDANTS' MATERIALLY FALSE AND  MISLEADING
        STATEMENTS AND OMISSIONS ................................................................... 42

        A.     Defendants Issued Three Categories of Materially False and
               Misleading Statements ........................................................................... 42

1.      Xerox Falsely Claimed that it Possessed a Platform that was Cost-Efficient, Transferable, Reusable, Replicable, Scalable, and had Plug-and-Play Characteristics ..................................... 42

2.      Xerox Falsely Represented That Its Health  Enterprise Implementations Were "Going Well" ........................................ 45

3.      Xerox Falsely Claimed that the Health Enterprise Implementations  Were Profitable and Poised to Deliver Additional Profits ..................................................................... 47

B.      Defendants' Class Period Misstatements And Omissions .................................... 50

1.      The April and May 2012 False or Misleading Statements ....................... 50

2.      The November 2012 False or Misleading Statements ............................. 59

3.      The December 2012 False or Misleading Statements ............................. 60

4.      The February 2013 False or Misleading Statements ................................ 62

5.      The March 2013 False or Misleading Statements .................................... 63

6.      The April 2013 False or Misleading Statements ...................................... 64

7.      The October 2013 False or Misleading Statements ................................. 65

8.      The December 2013 and January 2014 False or Misleading Statements ................................................................. 70

9.      The April 2014 False or Misleading Statements ...................................... 72

10.     The July and September 2014 False or Misleading Statements ................................................................. 76

11.     The October 2014 False or Misleading Statements ................................. 78

12.     The November 2014 False or Misleading Statements ............................. 80

13.     The January 2015 False or Misleading Statements ................................. 83

14.     The April 2015 False or Misleading Statements ...................................... 85

VI.     LOSS CAUSATION ..................................................................... 89

VII.    POST-CLASS-PERIOD DEVELOPMENTS ............................................... 102

A.      Xerox Spins-Off Its Business Process Outsourcing  Business, Creating A Publicly Traded Company Called Conduent .................................... 102

      B.     Conduent Announces It Likely Would Not Complete the New York Contract ........................................................................ 103

VIII.  ADDITIONAL ALLEGATIONS OF SCIENTER ......................................... 104

IX.    PRESUMPTION OF RELIANCE ................................................................ 114

X.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ........................................................ 115

XI.    CLASS ACTION ALLEGATIONS .............................................................. 116

XII.   CAUSES OF ACTION .................................................................................. 118

       COUNT I FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5 PROMULGATED THEREUNDER (Against All Defendants) .................................................... 118

       COUNT II FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT (Against the Individual Defendants) ............................... 120

XIII.  PRAYER FOR RELIEF ............................................................................... 122

XIV.  JURY TRIAL DEMANDED ........................................................................ 123

Arkansas Public Employees Retirement System ("Lead Plaintiff"), by its undersigned attorneys, brings this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of itself and all others persons or entities who purchased or otherwise acquired Xerox Corporation ("Xerox" or the "Company") common stock from April 23, 2012 through October 27, 2015 (the "Class Period").

Lead Plaintiff alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Lead Plaintiff's information and belief is based upon, among other things, the ongoing independent investigation of Court-appointed Lead Counsel, Kessler Topaz Meltzer & Check LLP, and Liaison Counsel, Labaton Sucharow LLP (together, "Counsel"). This investigation includes, among other things, a review and analysis of: (i) public filings by Xerox with the SEC; (ii) public reports and news articles; (iii) research reports by securities and financial analysts; (iv) economic analyses of securities movements and pricing data; (v) transcripts of investor calls and conferences with Xerox senior management; (vi) consultations with relevant experts and consultants; (vii) interviews with former Xerox employees; (viii) documents obtained pursuant to the Freedom of Information Act and state-law analogues (the "FOIA Requests"); and (ix) other publicly available material and data identified herein. Counsel's investigation into the factual allegations contained herein is continuing, and many of the facts supporting Lead Plaintiff's allegations are known only to the Defendants (as defined herein) or are exclusively within their custody or control. Lead Plaintiff believes that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

I.    **INTRODUCTION**

1.      Since coming to prominence in 1959, Xerox has primarily been a technology

company, so well-known for manufacturing and selling photocopier machines that its name

became synonymous with the very act of photocopying. Notwithstanding its historical position in

the hardware business, in the late 2000s, the Company made a strategic decision to refocus its

business on selling services rather than hardware technology. Xerox's initiative to transition into

a services business was part of an industry-wide shift, as other large technological hardware

companies, such as Dell, Inc. ("Dell") and Hewlett-Packard Company ("Hewlett-Packard"), were

undergoing similar transformations.

2.      For Xerox, the intended transformation into a services-centered business was

driven by a need for a more consistent revenue stream than its hardware business provided.

Xerox's hardware business was faced with shrinking profits amid competition from low-cost

manufacturers and volatility related to economic cycles.

3.      To accelerate its evolution into a services-centered company, Xerox acquired

Affiliated Computer Services, Inc. ("ACS") in February 2010, for $6.4 billion—Xerox's largest

acquisition ever. The ACS acquisition was pursued largely at the direction Defendant Ursula

Burns, who had recently become Xerox's Chief Executive Officer ("CEO"). Defendant Burns

believed that Xerox needed to transform into a services business to stay competitive, and she

viewed acquisitions as a critical component of the Company's transformation strategy.

4.      At the time of the acquisition, ACS specialized in business process outsourcing,

which includes contracting with customers to operate and manage certain of their business

functions, such as customer call centers, claims processing, or information-technology ("IT").

ACS provided these services to companies in a wide range of industries, including

telecommunications, retail, healthcare, education, and transportation. ACS also offered these

services to government customers, and contracted with state and local governments to run operations ranging from electronic-toll collection to student-loan processing. Analysts were encouraged that the ACS acquisition would enable Xerox to: (i) reduce its traditional dependence on selling hardware; and (ii) generate increased revenues and profit margins through the Company's shift into a services company.

5.     ACS's healthcare-related business segment was particularly attractive to Xerox at the time of the acquisition. As Xerox's CEO, Defendant Burns, explained in connection with the acquisition, "[c]learly, ACS's strength in the health care sector helped us with" the decision to acquire ACS—an acquisition Defendant Burns described as a "game-changing initiative" that was supposed to transform Xerox's business.[1]

6.     At the time of the acquisition, approximately 40 percent of ACS's revenue was derived from local, state, and federal government customers (the "Government Segment"). The Government Segment offered its customers a wide range of services, which included administering state Medicaid programs, as well as developing, designing, and implementing Medicaid Management Information Systems ("MMIS").

7.     A MMIS is a computer system that manages all aspects of a state's Medicaid programs in accordance with federal and state law, such as processing payments to healthcare providers and storing beneficiary information.

8.     Medicaid is a Medical Assistance Program financed through joint federal and state funding and administered by each state. In 2016, more than 72 million individuals received medical assistance through Medicaid, with state Medicaid expenditures exceeding $550 billion that year. When a state determines that it needs to replace its existing MMIS—because it is

---

[1]     David Hubler, *Xerox Acquires ACS for $6.4 Billion*, WASHINGTON TECHNOLOGY (Sept. 28, 2009).

outdated and/or no longer compliant with federal standards—the state typically contracts with a private company to implement a replacement system. Such contracts can be extremely lucrative for private companies. Because, on average, the Medicaid program accounts for over 25 percent of a state's budget, the replacement of a state's MMIS typically represents one of the most significant technical procurement projects financed through a state's coffers.

9. The replacement product that ACS offered to state governments prior to the Class Period was its proprietary Health Enterprise solution—a product that purportedly performed the claims processing and core administrative functions required of a MMIS, including: (i) benefit plan administration; (ii) financial management; (iii) information storage and retrieval; and (iv) reporting. At the time of its acquisition by Xerox, ACS had already contracted with New Hampshire, North Dakota, and Alaska to implement Health Enterprise. After the ACS acquisition, Xerox took over these implementation contracts, and later contracted with Montana, California, and New York to implement Health Enterprise.

10. Before it acquired ACS, Xerox had virtually no presence in the government healthcare solutions market. Through the ACS acquisition, Xerox instantly became a significant player in that market. Moreover, Xerox touted Health Enterprise as a revolutionary product that was more advanced than any competing product.

11. Specifically, after the ACS acquisition and throughout the Class Period, Xerox consistently represented that Health Enterprise was a unique "platform," which could be easily transferred from state to state (*i.e.*, it was a transferable, reusable, replicable, and scalable system) and it possessed "plug-and-play" characteristics—that is, that the purchaser of the system could install and use it with minimal customization. Xerox's purported ability to reuse the same Health Enterprise platform in each contracting state was critical because

- 4 -

implementation costs are materially less when using a reusable platform than when developing a

new, customized system for each state. Indeed, less than a month into the Class Period, at an

investor conference in May 2012, Defendants promoted this purported attribute of Health

Enterprise: "***now that we got the platform, we can reuse that platform as we acquire new***

***contracts, and therefore our cost of delivery of those contracts are [sic] going to be***

***significantly lower than what our competitors can offer***."[2]

12.     During the Class Period, Defendants consistently claimed that Health Enterprise

was a "***repeatable solution***[]," a "***plug-and-play***" platform, with "***functionality and features that***

***are unique***," and that Xerox's MMIS implementations were a "***replicable***" and a "***repeatable***

***process***[]." At the same time Defendants characterized Health Enterprise as a reusable and

repeatable platform, Xerox also assured investors that Health Enterprise: (i) could easily be

transferred from state to state; (ii) required only minor adaptations to meet each state's unique

specifications; and (iii) could be scaled to meet the needs of any state. These purported attributes

of the supposed platform were a significant departure from all other MMIS solutions available at

that time, *i.e.*, custom systems built specifically for each state and incapable of efficient and cost

effective transfer from state to state.

13.     Xerox's purported ability to transfer and adapt Health Enterprise efficiently and

cost-effectively to address each state's specifications was, according to Defendants, crucial to the

success of each Health Enterprise implementation and, in turn, to the profitability of the

Company's Services segment. Given its importance to the Company, Defendants paid

particularly close attention to the status of the Health Enterprise implementations. For example,

in an October 6, 2011 letter that Defendant Burns sent to representatives of the State of North

---

[2]     Unless otherwise noted, all emphasis herein is added.

Dakota obtained through the FOIA Requests, Defendant Burns represented that she was "fully informed" about the status of the implementations and considered the success of these implementations to be "one of [her] foremost priorities." Defendants also publicly claimed that they followed the implementation contracts "at the granular level."

14.     The supposed transferability and adaptability of Health Enterprise led investors and analysts to believe that Xerox could launch the Health Enterprise platform in multiple states with reduced time and expense, increasing the Company's profit margins and also providing Xerox with a competitive advantage. Accordingly, during the Class Period, investors focused on Xerox's profit margins in the Services segment—a key indicator of whether Xerox's transformation to a services-centered business was succeeding—and relied on Defendants' representations about the current progress of the implementations and capabilities that Health Enterprise supposedly offered.

15.     Notwithstanding the Company's public claims that it was rolling out a "platform" that would maximize its margins and minimize implementation costs, unbeknownst to investors, each implementation of Health Enterprise was fraught with significant problems, including extensive cost-overruns and delays. These delays and cost overruns resulted from the Company ***not actually having*** a transferable, reusable, replicable, and scalable platform with plug-and-play characteristics. In fact, and contrary to Defendants' public statements during the Class Period, the Company was effectively building a custom system for each state client—a time-consuming and expensive process that Defendants explicitly told investors Health Enterprise would avoid.

16.     During the Class Period, while Defendants repeatedly told investors that Xerox had a transferable, reusable, replicable, and scalable platform with plug-and-play characteristics that it would leverage to drive profitability at the Company, Xerox's state-government customers

consistently questioned whether the Company actually had such a platform, as evidenced by documents Counsel obtained pursuant to the FOIA Requests. For example:

(a)     According to a February 2014 letter from the California State Auditor discussing the implementation issues associated with Xerox's MMIS contract with California, Xerox "*project teams had essentially been proceeding as if they were developing new software, instead of determining how to adapt Xerox's existing software product to meet California's needs as originally intended*."

(b)     Similarly, a report prepared in April 2015 by an independent project oversight consultant on the status of the California MMIS implementation raised questions about "*the existence of a true transfer system*." A May 2015 report by the same entity found that while Health Enterprise "*was heavily marketed as a transfer system*," in reality it "*appears to be a custom build based on the collective merging of code from California, Alaska, and New Hampshire*."

(c)     An April 2015 report prepared for North Dakota by an independent third party assessing the stability of Health Enterprise found that: "The ND Health Enterprise MMIS has yet to be stabilized *due to continuing code changes and those that are still in development*."

(d)     Minutes from a May 20, 2015 Health Enterprise Systems Meeting, attended by representatives from the agencies responsible for administering the Medicaid programs in California, Montana, New Hampshire, North Dakota, and New York, revealed that, according to the Montana representative, "[p]roject staff is realizing that *Xerox staff does not know what the [Health Enterprise] system does*," and that "[t]he [Health Enterprise] documentation that is received from Xerox does not reflect what the system does."

(e)     On May 21, 2015, the Assistant Deputy Director of the California Department of Health Care Services MMIS Division concluded in an email to Xerox that Xerox's purported platform was not "***anywhere close to a scalable product***."

17.     Former Xerox employees, cited below as Confidential Witnesses, confirm that Xerox did not possess a transferable, reusable, replicable, and scalable platform with plug-and-play characteristics that could be implemented easily and cost effectively in any state's Medicaid environment.

18.     The Confidential Witnesses also confirmed that the lack of a transferable platform precluded Xerox from completing any Health Enterprise implementations within the deadlines specified in the contracts as they were premised on Xerox having such a platform. As a result, Xerox's Health Enterprise implementations faced significant problems, cost overruns, and delays.

19.     Despite these problems, which Xerox's state-government customers routinely raised with the Company, Defendants continuously and falsely reassured investors that these implementations had "***gone very well***," were "***performing well***" and "***progressing well***," and that the Company was "***very pleased with the successful implementations***." However, the documents obtained pursuant to Counsel's FOIA Requests show that the Health Enterprise implementations were plagued by problems, rendering Defendants' Class Period statements materially false or misleading. For example:

(a)     The Health Enterprise implementation in New Hampshire was ***delayed by more than five years and ended up costing nearly double the amount originally planned***.

(b)     The Health Enterprise implementation in North Dakota was ***delayed by more than six years and ended up costing nearly double the amount originally planned***.

(c)     Alaska's MMIS system went live ***three years behind schedule***, and the system suffered from extensive defects after it went live. A March 24, 2014 letter from the Commissioner of Alaska's Department of Health and Social Services notified Xerox that Alaska would declare the Company in default of the Alaska MMIS contract if these defects were not remediated. Moreover, in September 2015, three Alaska-based healthcare companies commenced litigation against Xerox alleging that the Company failed to properly implement the Medicaid billing software it provided under its contract with Alaska, costing providers millions of dollars as reimbursement claims languished. This lawsuit remains pending.

(d)     The Montana implementation also was fraught with delays and implementation problems. A May 2014 report to the Montana Legislative Finance Committee documented that an Independent Verification and Validation entity had reported that "the Xerox MMIS project performance status" was "'Red' [*i.e.*, the highest risk status that could be assigned] in all of their independent status reports since April 3, 2013."

(e)     The independent project oversight consultant responsible for overseeing the California Health Enterprise implementation consistently noted in monthly reports issued throughout the Class Period that the California implementation was behind schedule and that the MMIS that Xerox was deploying—purportedly an implementation of a transferable, reusable, replicable, and scalable platform—was "inadequately defined," meaning that it lacked the necessary "diagrams and . . . narrative[s]" needed for the state to make informed decisions as [it] carr[ies] out [its] oversight, review and management responsibilities for all phases of the [system replacement project]." In September 2015, this entity concluded that "[t]he project has endured challenges since the beginning." On September 22, 2015, the Assistant Deputy Director of the California Department of Health Care Services found Xerox in breach of the California contract

- 9 -

due to the Company's failure to timely implement an MMIS replacement system. ***The Company ultimately settled with the state of California for $143 million in damages***.

20.     The delays and cost overruns associated with Xerox's Health Enterprise implementations had a significant negative impact on Xerox's Services segment margins. To quell investor concerns about the Company's continually weak and inconsistent Services segment margin performance, Defendants misrepresented and concealed material facts in order to portray that the Company was successfully implementing a purportedly transferable platform with plug-and-play characteristics.

21.     For example, Defendants represented throughout the Class Period that Health Enterprise implementation costs were "***transitionary and temporary factors***" rather than admitting that the Company was incurring millions in costs per state to design and build a new system for each implementation contract. Defendants further misrepresented that these purported implementation "investments" would cease over time as a result of efficiencies and scale created through each successful implementation.

22.     Defendants also told investors that the implementations were profitable, representing in July 2014, for example, that the California contract had achieved "flat profitability." Indeed, contrary to Defendants' public statements concerning the profitability of its Health Enterprise platform, information obtained pursuant to Counsel's FOIA Requests reveals that ***Xerox had not been paid <u>any</u> money*** for its work implementing Health Enterprise in Montana and California as late as November 2014 and May 2015, respectively. Not only was the Company not receiving any payment for its Health Enterprise implementations in California and Montana, but on no fewer than three occasions the Company's state-government customers found Xerox in breach of its contractual obligations ***and sought liquidated damages*** from Xerox

due to its failure to implement a functioning MMIS. In the case of the Montana implementation, as of April 16, 2014, "the total accrued amount of liquidated damages [was] *$4,920,000*."

23.     As the Class Period progressed, Services segment margins did not improve. Rather than reveal the truth about Health Enterprise—that it was not a transferable platform with plug-and-play characteristics, but rather a computer program that required time-consuming, expensive, and customized implementation for each state—Defendants repeated their misrepresentations and concealed material facts in an effort to reassure investors that the Company's Health Enterprise business had stabilized.

24.     The truth about Defendants' fraud was revealed and/or materialized through a series of disclosures, beginning on October 22, 2014, when Defendants disclosed disappointing margins in the Services segment for the Company's third quarter of 2014. Defendants blamed the weak margin figures on high costs associated with "investments" to "improve" the purported Health Enterprise platform, and claimed that such increased costs were a negative "surprise."

25.     Additional previously misrepresented and/or concealed material facts concerning Xerox's Health Enterprise product and its efforts to implement that product emerged on April 24, 2015, when Defendants announced disappointing Services segment margins, driven by higher costs associated with implementing Health Enterprise. Defendants further revealed that, contrary to their prior representations throughout the Class Period that Health Enterprise was a transferable, reusable, replicable, and scalable platform with plug-and-play characteristics, the Company actually had bid on and entered into all but one of its state MMIS contracts "before [it] finished development of the core software platform" and while Health Enterprise was "still in design." Indeed, Defendant Zapfel admitted on April 24, 2015, that Xerox was still "***working to consolidate the customized instances into a standardized platform***." In short, Defendants

- 11 -

revealed that **Health Enterprise was _not_ the platform Xerox claimed it was throughout the Class Period**—a shocking admission, which caused the price of Xerox common stock to decline by more than 11 percent over the next two trading days

26.     On October 26, 2015, Xerox announced disappointing earnings results and revealed "that the Xerox Board of Directors ha[d] authorized a comprehensive review of structural options for the Company's business portfolio and capital allocation, with the goal of enhancing shareholder value." According to the Company, "a fundamental change in our Government Healthcare strategy, particularly in Health Enterprise" was a significant factor precipitating the "comprehensive review" of Xerox's business. In response to this new information, securities analysts concluded, among other things, that "challenges in the Health Enterprise (HE) division have led to the announced business portfolio review," and both Fitch Ratings and Standard & Poor's issued negative ratings reports for Xerox, causing the price of the Company's common stock to decline by $1.05, or more than 10 percent, from a closing price of $10.34 on October 23, 2015 to a closing price of $9.29 on October 27, 2015 on very heavy trading volume.

27.     Revelations that Health Enterprise was never a transferable, reusable, replicable, and scalable platform with plug-and-play characteristics, and/or the materialization of this hidden risk in the form of repeated cost overruns and an inability to successfully complete contracts on time or ever, took their toll on investors, who saw the Company's stock fall from a Class Period closing-price high of $14.32 per share on December 5, 2014 to a closing price of $9.29 per share on October 27, 2015, the last day of the Class Period.

II.     **JURISDICTION AND VENUE**

28.     The claims asserted herein arise pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

29.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

30.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Many of the acts charged herein, including the preparation and/or dissemination of materially false or misleading information, occurred in substantial part in this District. Xerox transacts business in this District, and the Company's stock trades in this District on the New York Stock Exchange ("NYSE").

31.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

III.    **THE PARTIES**

        A.      **Lead Plaintiff**

32.     Court-appointed Lead Plaintiff, Arkansas Public Employees Retirement System ("APERS"), is a public pension fund that provides retirement benefits for qualified public employees of the State of Arkansas. APERS was established in 1957 and, as of June 2016, managed assets exceeding $7.3 billion for approximately 93,000 members. As set forth in the certification attached hereto, APERS purchased Xerox common stock during the Class Period, and suffered damages as a result of Defendants' fraud.

B.      **Defendants**

33.     Defendant Xerox, a provider of business process and document management solutions, is a New York corporation with its principal executive offices located at 45 Glover Avenue, Norwalk, Connecticut. The Company's common stock is listed on the NYSE under the ticker symbol "XRX."

34.     Defendant Ursula M. Burns ("Burns") was, at all relevant times, the Chairman of the Board and Chief Executive Officer ("CEO") of the Company. Defendant Burns became the CEO of Xerox on July 1, 2009.

35.     Defendant Luca Maestri ("Maestri") was the Chief Financial Officer ("CFO") of the Company from February 16, 2011 until February 28, 2013.

36.     Defendant Kathryn A. Mikells ("Mikells") succeeded Defendant Maestri as CFO of the Company effective May 2, 2013. Defendant Mikells served as CFO and Executive Vice President of Xerox through the end of the Class Period.

37.     Defendant Lynn R. Blodgett ("Blodgett") served as Executive Vice President of Xerox and the President of Xerox's Services Business from February 2010 to April 1, 2014. Defendant Blodgett joined Xerox in 2010 after Xerox's acquisition of ACS. Prior to joining Xerox, Defendant Blodgett was the President and CEO of ACS.

38.     Defendant Robert Zapfel ("Zapfel") replaced Defendant Blodgett as President of Xerox's Services Business on April 1, 2014, serving in that position through the end of the Class Period.

39.     Defendant David H. Bywater ("Bywater") served as Chief Operating Officer of State Government at Xerox from February 2010 to July 2013 and as Corporate Vice President from February 2012 to July 2013.

40.     Defendant Mary Scanlon ("Scanlon") served as Xerox's Senior Vice President, National Sales and Business Development, for Government Health Care Solutions from August 2009 to October 2014.

41.     Defendants Burns, Maestri, Mikells, Blodgett, Zapfel, Bywater, and Scanlon are collectively referred to as the "Individual Defendants" and, together with Xerox, as the "Defendants."

42.     Each of the Individual Defendants, by virtue of his or her high-level position with Xerox, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential and proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition during his or her respective tenure with the Company, as alleged herein. As alleged below in Section V, the materially false or misleading information conveyed to the public resulted from the collective actions of the Individual Defendants. Each of these individuals, during his or her tenure with the Company, was involved in drafting, producing, reviewing, and/or disseminating the statements at issue in this case, approved or ratified these statements, and knew or recklessly disregarded that these statements were being issued regarding the Company.

43.     As executive officers of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and whose common stock was, and is, traded on the NYSE, and governed by federal securities laws, each of the Individual Defendants had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, financial statements, and internal controls, and to correct any previously issued statements that had become materially misleading or untrue, so that the market

prices of the Company's publicly traded securities would be based on accurate information. Each of the Individual Defendants violated these requirements and obligations during the Class Period.

44.     Each of the Individual Defendants, because of his or her positions of control and authority as an executive officer of Xerox, was able to and did control the content of the SEC filings, press releases, and other public statements that Xerox issued during the Class Period, was provided with copies of the statements at issue in this action before they were made to the public, and had the ability to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the materially false or misleading public statements alleged herein.

45.     Each of the Individual Defendants, because of his or her positions of control and authority as an executive officer of Xerox, had access to the adverse undisclosed information about Xerox's business, operations, financial statements, and internal controls through access to internal corporate documents, conversations with other Xerox officers and employees, attendance at Xerox management meetings, and via reports and other information received in connection therewith, and knew or recklessly disregarded that these adverse undisclosed facts rendered the representations made by or about Xerox materially false or misleading.

46.     Each of the Individual Defendants is liable as a participant in a fraudulent scheme or course of conduct that operated as a fraud or deceit on purchasers of Xerox securities by disseminating materially false or misleading statements and/or concealing adverse facts. The scheme: (i) deceived the investing public regarding Xerox's products, business, operations, and management, and the intrinsic value of Xerox common stock; and (ii) caused Lead Plaintiff and members of the Class to acquire Xerox common stock at artificially inflated prices.

C.      **Relevant Non-Parties**

1.      **Cognizant Business Services Corporation**

47.      Cognizant Business Services Corporation ("Cognizant") is a Delaware

corporation with a principal place of business at 500 Frank W. Boulevard, Teaneck, New Jersey.

Cognizant provided Xerox with business processing outsourcing services through sub-contracts

in connection with Xerox's Health Enterprise implementations.

2.      **Confidential Witnesses**

48.      As part of the investigation into the facts underlying this action, counsel for Lead

Plaintiff interviewed several former employees:

49.      Confidential Witness ("CW") 1 is a former ACS and former Xerox employee who

worked for ACS from 2009 to 2010 and then for Xerox State Healthcare, LLC, a Xerox

subsidiary, between 2010 and April 2013. CW 1 worked on the New Hampshire Health

Enterprise implementation before becoming the Director of Software Systems Development on

the North Dakota Health Enterprise implementation in 2012. CW 1 oversaw the implementation

of Health Enterprise in North Dakota during this period, and supervised more than 100 offshore

contractors who primarily conducted development and testing of the North Dakota MMIS.

During CW 1's time working on the New Hampshire project, CW 1 reported to an ACS Vice

President and the Director of Enterprise Systems Development. When CW 1 assumed the role of

Director of the North Dakota Health Enterprise implementation, CW 1 reported to a Xerox Vice

President, who reported to Alan Bratton ("Bratton"), Xerox Senior Vice President and Chief

Information Officer ("CIO") of Government Healthcare Solutions. CW 1 stated that Bratton's

line of reporting included Defendant Bywater. During 2012, in CW 1's capacity as Director of

Software Systems Development of the North Dakota Health Enterprise implementation, CW 1

participated in bi-weekly calls with the directors who were overseeing Xerox's Health Enterprise

implementations in Alaska, New Hampshire, and Montana. CW 1 stated that Xerox Vice

Presidents led these calls. In addition to these bi-weekly calls, CW 1 had regular communications

with the directors of the other Health Enterprise implementations in these states.

50.     CW 2 is a former ACS and Xerox employee. CW 2 worked for ACS from 2005

until it was acquired by Xerox in 2010, and worked at Xerox until September 2015. While at

Xerox, CW 2 worked as a Manager on the Alaska Health Enterprise implementation. CW 2 was

responsible for testing and quality assurance and supervised a team of approximately 40

individuals. After Alaska went live in October 2013, CW 2 worked as a Manager on the New

Hampshire implementation.

## IV.    FACTUAL ALLEGATIONS

### A.    Company Background and Reporting-Segment Information

51.     Xerox has been a global provider of printing and copying machines for over 50

years. Following the introduction of the Xerox 914 in 1959, the first widely distributed

commercial photocopier, the Company's name became synonymous with xerography, the

photographic technique used by photocopiers to make paper copies.

52.     During the Class Period, the Company's primary reporting segments were

Services and Document Technology.[3] The Document Technology segment contained Xerox's

traditional hardware manufacturing and sales business.

53.     As alleged herein, after the acquisition of ACS, the Services segment became the

largest segment within the Company, accounting for more than 50 percent of Xerox's total

revenue for every year of the Class Period: (i) $11.53 billion in revenue in 2012 (52 percent of

2012 total revenue); (ii) $11.86 billion in revenue in 2013 (55 percent of 2013 total revenue);

---

[3]     A third reporting segment, referred to by the Company as "Other," is not relevant for
purposes of the allegations in this Complaint.

(iii) $10.58 billion in revenue in 2014 (54 percent of 2014 total revenue); and (iv) $10.14 billion in revenue in 2015 (56 percent of 2015 total revenue).

54.     At the start of the Class Period, the Services segment was comprised of three service offerings: (i) Business Process Outsourcing; (ii) Information Technology Outsourcing; and (iii) Document Outsourcing. In 2014, Xerox sold its Information Technology Outsourcing business, after which the Services segment comprised only Business Process Outsourcing and Document Outsourcing.

55.     Business Process Outsourcing represented 57 percent of the total Services segment revenue in 2012, 59 percent of total Services segment revenue in 2013, 68 percent of total Services segment revenue in 2014, and 68 percent of total Services segment revenue in 2015.

56.     Xerox's Business Process Outsourcing division provided a number of services, including Government Healthcare Solutions, which provided administrative and care management solutions to state healthcare programs, such as processing Medicaid claims, managing pharmacy benefits, managing clinical programs management, supporting health information exchanges, processing and determining the eligibility of applications, managing long-term care programs, and delivering public and private health insurance exchange services.

**B.     <u>Xerox Seeks to Become a Services Company and Acquires ACS</u>**

57.     Prior to the start of the Class Period, Xerox operated for decades as a hardware company. However, services businesses, which included managing the back-office operations for private company and government customers, offered a steadier source of revenues than products businesses. Services businesses were less vulnerable to competition and less sensitive to economic downturns, and also helped foster closer relations with customers, who had become more likely to expect their hardware suppliers (like Xerox) to also provide services offerings.

58.     In an effort to find more consistent revenue streams to offset shrinking profits in their hardware businesses, many large technology companies that had traditionally focused on selling products started acquiring services companies. For instance, in 2008, Hewlett-Packard purchased Electronic Data Systems for $13.9 billion, and in 2009, Dell purchased Perot Systems for $3.9 billion.

59.     Like its competitors, Xerox—largely at the direction of Defendant Burns— recognized the importance of building its services business through acquisitions. Immediately after becoming CEO in July 2009, Defendant Burns spearheaded intense negotiations with ACS, examining the possible benefits of a takeover. These negotiations included nearly two months of due diligence review led by Xerox's senior management team. Recognizing that Xerox had struggled for years to generate significant revenue growth through its hardware business, Defendant Burns acted quickly to finalize a deal. On September 28, 2009, just months after Defendant Burns became CEO, Xerox announced that it would acquire ACS for $6.4 billion. The transaction—Xerox's largest acquisition ever—was completed on February 8, 2010.

60.     The ACS acquisition was the cornerstone of Xerox's strategic transition into a services company. As Xerox explained in its first annual report following the acquisition, dated February 23, 2011, "[t]he majority of [the Company's] Services business is the result of" the ACS acquisition. According to the Company, integration of ACS provided Xerox with a $500 billion market opportunity, signaling to investors that the acquisition would fuel Xerox's shift to services and open new avenues for revenue growth.

61.     ACS specialized in business process outsourcing, which involves contracting with customers to operate and to manage certain of the customers' business functions, such as

customer call centers and claims processing. ACS provided these services to private companies in various industries, including telecommunications, healthcare, and education.

62.     ACS also offered these services to government customers, contracting with state and local governments to run a wide range of operations, including large-scale program management services, such as Medicaid-claims processing, which is at issue here. At the time of the acquisition, ACS derived approximately 40 percent of its revenue from its Government Segment which included providing state-government clients with Medicaid program administration. ACS contracted with state governments to administer their Medicaid programs, and also contracted with state governments to develop, design, and implement these states' MMIS. As alleged herein, a MMIS is a system that processes Medicaid claims and performs other related functions. States are required by law to have a MMIS system.

63.     ACS's healthcare-related offerings for government customers were particularly attractive to Xerox. After Xerox announced the ACS acquisition in September 2009, Defendant Burns explained that "[c]learly, ACS's strength in the health care sector helped us with" the decision to acquire ACS. Defendant Burns characterized the ACS acquisition as a "game-changing initiative," explaining that "[b]y combining Xerox's strengths in document technology with ACS's expertise in managing and automating work processes, we're creating a new class of solution provider."

64.     Analysts viewed the ACS acquisition and Xerox's shift to a services-centered business favorably, despite acknowledging some risks associated with a large-scale acquisition. For example, a September 30, 2009 analyst report issued by Argus stated: "The ACS deal has certainly put Xerox back on our radar screen. At present, we think the deal costs for a still financially strained organization represent a continued hurdle for XRX shares. However, once

investors warm to the notion that Xerox can be more than a product company, investor sentiment may become more favorable." Similarly, Deutsche Bank, in an October 22, 2009 report, explained that its "analysis suggests [that cost-related synergies] alone make the deal financially attractive *while diversifying XRX's business towards faster growth avenues*." In a report released on June 28, 2010, Argus upgraded its rating on Xerox, in part because the ACS acquisition "ha[d] diversified Xerox's business by adding a service component that *should smooth overall revenue generation while driving overall margins higher*."

65.     As part of the acquisition, Xerox took control of ACS's contracts with three states, New Hampshire, North Dakota, and Alaska, to implement replacement MMIS using Health Enterprise. Prior to the acquisition, Xerox had no experience designing, developing, or implementing replacement MMIS. The ACS acquisition meant that Xerox instantly became a significant player in that market because Xerox claimed it now could offer state-government customers the Health Enterprise solution—purportedly a revolutionary product Xerox promoted as more advanced than what competitors were offering. Indeed, as alleged herein, Xerox marketed Health Enterprise as a "platform," which Defendants explained meant that Health Enterprise could be easily transferred from state to state (*i.e.*, it was transferable, reusable, replicable, and scalable) and that it possessed plug-and-play characteristics—all features that were supposedly unique to Health Enterprise. Defendants also represented that the transferability of the platform would reduce implementation costs and drive up the profits of Xerox's Services segment.

## C.     Background on Medicaid, MMIS, and Xerox's Health Enterprise Product

66.     The Medicaid program, enacted in 1965 under Title XIX of the Social Security Act, is a grant-in-aid Medical Assistance Program financed through joint federal and state funding and administered by each state according to an approved state plan. Under such a plan, a

state reimburses providers of medical assistance for services provided to eligible individuals. In 2016, more than 72 million low-income individuals received medical assistance through Medicaid, with Medicaid spending totaling approximately $558.3 billion.

67.     In order to process Medicaid claims, each state is required to have a MMIS—a computer system that manages all aspects of Medicaid programs in accordance with federal law, including processing payments to participating healthcare providers and delivering certain other services to administrators, providers, and beneficiaries. Federal law provides for 90-percent Federal financial participation ("FFP") for the design and development of a state's MMIS, and 75-percent FFP for its operation.

68.     A state's MMIS is typically operated by a private company, referred to as a fiscal agent, fiscal intermediary, contractor, or vendor. States solicit proposals from private companies to implement a replacement MMIS when the state determines that its current system is outdated, no longer compliant with federal standards, or for other reasons altogether. Because, on average, the Medicaid program accounts for over 25 percent of a state's budget, the replacement of a state's MMIS typically represents one of the most significant technical procurement projects financed through state coffers.

69.     The replacement product that Xerox (and ACS before it was acquired) offered its state-government customers was its proprietary Health Enterprise solution. Historically, companies that replaced a MMIS for a state did so by designing and developing a custom system built specifically for that state. These systems were unique to the state for which they were created and were not easily transferred between states. Health Enterprise was marketed as a revolutionary product in comparison to these more traditional systems. Specifically, Xerox represented that Health Enterprise could be reused by replicating and transferring it from state to

state, required only minor adaptations to meet each state's unique specifications, could be scaled

to meet the needs of any size state, and possessed plug-and-play characteristics. In other words,

Xerox claimed that Health Enterprise was a "platform" that possessed pre-built technical

architecture and components that was ready to be deployed in any state. A platform with such

attributes is more cost effective than building a custom system for each state (*i.e.*, the traditional

approach).

> **D.    Xerox Contracts with States to Implement Health Enterprise**

70.    At the time Xerox acquired ACS in February 2010, ACS had bid on or already

had been awarded contracts to implement Health Enterprise in New Hampshire, North Dakota,

and Alaska. After the ACS acquisition, Xerox was awarded contracts to implement Health

Enterprise in Montana, California, and New York. Each of these contracts required Xerox to,

among other things, deploy Health Enterprise in the state's preferred computer network,

configure Health Enterprise business rules to the state's requirements, transfer information from

the state's existing MMIS into Health Enterprise, and operate the business processes and/or

technology services for a multi-year period.

71.    As alleged herein, Xerox's implementations were fraught with significant

problems, including extensive cost-overruns and scheduling delays because, unbeknownst to

investors, ***Health Enterprise was never a transferable, reusable, replicable, and scalable***

***platform with plug-and-play characteristics***, either before or after Xerox acquired ACS. In

reality, Xerox was building a custom system in each state, whether the contract was inherited

from the ACS acquisition or entered into thereafter, and developing new program code for each

specific system's implementation. The extensive cost overruns and delays cut deeply into the

Company's profit margins for the Services segment. As alleged more thoroughly below,

Defendants concealed this fact not just from the states, but also from investors.

72.     As part of Counsel's investigation in this matter, Counsel issued FOIA Requests to the states with which Xerox had MMIS implementation contracts. The materials obtained in response to those FOIA Requests demonstrate that, despite Defendants' Class Period representations to the contrary: (i) Xerox had no pre-existing transferable, reusable, replicable, and scalable platform with plug-and-play characteristics; (ii) the Health Enterprise implementations were plagued with delays and cost overruns; and (iii) the cost overruns adversely impacted Xerox's profitability.

### 1.     New Hampshire

73.     On September 14, 2004, the State of New Hampshire issued a Request for Proposal ("RFP") to solicit proposals from vendors to implement a new MMIS. In January 2005, New Hampshire received four bids, one of which was from ACS.

74.     On December 20, 2005, ACS announced that it had entered into a $61 million contract with the State of New Hampshire's Department of Health and Human Services to implement Health Enterprise.

75.     New Hampshire originally projected that ACS would complete the implementation of the state's new MMIS by January 2008. However, because of extensive delays and cost overruns, Xerox did not finish implementing the system ***until April 2013—more than five years after the scheduled completion date***.

76.     The New Hampshire contract not only took much longer than expected, it also experienced significant cost overruns. The original proposed cost for the implementation was $60,860,763. The actual cost to implement nearly doubled to $117,325,120 by June 2014.

### 2.     North Dakota

77.     In June 2005, the State of North Dakota Department of Human Services ("North Dakota DHS") issued a RFP for replacement of its existing MMIS. It received just one response,

which was from ACS. On December 20, 2005, ACS was awarded the contract to implement Health Enterprise.

78.     The North Dakota implementation also experienced chronic delays. North Dakota anticipated Health Enterprise would be implemented by July 2009. However, according to documents obtained pursuant to Counsel's FOIA Request issued to North Dakota, as the implementation progressed, it became clear that this deadline would not be met.

79.     For example, on June 3, 2008, the Executive Director of the North Dakota DHS sent a letter to ACS expressing "concern[] about the state of ACS Enterprise product and the affects (sic) this [was] having on the North Dakota project." The letter stated: "It appears that delays in the Enterprise product place [the North Dakota DHS] at risk of not being able to become a full turnkey operation as originally agreed upon."

80.     Delays persisted. On April 20, 2010, the Executive Director of the North Dakota DHS sent another letter to ACS expressing disappointment with the continued scheduling delays:

> Imagine my indescribable disappointment and frustration Monday afternoon when I listened to ACS staff tell the Department of Human Services that the April 1, 2011 implementation date for the North Dakota Enterprise Product is unachievable. What went through my mind was the conversation you and I had over the phone several weeks ago during which you told me that even though the March 17, 2010 completion date for Systems Integration Testing was about six weeks behind schedule, the April 1, 2011 implementation date was not in jeopardy. . . . ***I am now left to wonder not only how long ACS has known about this latest major delay in implementation of North Dakota Enterprise, but also whether I can trust any representations that your company makes to the Department***.

81.     Months later, on July 12, 2010, the North Dakota DHS sent a notice to ACS "requesting payment from ACS of damages arising out of ACS's additional 14-month delay in the implementation of North Dakota Enterprise, from April 1, 2011 to June 1, 2012." The letter

attached an itemization of the estimated costs and damages to North Dakota resulting from

ACS's delay.

82.     Still, additional delays followed. On September 7, 2011, the Executive Director of

the North Dakota DHS wrote a letter to Defendants Burns and Blodgett that detailed the extent of

the scheduling delays:

> The go-live date is a moving target: ACS contracted with North
> Dakota to deliver a MITA-compliant web-based MMIS . . . . The
> go-live date for the new system was July 1, 2009. In the fall of
> 2008, ACS told North Dakota that the go-live date would have to
> be pushed back to May 2010. Subsequently, the go-live date was
> again pushed back to April 2011, then to June 1, 2012, then to
> October 1, 2012. However, the State is now being told that the go-
> live date will be July 1, 2013.

83.     Defendants were personally aware of these delays. On October 6, 2011, in

response to North Dakota's September 7, 2011 letter, Defendant Burns sent a letter to the

Executive Director of the North Dakota DHS (copying Defendants Blodgett and Bywater)

stating: "I wanted to take this opportunity to assure you that ***I have been kept fully informed of

the status of the implementation***. . . . Successful completion and implementation of the Health

Enterprise solution is ***one of my foremost priorities***."

84.     Additional correspondence and further missed deadlines followed. For example,

during the Class Period, on November 9, 2012, the Interim Director of the North Dakota DHS

sent a letter to Defendant Bywater notifying the Company that North Dakota intended to impose

liquidated damages on Xerox for multiple missed contract milestones attributable to Xerox's

"inability to resolve defects" with Health Enterprise.

85.     Months later, on February 14, 2013, the Interim Director of the North Dakota

DHS sent another letter to Defendant Bywater explaining that North Dakota would withhold full

payment on a number of contract deliverables and that the "*[t]otal liquidated damages accrued through February 14, 2013 on the late deliverables . . . is $687,000*."

86.     Additional undisclosed details about Xerox's delayed implementation were set forth in an October 2013 report prepared by SLI Global Solutions—the third-party that provided Independent Verification and Validation ("IV&V") services on the North Dakota project. The report detailed Xerox's many missed deadlines, and stated: "The result is de facto inability to use the most basic project management principle of [a] schedule to evaluate if the project is on track and the associated level of risk associated for missed project milestones and deliverables."

87.     Ultimately, Xerox completed its implementation in North Dakota on *October 2015—more than six years after the initially scheduled completion date*. The delays were attributable to "Xerox taking a long time designing and developing the system"[4]—circumstances wholly antithetical to Defendants' representations throughout the Class Period that Xerox possessed and was implementing a transferable, reusable, replicable, and scalable platform with plug-and-play characteristics.

88.     Indeed, an April 2015 report prepared for North Dakota by SLI Global Solutions, which assessed the stability of Health Enterprise before the scheduled go-live date, stated: "The ND Health Enterprise MMIS has yet to be stabilized *due to continuing code changes and those that are still in development*."

89.     CW 1, who was responsible for implementing Health Enterprise in North Dakota, stated that the system Xerox was implementing in North Dakota had been "imported" from New Hampshire and suffered from "tens of thousands of defects" requiring constant efforts to rewrite the underlying base code, as new defects were constantly discovered. CW 1 reviewed weekly

---

[4] Nick Smith, *State Medicaid IT Project Goes Live*, THE BISMARCK TRIBUNE (Oct. 9, 2015).

status reports prepared as part of the quality assurance process which detailed the various code deficiencies with Health Enterprise in North Dakota. CW 1 also reviewed code defects in Rational ClearQuest, Xerox's defect management system. CW 1 stated that it was apparent throughout CW 1's tenure as the director of the North Dakota Health Enterprise implementation that the Health Enterprise code imported from New Hampshire would not scale properly given the large number of defects and the fact that the base code had been designed specifically for New Hampshire.

90.     In short, the delays and issues experienced with implementing Health Enterprise in North Dakota were attributable to Xerox not actually having a transferable, reusable, replicable, and scalable platform with plug-and-play characteristics, and instead having to build a custom system.

91.     This lack of a transferable platform caused the North Dakota implementation to experience significant cost overruns. The original contractual total cost for the implementation project as of June 2006 was projected to be $37,105,585. As of March 2015, the actual costs for the project were $65,402,877, or more than 40 percent greater.

### 3.     Alaska

92.     In November 2006, the Alaska Department of Health and Social Services ("Alaska DHSS") issued a RFP to replace its existing MMIS. Again, ACS submitted a bid and Alaska chose ACS to replace its MMIS system.

93.     On October 5, 2007, ACS announced that it had entered into a contract with the Alaska DHSS for ACS to implement Health Enterprise. The contract originally specified that the implementation would be completed by June 1, 2010.

94.     The Alaska implementation experienced significant delays, as detailed in documents obtained pursuant to Counsel's FOIA Request issued to Alaska. For example, on May

14, 2010, the Deputy Commissioner of the Alaska DHSS wrote a letter to ACS, which stated in part: "It has been many months since we were informed of the delays in the new MMIS system for the State of Alaska and, despite repeatedly requesting firm dates with supporting documentation, *we remain uncertain as to when the system will actually go live and any ramifications of the delay*."

95.     The May 14, 2010 letter continued: "Despite verbal assurances, the *State remains insecure of Xerox/ACS's ability to timely complete this project due to its demonstrated lack of diligence in its performance to date*. The State will no longer accept ACS's failure to timely perform under the contract. We require adequate assurances that Xerox/ACS can and will perform its obligations under the contract to deliver a fully certified Enterprise product."

96.     Additional delays followed. By September 2013, after several contract modifications, Health Enterprise was still not ready to go live. In testing done that month, several defects were identified in Xerox's product, but Xerox assured the State that these defects would be fixed.

97.     Health Enterprise went live in Alaska on *October 1, 2013—more than three years after the initially scheduled completion date*. However, even though the system went live on October 1, 2013, it did not actually work because it was unable to accept claims from providers on that date, which is the most fundamental requirement of a MMIS. It also suffered from a number of other related issues.

98.     For example, on January 18, 2014, just months after the "go-live" date, the Commissioner of the Alaska DHSS sent an email to Defendant Blodgett and others at Xerox informing the Company of the severity of the Health Enterprise implementation failures:

> Earlier today I was alerted that I will be receiving a serious set of
> questioning about the performance of the new MMIS at the House

Finance Meeting on next Wednesday. The Governor has indicated that Xerox leadership needs to be at the meeting. Your lobbyist will not do and I will expect one or more of you to be there. In addition, Legislative Legal is pushing me hard on what we have paid and what penalties have been assessed . . . *Gentlemen, this is serious and movement toward resolution has not been satisfactory*.

99.     Months later, on March 24, 2014, the Commissioner of the Alaska DHSS sent a

letter to Defendant Blodgett threatening to declare Xerox in default of the contract if identified

defects were not resolved. The letter stated:

> The reported number of system defects in a high to mid-high severity on [October 1, 2013] was 44. . . . Within weeks of system Go Live the number of defects of a similar nature had climbed well over 500. To date, there are deliverables and milestones associated with the completion of systems testing on defect resolution. *Xerox has not met any of these deliverable or milestone deadlines, and seems unable to project when they will be completed*.

100.    Xerox responded to the letter on April 28, 2014, acknowledging the

implementation's shortcomings and agreeing "that work remains to stabilize the Alaska [MMIS,

*i.e.*, Health Enterprise] . . . ." Alaska, however, found the response to be incomplete, and, on July

2, 2014, Alaska's Attorney General sent a demand for mediation to Xerox's general counsel,

which stated: "the State of Alaska is escalating the dispute over Xerox State Healthcare LLC

("Xerox")'s failure to provide a corrective action plan or otherwise cure its performance

deficiencies in response to the State Notice to Cure dated March 24, 2014." The letter continued:

> [T]he defects and performance problems with the MMIS persist. These problems continue to harm the State, the provider community, and ultimately the Alaska Medicaid recipient population. Xerox's failure to meet its obligations also results in the accrual of liquidated damages associated with missed deadlines.

101.    On September 25, 2015, three Alaska-based healthcare companies commenced

litigation against Xerox alleging that the Company failed to properly implement Medicaid billing

software it provided under its contract with Alaska, costing providers millions as reimbursement claims languished. This lawsuit is currently pending.

102.     Like the Healthcare Enterprise implementations that preceded it, the delays and issues experienced with implementing Health Enterprise in Alaska were attributable to Xerox not actually having a platform, and instead having to build the system from the ground up. This lack of a transferable platform with plug-and-play characteristics caused the Alaska implementation to experience significant cost overruns. The original cost of the implementation was contracted to be $32,487,982. When all was said and done, approximately $146,000,000 was spent between 2007 and October 2013—nearly five times the original contract amount.

103.     CW 2 explained that Xerox was unable to resolve all of the defects with Health Enterprise prior to going live in Alaska. As a result, the system suffered from functionality issues when it went live. CW 2 stated that it was apparent to CW 2 and to the employees CW 2 supervised that they were working in a "system that was doomed." At least three months prior to "go live" in Alaska, at the end of the second cycle of system testing, it was clear to CW 2 that Health Enterprise was not going to be successfully implemented in Alaska. According to CW 2, Xerox management definitely knew the implementation was in trouble at that point, due to the volume and severity of defects, which were tracked by Xerox. Approximately three months prior to going live, Xerox management made the decision to focus resources on attempting to fix defects only at the highest severity levels and to forego addressing defects at lower severity level, which accounted for approximately 30 percent of all defects. This decision by Xerox management effectively meant that 30 percent of all defects were unaddressed prior to Health Enterprise going live in Alaska.

104.     CW 2 recounted that a few days prior to Health Enterprise being launched in

Alaska, a big meeting was held with Xerox leadership, wherein Xerox leadership discussed the

fact that "Health Enterprise was not ready" for deployment and "was not going to work 100%" in

Alaska. However, Xerox leadership decided that, as with the New Hampshire system, the

Company would go live first and then attempt to resolve the defects with the system after it was

launched. CW 2 explained that the state client in Alaska was "shocked" at the large number of

defects that existed with Health Enterprise after it was launched on or about October 1, 2013.

### 4.   **Montana**

105.     On April 2, 2012, Xerox was awarded a $70 million contract to implement Health

Enterprise in Montana. The original implementation launch date was scheduled to be February

18, 2015.

106.     The Montana implementation experienced significant delays, as detailed in

documents obtained pursuant to Counsel's FOIA Request issued to Montana. For example, a

June 2013 report prepared for Montana by Public Knowledge LLC ("Public Knowledge")—a

third-party that provided IV&V services on the Montana project—reported that "***[t]he overall

project status is red*** due to . . . resource over-allocation, [and] ***design, development and system

testing delays***."

107.     That same month, a report prepared for the Montana Legislative Finance

committee confirmed these implementation issues:

> The ***overall project status is red***, which identifies that the project is
> experiencing both issues and risks that may affect the ability of
> Xerox (the MMIS DDI Contractor) to deliver the project on
> schedule. . . . The primary factors driving the project status are
> slipped or deferred work plan tasks, insufficient project resources
> with the required knowledge and expertise in the Health Enterprise
> solution, contractor delay in documenting existing system business
> rules, contractor design, development and testing delays related to
> the Health Enterprise solution.

108.    The Montana Legislative Finance report also explained that "Xerox will only receive payment when they successfully complete development for a functional area and demonstrate that the Health Enterprise solution has been configured to meet Montana RFP requirements and satisfies DPHHS business needs."

109.    Delays continued. An April 2014 Monthly Status Report prepared for Montana by Public Knowledge revealed that, as a result of the scheduling delays, Xerox had not been paid for its work.

110.    The April 2014 report also revealed that "Liquidated Damages have been accruing since Xerox missed their first Payment Milestone on November 5, 2013, per the approved project work plan and payment milestones. The liquidated damages will continue to accrue until the Xerox re-planned work plan and contract amendment #5 are approved. As of 4/16/14 the total accrued amount of liquidated damages is *$4,920,000*."

111.    Xerox implementation issues were confirmed again in a May 2014 report to the Montana Legislative Finance Committee, which stated that, "Public Knowledge . . . has reported *the Xerox MMIS DDI project performance status as 'Red' in all of their independent status reports since April 3, 2013*" and that "*Xerox has been engaged in a re-planning process since June 11, 2013 and the project has not made significant project progress as a result*."

112.    On June 18, 2014, a Montana state representative sent Xerox a notice that Xerox was in breach of the implementation contract, and that Montana's state health department had serious concerns about Xerox's ability to perform its obligations.

113.    After a series of contract amendments and extensions, the parties agreed, on July 18, 2014, to extend the contract for a planned go-live date of May 30, 2017.

114.    But, over the next year, the implementation continued to suffer from additional delays and cost overruns. On November 26, 2014, Montana issued a corrective action notice to Xerox. Then, on March 18 and May 15, 2015, Montana sent additional notices to Xerox that the Company was in material breach of its implementation contract for repeatedly missing deadlines.

115.    These delays resulted from the fact that Health Enterprise was not a transferable, reusable, replicable, and scalable platform with plug-and-play characteristics. Minutes from a May 20, 2015 Health Enterprise Systems Meeting, attended by representatives from the states of California, Montana, New Hampshire, North Dakota, and New York, revealed that, according to the Montana representative, "[p]roject staff is realizing that *Xerox staff does not know what the [Health Enterprise] system does,*" and that "[t]he [Health Enterprise] documentation that is received from Xerox does not reflect what the system does."

116.    As a result of these delays and related issues, the Montana Legislative Finance Committee commissioned Public Knowledge to conduct an audit of Xerox's performance under the implementation contract. The July 1, 2015 audit report found that, at the current average pace of completing work, it would take approximately 96 months to complete this project—well beyond the extended May 30, 2017 deadline. The report also concluded: "[I]f the project continues on its current trajectory, Montana would likely incur schedule delays, will cost more than originally budgeted, and will have post implementation issues or impacts." Xerox never completed its implementation in Montana.

117.    The delays and cost overruns experienced as part of the Montana implementation were attributable to Xerox not having a transferable, reusable, replicable, and scalable platform with plug-and-play characteristics as Defendants repeatedly represented to the public throughout

the Class Period. Instead, like the other state implementations, Xerox built a customized Health Enterprise system specifically for the Montana contract.

### 5. California

118.    In 2008, the California Department of Health Care Services ("California DHCS") solicited proposals for companies qualified to assume operational responsibility for California's MMIS, and to implement and operate a replacement system. According to information obtained pursuant to Counsel's FOIA Request issued to California, the state's MMIS had to be replaced because it was over 30 years old, its operations were inefficient, maintenance was difficult, and the risk of system failure was high. The system also did not comply with applicable standards.

119.    Xerox was the successful bidder. On March 18, 2010, California and Xerox entered into a $1.7 billion contract, pursuant to which Xerox would implement Health Enterprise.

120.    Xerox's implementation in California was plagued with delays and cost overruns similar to its prior implementation efforts because Xerox did not possess a transferable platform with plug-and-play characteristics. According to a February 2014 letter from the California State Auditor (the "2014 California Auditor Letter"), which Counsel obtained pursuant to its FOIA Request to California, in June 2013, officials from the California DHCS and Xerox reported in a special session of the California MMIS advisory group that the team working on the first phase of the replacement MMIS was not making expected progress in finalizing requirements. In particular, the California officials noted that Xerox "***project teams had essentially been proceeding as if they were developing new software, instead of determining how to adapt Xerox's existing software product to meet California's needs as originally intended***."

121.    Likewise, an August 2012 report prepared by the California MMIS Independent Project Oversight Consultant ("California IPOC")—an independent third party—reveals that the California contract experienced early delays. The report identified a lack of a schedule for the

project's design, development and implementation phases, and noted that "[d]elays in development of strategic Project and Process management foundation documents . . . will most likely result in schedule delays and impact work product quality."

122.    A December 2012 California IPOC report identified similar issues, concluding that "[b]ased on our assessment of the current [MMIS system replacement] schedule, the overall project performance [against the schedule] will most likely continue in the negative."

123.    Other reports revealed that Health Enterprise never was a transferable, reusable, replicable, or scalable platform with plug-and-play characteristics. An October 2014 California IPOC report complained of a "lack of [Health Enterprise] Platform/Product design and insufficient technical design information." The report also revealed that the implementation was not making expected progress.

124.    That Xerox did not have a transferable platform with plug-and-play characteristics was confirmed months later, in a March 2015 California IPOC report, which stated:

> *[L]ack of HE platform/product design represents a catastrophic risk (High Severity) to the project*. Originally opened in October 2014, during Release 1 implementation (Single Sign-on) into production, with the intent to raise awareness, *the project has been unable to adequately convey what functionality is being provided by the baseline Xerox Health Enterprise (HE) Platform, versus what functionality is being developed by Xerox California Platform Group and/or SRP Delivery team* . . . .
>
> With Release 1, scheduled to complete in May 2015, Release 2 planned for its first implementation in June, 2015, and Release 3 now in progress, *it is increasingly important that Xerox provide system architecture documentation that fully describes how the HE platform/project is open, scalable, extensible, flexible and consistent with the MITA guidelines*. Failure to address these architecture deficiencies, may cause schedule delays and costly rework . . . .
>
> California is 78% greater than New Hampshire. *Xerox concludes that to remediate the gap, multiple projects will need to be defined, and may include 'hardware, configuration, tuning of*

- 37 -

> *existing programs, redesigns, and re-architecture of system components*.'

125.    In addition to citing the "lack of HE platform/ product design" as a "catastrophic risk" to the implementation project, the March 2015 California IPOC report provides additional evidence of the lack of a reusable platform by citing the need for redesign and re-architecture of core components—remedies that would be unnecessary if Xerox had transferable, reusable, replicable, and scalable platform with plug-and-play characteristics. Moreover, the report indicates that Xerox had not provided documentation describing how the purported Health Enterprise platform is "open, scalable, extensive, [and] flexible"—basic features of any such platform.

126.    The California IPOC reports grew more emphatic as it became clear to California that Health Enterprise was not the transferable platform with plug-and-play characteristics that Xerox had marketed to the state. In April 2015, the California IPOC concluded that although Xerox had marketed Health Enterprise as a "transfer system" that was "reliable, flexible, scalable, and easy to modify system design," it turned out that this was untrue. The report explained:

> *Xerox's continuous inability to provide sufficient architectural documentation and/or communication related to the code, design, interdependencies, constraints, and other key documentation are an indication of an incomplete, or even worse, immature product*. . . . With the Corrective Action Plan (CAP) response due on May 7, the department should immediately receive the information requested from the said "transfer system" and it should not include a plan to create documents, rather an understanding from the New Hampshire system and a process in place to address architecture throughout the System Development Life Cycle (SDLC). *By not producing these documents in a timely manner is concerning [sic], as it would question the maturity and existence of a true transfer system*.

127.    The next month, the California IPOC confirmed that Health Enterprise was not a

true transfer system, *i.e.*, a system that could easily be transferred from state to state. The May

2015 California IPOC report concluded that Health Enterprise "***was heavily marketed as a***

***transfer system, but appears to be a custom build based on the collective merging of code from***

***California, Montana, Alaska, and New Hampshire***."

128.    That same month, on May 21, 2015, the Assistant Deputy Director of the

California DHCS, MMIS Division sent an email to representatives of Xerox that further revealed

that Xerox never had a transferable, reusable, replicable, and scalable platform with plug-and-

play characteristics and was instead building a custom system for each state. The email stated:

"***[w]e need to be transparent that this application is . . . a custom built application for***

***California***" and what Xerox was implementing was not "***anywhere close to a scalable product***."

129.    Xerox's lack of a transferable platform with plug-and-play characteristics was

further documented in a September 2015 California IPOC report, which explained that Xerox

was implementing "an alleged 'transfer' system from New Hampshire" that was intended "to

provide other states reliable, flexible, scalable, and easy to modify system design." However, the

report explained, "***[t]here has been no indication the SRP [system replacement project] is***

***aligned to any of the recognized frameworks cited in the [Narrative Technical Proposal]***."

130.    As a result of Xerox never actually having a reusable platform with plug-and-play

characteristics to implement in California, the California implementation experienced delays,

cost overruns and a lack of profitability for the Company (in fact, Xerox ***lost money*** on the

contract). The 2014 California Auditor Letter explained that, as of February 2014, California had

"not paid Xerox for any of its work on the system replacement project because Xerox ha[d] not

yet submitted any deliverables that require[d] a payment under the contract." An April 2015

California IPOC report further revealed that "[n]o dollars ha[d] been reported as paid to Xerox" for its implementation work.

131.    By May 2015, Xerox still had not been paid. The May 2015 California IPOC report disclosed that, "Xerox ha[]d not been able to deliver business value . . . ***nor ha[d] any payment been approved for delivery of any business functionality***."

132.    On September 22, 2015, the Assistant Deputy Director of the California DHCS, MMIS Division sent a letter to Xerox, stating: "[t]he purpose of this letter is to notify Xerox State Healthcare, LLC (Xerox) that it is out of compliance with Contract 09-86210 (Contract). Specifically, Xerox has been unable to timely design, develop, and implement Release 2.0 of the System Replacement project by the agreed upon deferred schedule date of September 21, 2015."

133.    The September 22, 2015 letter identified a number of issues that plagued the California implementation, including "[a]rchitectural design deliverable deficiencies" and "[s]ource code deficiencies," and also stated: "[The California DHCS] expects that Xerox will provide recompense to [the California DHCS] for the costs and damages that [the California DHCS] is incurring as a result of this delay." Both of these deficiencies are consistent with a MMIS in design as opposed to a transferable, reusable, replicable, and scalable platform with plug-and-play characteristics. Xerox never completed its implementation in California.

134.    In April 2016, California terminated its contract with Xerox as a result of the cost overruns and scheduling delays.

135.    On April 11, 2016, Xerox and DHCS entered into a Settlement Agreement to resolve claims arising out of the Company's failed Health Enterprise implementation. Under the terms of the settlement, Xerox was required to (i) pay DHCS $123,303,571; (ii) provide

$15,000,000 worth of hardware and software to DHCS; and (iii) release claims valued at $5,000,000.

### 6.   New York

136.   On June 25, 2013, the New York State Department of Health ("New York DOH") solicited RFP responses for a contractor to replace New York's current MMIS.

137.   Xerox responded to the New York DOH RFP in November 2013.

138.   On April 20, 2015, Xerox formally announced that it was awarded a $564.9 million, five-year contract with the New York DOH to implement Health Enterprise.

139.   On April 24, 2015, Xerox assured its investors that the New York implementation would not suffer from the same problems that plagued the Company's other Health Enterprise implementations. As alleged below in ¶¶ 270 and 297, Defendants admitted on April 24, 2015 that the Company's prior Health Enterprise contracts were not implementations of a transferable, reusable, replicable, and scalable platform with plug-and-play characteristics, and that as of this date, Xerox was still "***working to consolidate the customized instances [of Health Enterprise] into a standardized platform***." In light of this admission, Defendants distinguished the New York contract by assuring investors that the New York contract was "***bid [with] an already-working system***" and "***starting from a working code base rather than starting from something that was still in design***."

140.   As alleged below in ¶¶ 247-51 and 262-73, the New York project was never completed. The ultimate failure of Xerox (and its successor Conduent Incorporated) to successfully implement Health Enterprise in New York confirms that Xerox never had a transferable platform with plug-and-play characteristics to offer, and instead was attempting to custom-build a MMIS system for each implementation contract.

## V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.   Defendants Issued Three Categories of Materially False and Misleading Statements

141.   As alleged above, each of Xerox's Health Enterprise implementation contracts experienced significant cost overruns and delays, with most ultimately failing. Defendants, however, made materially false or misleading statements during the Class Period that: (i) Xerox had a platform that was transferable, reusable, replicable, and scalable, and possessed plug-and-play characteristics; (ii) the Health Enterprise implementations were successful and/or going well; and (iii) those implementations had become and/or would be profitable due to the transferable and low cost nature of the Health Enterprise platform. Set forth below is an overview of the three categories of materially false or misleading statements that were central to Defendants' scheme to perpetuate the myth of Xerox's successful transformation into a service-centered company. Each of the statements that Lead Plaintiff alleges was materially false or misleading when made, and the facts demonstrating why each such statement was materially false or misleading when made, are alleged below in Section V.B.

#### 1.   Xerox Falsely Claimed that it Possessed a Platform that was Cost-Efficient, Transferable, Reusable, Replicable, Scalable, and had Plug-and-Play Characteristics

142.   Throughout the Class Period, Defendants represented that Health Enterprise was a transferable, reusable, replicable, and scalable platform with plug-and-play characteristics that could be implemented easily and cost effectively in any state Medicaid environment. While referring to Health Enterprise as a "platform," Defendants represented that it was a pre-built product that could be readily transferred from state to state, requiring only minor adaptations to meet a state's specific requirements. Health Enterprise's putative "plug-and-play" characteristics denoted that it was more cost-effective than designing a new system for each implementation,

and was a basis for Xerox's claims that it was transforming into a services-centered company with improved profit margins and competitive advantages.

143.    For example, on April 23, 2012, Xerox issued a press release announcing its first-quarter 2012 earnings results. On a related earnings call that same day, Defendant Blodgett discussed significant investments that had been made to develop Health Enterprise into a transferable, reusable, replicable, and scalable, and thus profitable, "platform": "*we are shifting a lot of our work to platforms . . . our new MMIS platform that was a significant investment is the kind of thing that will help drive higher margins*."

144.    Despite Defendants' knowledge that Health Enterprise was not such a platform, and had to be customized at a high cost for each implementation, Defendant Blodgett specifically described Health Enterprise as a "platform" that could easily be transferred from state to state:

> *It's the first new MMIS system that's been built in 15 years, and it's compliant with all of the new regs and everything; that is a major, a major accomplishment to get that in and as we put applications or states on that new platform we'll see improved margins*.

145.    On May 17, 2012, Defendant Maestri further reiterated the transferability and scalability of the purported "platform":

> [W]e have spent a significant amount of money during 2010 and 2011 to deliver a specific platform to deliver health care processing services to the states here in the U.S.
>
> And so obviously, *now that we got the platform, we can reuse that platform as we acquire new contracts, and therefore our cost of delivery of those contracts are going to be significantly lower than what our competitors can offer*.

146.    Xerox used its 2012 Investor Conference, held on November 13, 2012, to again misleadingly characterize Health Enterprise as a transferable, reusable, replicable, and scalable platform with plug-and-play characteristics, stating that "[t]his idea of platform is something that

we spend a lot of time talking about that it's important that you understand that ***helps us differentiate ourselves from our competitors*** around the world. Platforms across the board help us to have ***repeatable solutions***."

147.    Months later, on February 12, 2013, at the Goldman Sachs Technology & Internet Conference, Defendant Blodgett asserted that because Health Enterprise was a "platform," it provided the Company with a unique product that helped the Company acquire new business:

> I think we win [contracts] because we have great technology. People look at our platforms and they realize that this stuff is pretty complicated. ***Our Medicaid platform has six million lines of code in it***. And, there hasn't been a new Medicaid system that's been developed for a long time, over a decade. ***And now, so as we demonstrate that to people, they can, they are experts, they look at it and say, wow, it has functionality and features that are unique***.

148.    On March 7, 2013, the Company hosted analysts and investors at its Healthcare Services Analyst Day, during which Defendant Scanlon represented that Health Enterprise provided Xerox with a "competitive advantage" over its peers because it was a singular "***plug-and-play***" platform.

149.    Analysts, like investors, were duped and thereby encouraged by the Company's healthcare services prospects and the claim that the Company's investments in Health Enterprise provided Xerox with a supposed competitive advantage. For example, analysts at J.P. Morgan reiterated Defendant Scanlon's March 7 comments in a report issued on the same day: "***Medicaid platform provides a competitive advantage in government health***."

150.    Similarly, an August 16, 2013 report from Piper Jaffray stated:

> **Platform Solutions Offer Scale, Leverage.** Platform solutions in services involve software, systems and processes ***that can be extended to additional customers with little incremental investment***. Notable platform solutions include Xerox's Medi-Cal . . . Platform solutions represent a low-risk source of services revenue growth and significant source of margin leverage for

Xerox. Growth in platform solutions, along with healthcare, is an important source of sustainable mid-to-high single digit revenue growth in services.

151.    In 2014, Defendants continued to promote the purported replicable nature of Health Enterprise. For example, on March 11, 2014, Defendant Mikells stated: "last year, we implemented our new MMIS platform, which we call Health Enterprise, in both Alaska and New Hampshire."

152.    Notwithstanding consistent statements over several years that Xerox had a transferable, reusable, replicable, and scalable platform that had plug-and-play characteristics, on April 24, 2015, Xerox admitted that no such platform had actually existed. For example, Defendant Zapfel on a Company conference call conceded: "***We're working to consolidate the customized instances into a standardized platform that would then be less costly to implement and manage going forward***."

153.    Thereafter, as alleged below in ¶¶ 286-92, Xerox spun off its entire MMIS business into Conduent Incorporated, which ultimately failed to successfully implement Health Enterprise, demonstrating that at no point in time did Xerox ever have the platform it described to investors during the Class Period.

## 2.    Xerox Falsely Represented That Its Health Enterprise Implementations Were "Going Well"

154.    As alleged in detail above: (i) Health Enterprise never was a transferable, reusable, replicable, or scalable platform with plug-and-play characteristics that Xerox could easily replicate and readily implement in multiple states and (ii) contemporaneous state records and statements from the Confidential Witnesses show that the Health Enterprise implementations were riddled with delays and cost overruns. Faced with these facts, Defendants nevertheless

made materially false or misleading statements to reassure investors throughout the Class Period that the Health Enterprise implementations were proceeding smoothly.

155.    For example, on May 23, 2012, Defendant Blodgett publicly touted the status of the California Health Enterprise implementation: "We're happy **the State of California implementation has gone very well** . . . . So we're confident that just the natural progression will bring margins up."

156.    Defendants also touted the success of Xerox's other implementation contracts. On October 24, 2013, during an investor conference call, Defendant Mikells stated: "***We're very pleased with the successful implementation of these platforms, with Alaska [MMIS] . . . launched successfully this past quarter***." Defendant Mikells also added on the call, "We were incredibly pleased that we've been actually standing up the new MMIS systems successfully."

157.    During an April 22, 2014 earnings call conducted to discuss Xerox's first-quarter 2014 earnings results, Defendant Burns again described the Health Enterprise implementation as a success: "***California is going fairly well, and MMIS is actually going pretty well and we're now at the point where we're starting to lean out our implementation on California and drive it to increased profitability***."

158.    Even as late as November 11, 2014, at Xerox's annual investor conference, Defendant Zapfel presented a slide that described the Health Enterprise implementations in New Hampshire and Alaska as "performing well," and described the California contract as "progressing well overall."

159.    Notwithstanding the contemporaneous documentation, corroborated by the Confidential Witness statements herein, that existed at the time of the foregoing public

statements, demonstrating that the implementations in California, Montana, North Dakota, and Alaska were plagued with problems, investors were kept in the dark.

> ### 3.   Xerox Falsely Claimed that the Health Enterprise Implementations Were Profitable and Poised to Deliver Additional Profits

160.   Throughout the Class Period, analysts and investors paid particularly close attention to Xerox's Services segment margins—the strength of which depended significantly on the success and cost-effectiveness of the Health Enterprise implementations. To assure investors that Services segment margins were improving, Defendants represented that Xerox's costs associated with the implementation of the purportedly transferable Health Enterprise platform were start-up investments that would materially decline with subsequent state implementations. Defendants further represented that this decline in costs was resulting in and would continue to drive increased profitability at the Company.

161.   In reality, the implementation costs continued to escalate, and Xerox's Services segment margins suffered throughout the Class Period, because Xerox had to build a custom Health Enterprise system for each state implementation. This customization-required process for each implementation led to significant costs and delays, thereby adversely affecting the Company's Services segment margins. Despite this private reality, Defendants repeatedly assured investors that Xerox was recognizing and was poised to recognize profits from the implementation of Health Enterprise in customer states.

162.   For example, on April 23, 2012, the first day of the Class Period, Defendant Maestri explained that Defendants paid particularly close attention to the Health Enterprise implementations and that, based on their firsthand knowledge of putatively current facts, Defendants assured investors that Health Enterprise would improve Service Segment margins:

> "We essentially follow these contracts, and I'll let Lynn [Blodgett] expand on it, *but we follow all these contracts at the granular*

*level* so each one of them, and we've got specific, you know, actions for all of them, starting from California, but all the other big ones that we are starting up and I think it's just going to be the way that we go through the year that some of *those [margin] pressures are going to mitigate as we actually get these contracts to a steady state*."

163.    Similarly, on May 23, 2012, Defendant Blodgett told investors that Services margins "are of *critical, critical importance* to [the Company]," and informed investors that because Xerox made "investments" during the early implementations of Health Enterprise, implementation costs were decreasing:

> *We're happy the State of California implementation has gone very well* and we're just working now through the—*you kind of go through the stage of assimilating it, then you go through the refining process where you can help bring down costs . . . . So we're confident that just the natural progression will bring margins up*.

164.    By 2013, despite Defendants' representations that investment costs were in the past and Health Enterprise, as a reusable platform with plug-and-play characteristics, created an environment for improved margins, Xerox continued to experience increased costs associated with implementing Health Enterprise, which put pressure on margins. Rather than reveal the truth—*i.e.*, that the ever increasing costs arose from having to build a custom system for each implementation—Defendants continued to encourage investors to remain patient, assuring the market that because Health Enterprise was a transferable platform, implementation costs would decline with each new implementation, leading to increased margins.

165.    For example, on October 24, 2013, Defendant Mikells stated: "We've had a little more pressure on margins as we have stood up some of these new platforms. That's not unusual, *but these things are now going to become for us repeatable processes*, right? We will get better because of experience and *we'll get better because of scale*."

166.    Although Services segment margins were still not improving, Defendants assured

investors that, even with high implementation costs in 2013, moving into 2014 the Company had

become more efficient at implementing the supposed Health Enterprise platform. On January 24,

2014, when the company revealed continued margin pressure as a result of "healthcare platform

expenses coming in above [the Company's] original forecast," Defendant Burns assured

investors that the investments in Health Enterprise would pay off:

> *And so throughout 2014, this significant investment that we're*
> *making—that we made in 2013 and in the tail-end of 2012,*
> *should start to pay off* with more accretive performance—
> accretive results to the company.

167.    On April 22, 2014, Defendant Burns again assured investors that the Health

Enterprise investments were paying off and generating profits:

> . . . California is going fairly well, and MMIS is actually going
> pretty well and we're now at the point where we're starting to lean
> out our implementation on California and drive it to *increased*
> *profitability*.

168.    Analysts relied on Defendants' representations that the Company's prior Health

Enterprise-related investments would improve Services margins. Analysts at Piper Jaffray, for

example, in an April 22, 2014 report, stated: "*We view the implementation spend as investing*

*for long-term growth and returns in Xerox's healthcare and broader services business*.

Healthcare margins have a history of being margin accretive, so we see these investments as a

precursor to margin upside over time."

169.    On July 25, 2014, Defendant Burns again asserted that the California Health

Enterprise implementation had achieved profitability and was poised for even greater

profitability:

> California for example, we have been able to literally move that
> contract from investment phase to *flat profitability*, now to looking

for growing profitability in a very predictable kind of a standard
way.

170.     Despite Defendants' statements that the Health Enterprise implementations were

and would continue to be profitable because Xerox had invested in a purported platform, as

alleged in Sections IV and VIII, Defendants knew that their statements were false or misleading

and/or without a reasonable basis because Xerox did not have the completed Health Enterprise

platform required to control and reduce implementation costs.

**B.     Defendants' Class Period Misstatements And Omissions**

**1.     The April and May 2012 False or Misleading Statements**

171.     On April 23, 2012, Xerox held a conference call with analysts and investors to

discuss the Company's first-quarter 2012 financial results. Analysts were focused on the

Company's Services margins, as Xerox had previously reported that its operating margins would

be under pressure in the first half of 2012 due to startup costs associated with Health Enterprise

implementation contracts. Defendant Blodgett allayed these concerns by touting the Company's

investments in Health Enterprise as "the kind of thing that will help drive higher margins":

> We are doing a number of things, we think, to continue to drive
> margin improvement. . . . *[W]e're shifting a lot of our work to*
> *platforms, our new MMIS platform that was a significant*
> *investment is the kind of thing that will help drive higher*
> *margins*.

172.     Defendant Blodgett described Health Enterprise as a "platform"—meaning it was

transferable, reusable, replicable, and scalable, had plug-and-play characteristics, and could

easily be implemented in other states—which would help drive improved margins:

> Yeah, the other thing that's happening is that the use of the
> platforms that we've made significant investments in, you know,
> *the MMIS application that has taken us a long time to build. It's*
> *the first new MMIS system that's been built in 15 years, and it's*
> *compliant with all of the new regs and everything; that is a*
> *major, a major accomplishment to get that in and as we put*

- 50 -

> ***applications or states on that new platform we'll see improved margins***.

173.    Analysts relied on Defendants' assertions that Xerox had actually built the purported "platform" and that the "investments" associated with developing Health Enterprise would abate and lead to increased margins going forward, thereby demonstrating their materiality. For example, a Credit Suisse report issued on April 24, 2012 noted that "[f]or the full year, management continues to expect mid-to high single digit revenue growth and OMs [operating margins] flat to up slightly. ***Services OMs are expected to improve sequentially through the year as pressure from upfront investments associated with contract ramps abates***."

174.    On May 17, 2012, during the Company's presentation at the J.P. Morgan Global Technology, Media, and Telecom Conference, Defendant Maestri continued to tout Health Enterprise and the positive impact it was supposedly having on the Company's operating margins:

> [A]s we enter 2013, we're going to be entering at a significantly higher level of operating margins on the services side. And the reason for that is that, a lot of the start-up cost, the ramp being of – ***the investment in platforms that we made on some of the services business have already taken place and now we're getting to a much more normalized level of margins on a lot of these new contracts***.

175.    Defendant Maestri specifically represented that Health Enterprise was a platform, meaning it was "reus[able]," and one that would lead to a competitive advantage given the purportedly lower costs to Xerox of delivering its singular "platform" to new states:

> [W]e've made platform investments that our competitors have not made. So for example, we have spent a significant amount of money during 2010 and 2011 to deliver a specific platform to deliver healthcare processing services to the states here in the U.S. ***And so obviously, now that we've got the platform, we can reuse that platform as we acquire new contracts, and therefore our cost of delivery of those contracts are going to be significantly lower than what our competitors can offer***.

176.     Investors were encouraged by these representations. Analysts at J.P. Morgan, in a

May 17, 2012 report, noted:

> Based on the company's comments during the presentation, we
> believe that Xerox is on verge of a positive inflection point
> whereby services signings start to convert to meaningful profit and
> cash flow contribution. . . . In our view, *the company signaled that
> the model impact from the start-up costs should start to taper off
> later this year and next, setting the stage for better profit* and cash
> flow contribution.

177.     The statements set forth above in ¶¶ 171-72 and 174-75, touting Health Enterprise

as a transferable, reusable, replicable, and scalable platform with plug-and-play characteristics

that had already been developed and therefore could be easily deployed in multiple states, were

materially false, or misleading because Defendants failed to disclose material information, when

made. Rather than constituting a singular "platform" that Defendants could readily "reuse" to

"put . . . states on," as set forth in this paragraph and in paragraph 178 below, Defendants knew

or recklessly disregarded that Health Enterprise was not a transferable, reusable, replicable, or

scalable platform with plug-and-play characteristics at all, and that instead, a custom system had

to be built for each implementation, as evidenced by the following:

a.  On April 24, 2015, Defendant Mikells *admitted* that "[w]ith the exception of
    the New York Medicaid contract," which the Company signed on April 20,
    2015, "these [MMIS] deals were signed before we finished development of
    the core software platform" and "in advance of our standard [Health
    Enterprise] platform being completed."

b.  On April 24, 2015, Defendant Zapfel *admitted* that the Company was working
    as of that date to create a replicable platform, *i.e.*, as of April 24, 2015, the
    Company was working "to consolidate the customized instances into a
    standardized platform" because for "the previous contracts we [had] not yet
    completed the code base."

c.  A February 25, 2014 Letter Report from the California State Auditor that
    found that the Company's "*project teams had essentially been proceeding as
    if they were developing new software*, instead of determining how to adapt
    Xerox's existing software product to meet California's needs as originally
    intended."

d.  A March 2015 California IPOC report that found that one "catastrophic risk" to the California Health Enterprise implementation was the fact that throughout the project the Company "***has been unable to adequately convey what functionality is being provided by the baseline Xerox Health Enterprise (HE) Platform, versus what functionality is being developed by Xerox" for California***.

e.  An April 2015 California IPOC report, which noted that the Company's Narrative Technical Proposal ("NTP") marketed Health Enterprise as a "reliable, flexible, scalable, and easy to modify system design," and found that "Xerox's continuous inability to provide sufficient architectural documentation and/or communication related to the code, design, interdependencies, constraints, and other key documentation are an indication of an incomplete, or even worse, immature product" and raised questions as to the "***existence of a true transfer system***."

f.  A May 2015 California IPOC report, which found that "[i]n review of the NTP, ***the system was heavily marketed as a transfer system, but appears to be a custom build based on the collective merging of code from California, Montana, Alaska, and New Hampshire***."

g.  Minutes from a May 20, 2015 Health Enterprise Systems State User Group meeting, attended by representatives from California, Montana, New Hampshire, North Dakota, and New York (all states where Xerox had or was attempting to implement Health Enterprise), in which the Montana representative stated that the Montana "[p]roject staff is realizing that ***Xerox staff does not know what the [Health Enterprise] system does,***" and that "[t]he [Health Enterprise] documentation that is received from Xerox does not reflect what the system does."

h.  A May 21, 2015, email from the California DHCS Assistant Deputy Director of the CA-MMIS Division to the Company stating that "***[w]e need to be transparent that this application is . . . a custom built application for California***" and that the purported platform Xerox was building was not "***anywhere close to a scalable product***."

i.  A September 2015 California IPOC report that found that although the Company was supposed to be "implement[ing] an alleged 'transfer' system from New Hampshire" with a "reliable, flexible, scalable, and easy to modify system design. ***There has been no indication the SRP [system replacement project] is aligned to any of the recognized frameworks cited in the NTP***."

178.    Confidential Witnesses confirm that, contrary to Xerox's public statements during

the Class Period, Xerox did not possess a transferable, reusable, replicable, and scalable platform

with plug-and-play characteristics that could be implemented easily in any state Medicaid environment.

(a)     CW 1, who worked for ACS from 2009 until it was acquired by Xerox in 2010, and who was the Director of Software Systems Development on the North Dakota Health Enterprise implementation from 2012 to 2013, stated that based on information CW 1 received from Xerox management during CW 1's tenure, including from the software architects who developed the Health Enterprise code, the original concept for Health Enterprise was to develop a transferable, scalable, plug-and-play MMIS product. CW 1 explained that when CW 1 joined Xerox in 2010, there was a "big push" by Xerox to create a standard MMIS product they could sell from state to state. The "dream" was to have a standalone product, but Xerox started concurrent projects before the base product was completed. As a result, CW 1 explained that "there was no product to transfer." CW 1 explained that the transferable Health Enterprise that Xerox promised never materialized. Instead, according to CW 1, Xerox "imported" the code that had been developed for the New Hampshire Health Enterprise implementation, which CW 1 stated suffered from "tens of thousands of defects." As a result, the North Dakota Health Enterprise suffered from extensive problems, which CW 1 attributed to the defective and immature code base imported from New Hampshire.

(b)     CW 2 explained that prior to Xerox acquiring ACS, the vision for Health Enterprise was that of a plug-and-play product, that would be transferable and scalable from state to state. In reality, CW 2 never saw any evidence that Health Enterprise was such a product. CW 2 explained that the New Hampshire Health Enterprise implementation was the "pilot" for Xerox's Health Enterprise program. Health Enterprise was "initially supposed to be a canned product customizable for each state, but that failed." CW 2 knows this because as part of CW 2's

role as a Manager responsible for testing and quality assurance on the Alaska Health Enterprise implementation, CW 2 constantly interacted with all phases of Xerox's software development teams. According to CW 2, after the original idea for Health Enterprise failed, Xerox decided to take the Health Enterprise code that had been developed for New Hampshire and try to use it for other state Health Enterprise implementations. CW 2 explained that in 2010, Bratton was very vocal about the fact that Xerox's plan to share New Hampshire's base code with other states was not working and that Xerox needed to go back to the original plan of developing a transferable Health Enterprise platform. Attempting to adjust the New Hampshire code to fit other states was causing problems and delays with other implementation projects, such as the Alaska implementation, because Xerox was still developing fixes for the New Hampshire code while simultaneously trying to adapt it for use in other states. As a result, the testing for the Alaska Health Enterprise implementation began a year late, leading to problems after the project went live. CW 2 knows this because CW 2 responsibilities included testing on the Alaska project. CW 2 explained that the "serious issues" experienced by Xerox in attempting to utilize the New Hampshire Health Enterprise code for other state implementations were "very well known" at CW 2's level in the Company.

179.     Defendant Maestri's representations that the Company's current Health Enterprise implementations were profitable because Xerox had gotten to a "normalized level of margins" or "a steady state," were materially false, or misleading because Defendant Maestri failed to disclose material information, when made. As Defendant Maestri, the Company's CFO, knew or recklessly disregarded, the Company was not receiving *any* revenue for its implementation of either the California or the Montana MMIS replacement system as of the date of his statements. In fact, these contracts were generating losses due to the material expenses that were being

incurred to customize Health Enterprise for each state system, as evidenced by the following

later findings, each of which reflected conditions that existed as of the time of the foregoing

representations and thereafter:

    a.  On October 26, 2015, Defendant Mikells *admitted* that the Company's California and Montana Health Enterprise "***implementations were generating losses***."

    b.  On October 26, 2015, Defendant Burns *admitted* that the Company's California and Montana MMIS contracts "***were at a loss***."

    c.  The 2014 California Auditor Letter (sent on February 25, 2014), which documented that as of the date of the report, and thus as of the dates of the foregoing misstatements, the California DHCS "has not paid Xerox for *any of its work* on the system replacement project because Xerox has not yet submitted any deliverables that require a payment under the contract."

    d.  An April 2014 California IPOC report that found that as of April 2014, "[n]o dollars have been reported as paid to Xerox for DDI [design, development, and implementation] work."

    e.  A May 2015 California IPOC report that found that "to date Xerox has not been able to deliver business value to the stakeholders, nor has any payment been approved for delivery of any business functionality."

    f.  A November 15, 2014, report to the Montana Legislative Finance Committee that documented that as of that date, Xerox had not been paid any money related to the contract payment milestones for the Montana Health Enterprise implementation.

180.    On May 23, 2012, the Company met with analysts and investors at the Barclays

Capital Global Technology, Media, and Telecommunications Conference. Defendant Blodgett

again stressed the importance of the Company's Services margins, stating that "[o]bviously, the

***[services] margins are of critical, critical importance to us***." Defendant Blodgett further

represented that any pressure on the Company's Services margins was short-lived because "the

sole driver of margin declines had to do with the significant step-up in bookings and in growth

rate," and that this growth "was driven almost exclusively by the State of California," referring

to the ongoing implementation of Health Enterprise in that state.

181.    Defendant Blodgett further assured investors that because the California Health

Enterprise implementation purportedly "ha[d] gone very well," the margin pressure associated

with startup costs under this contract were in the past:

> So we knew that we'd see some downward pressure [on margins].
> The way that that becomes resolved is that we just continue to
> work through the startup phase. ***We're happy the State of
> California implementation has gone very well and we're just
> working now through the – you kind of go through the stage of
> assimilating it, then you go through the refining process where
> you can help bring down costs and then you really go to the
> ultimate full implementation phase of it. We're right in the
> middle of those. So we're confident that just the natural
> progression will bring margins up.*** We expect to see a slight
> uptick from the last quarter, see it again next quarter, and then by
> fourth quarter we'll be exiting out of our – more of our target run
> rate for margins.

182.    Investors were again encouraged by the Company's representations about margin

improvement in the Services segment. Analysts at BMO Capital Markets, for instance, in a June

18, 2012 report, explained: "We expect the margins for services business to improve q/q for the

next three quarters as the negative impact from new projects declines."

183.    The statements set forth above in ¶¶ 180-81 were materially false, or misleading

because Defendants failed to disclose material information, when made. In particular, Defendant

Blodgett's statements that the Company's Health Enterprise implementation in California "ha[d]

gone very well," and that the Company was "in the middle of" a "natural progression" towards

"the ultimate full implementation phase," were materially false or misleading because they

omitted material facts about the Company's unsuccessful attempt to implement Health Enterprise

in California. Later findings reflecting conditions that existed throughout the Class Period,

including at the time of the foregoing public representations, demonstrate that there was no

reasonable basis to expect near term improvement in margins as of the time of those statements:

    a.   An August 2012 California IPOC report, which found that one "high risk" item was the lack of a schedule for the project's design, development and implementation phases. The report also notes that "delays in development of strategic Project and Process management foundation documents . . . will most likely result in schedule delays and impact work product quality."

    b.   A December 2012 California IPOC report, which concluded that "[b]ased on our assessment of the current [MMIS system replacement] schedule, the overall project performance [against the schedule] will most likely continue in the negative."

    c.   The following California IPOC reports, which demonstrate that the California Health Enterprise system was not successfully being implemented as of the date of the alleged misstatements:

        i.   A January 2013 IPOC report, which found that the system technical architecture of the Company's planned California MMIS replacement system was "inadequately defined," meaning that it lacked the necessary "diagrams . . . and narrative[s]" representing both the current system and the proposed replacement system, and that this deficiency was "impacting . . . the ability of DHCS and other stakeholders to make informed decisions as they carry out their oversight, review and management responsibilities for all phases of the [system replacement project]."

        ii.   An October 2014 IPOC report, which found that the problems noted in the January 2013 IPOC report remained open issues as of October 2014, and had been elevated to a "high criticality level" due to the lack of progress. In April 2015, IPOC reported that it still "ha[d] not seen any consistent architecture methodology used to . . . architect the system to meet the business needs."

        iii.   A May 2013 IPOC report, which documented that on April 8, 2013, California DHCS denied the Company's change order request to extend the ***first phase*** of the California replacement MMIS project from 18 months to 29 months at an additional cost of over $29 million. The May 2013 report concluded that the Company's "manner of execution and the complications encountered in ***implementing*** their [system development] methodology has raised concerns that the current Xerox teams and staff may not adequately understand the approved methodology,

may not have sufficient experience with the methodology, or are not properly and consistently applying the methodology."

    iv.   A September 2015 IPOC report, which found that "[t]he project *has endured challenges since the beginning* of the Design, Develop and Implementation (DDI) effort," due to the fact that "Xerox lacks knowledgeable staff to complete the application architecture work required to build the replacement system" and that "[m]ost of the Design documentation are either incomplete, deficient or have not been developed."

   d.   A September 22, 2015 letter from the Assistant Deputy Director of the California DHCS letter to Sanjeev Balsara, the Executive Program Director of the Company's California Health Enterprise implementation, "notif[ying] Xerox . . . that it is out of compliance" with the California contract based on the fact that "*Xerox has been unable to timely design, develop, and implement*" a MMIS replacement system in California. The letter identified numerous issues affecting the project, including "Xerox's demonstrated inability to satisfactorily respond to" corrective action plans related to system "[a]rchitectural design deliverable deficiencies," and "[s]ource code deficiencies."

## 2.   The November 2012 False or Misleading Statements

184.   On November 13, 2012, at the Company's annual Investor Conference, Defendant Burns emphasized the importance of the Company's purportedly replicable Services platforms to the Company's success, stating that "developing repeatable solutions into [sic] very complex problems" was an "area of strength" for the Company and that "[t]his is all about platforms":

> This idea of platform is something that we spend a lot of time talking about that it's important that you understand that helps us differentiate ourselves from our competitors around the world. *Platforms across the board help us to have repeatable solutions.*

185.   Defendant Burns singled out Health Enterprise as an example of such a "repeatable solution[]" and Defendant Blodgett represented that Health Enterprise was a platform, stating, "[w]e have [a] platform we call Enterprise. Enterprise is the newest Medicaid platform."

186.     The statements set forth above in ¶¶ 184-85, touting the competitive advantages

of Health Enterprise, were materially false, or misleading because Defendant Burns failed to

disclose material information, when made. Rather than constituting a "platform" that Xerox

could provide as a "repeatable solution[]" for use in other states, for the reasons set forth above

in ¶¶ 177-78, Defendants Burns and Blodgett knew or recklessly disregarded that Health

Enterprise was not a transferable, reusable, replicable, or scalable platform with plug-and-play

characteristics at all, and instead, a custom system had to be built for each implementation.

### 3.     The December 2012 False or Misleading Statements

187.     On December 7, 2012, during the Company's presentation at the BMO Capital

Markets IT Services Day, analysts continued to focus on the progress of the Company's Health

Enterprise implementations and its impact on profit margins. The following exchange occurred

between Keith F. Bachman ("Bachman"), a BMO analyst, Defendant Bywater, and Jennifer

Horsley ("Horsley"), the Company's Director of Investor Relations:

> BACHMAN: [A]bout the State of California, can you give us an
> update on where you are and how you see that margin profile
> progression for that one area?
>
> BYWATER: Yeah, great client, very large client. ***I think it's
> operating well. We're continuing to drive efficiencies into that
> business and I'm encouraged by the trend, very encouraged by
> the trend on that business unit***.
>
> BACHMAN: My impression was it was going to turn a profit in
> the December quarter?
>
> BYWATER: ***It's definitely getting closer. So it's improving***.
>
> HORSLEY: Yeah, and I don't think we've given of late any
> specifics on that, but I think what David [Bywater] is saying, is ***the
> trend keeps improving and we're confident that we're going to
> see a sequential positive on the California deal***.
>
> BYWATER: These are, these contracts, as you know, are – some
> Medicaid contracts will run 10, 15, 20 years. And they're, ***it's a***

> ***very profitable piece of my portfolio***. So it has not improved as
> quickly as we wanted it to but ***it's definitely on a steady***
> ***improvement, which is very encouraging for us. And we're***
> ***making the investment to make sure that is a long-term, very***
> ***positive relationship, an accretive relationship for all parties***.
>
> BACHMAN: Why has it been slower? We've talked about it for
> two years? . . . has it been California releasing or has it been you
> guys executing against the benchmarks?
>
> BYWATER: There's, I think, some significant challenges in the
> fiscal area out in California, so a good portion of the change orders
> that we were hoping to see, they've had a decrease in what they'd
> be able to do historically. So we expect that to improve over time.
>
> And then we had – so as a result, we had to drive down our – drive
> our efficiencies faster. ***And we've made good progress but you***
> ***can only go so fast and make sure you continue to drive and***
> ***deliver a very solid performance for the client***, which is our first
> priority.

188.     Bywater and Horsley's statements set forth above in ¶ 187, regarding

improvements and the near-term profitability of the California Health Enterprise implementation,

including that margins were "improving" and that the project was "definitely getting closer" to

turning a profit, were materially false, or misleading because Bywater and Horsley failed to

disclose material information, when made. For the reasons set forth above in ¶ 179, Bywater and

Horsley knew or recklessly disregarded that the Company was not receiving *any* revenue for its

implementation of the California MMIS replacement system as of the date of their statements. In

fact, these contracts were generating losses due to the material expenses that were being incurred

to implement a custom system in each state.

189.     Similarly, the statements by Bywater and Horsley positively characterizing the

status of the California Health Enterprise implementation as "operating well," "definitely on a

steady improvement," "the trend keeps improving," and that the Company was "continu[ing] to

drive and deliver a very solid performance for the client" were materially false, or misleading

because Bywater and Horsley failed to disclose material information, when made. For the

reasons set forth above in ¶ 183, the Company's Health Enterprise implementation in California

was not "progressing well" at any point.

### 4.     The February 2013 False or Misleading Statements

190.    On February 12, 2013, the Company met with analysts and investors at the

Goldman Sachs Technology & Internet Conference. Defendant Blodgett reiterated the

Company's statements touting the competitive advantages offered by Xerox's purported Health

Enterprise "platform":

> *I think the overall competitive advantage that we have . . . as an
> overall general statement, we have strong platforms. If you look
> at our Medicaid business for example, . . . we're just introducing
> our new enterprise platform that's going live here in a couple of
> months*.

191.    Defendant Blodgett attributed the Company's success in winning new

government healthcare contracts specifically to the functionality of Health Enterprise:

> I think we win [contracts] because we have ***great technology***.
> People look at our platforms and they realize that this stuff is pretty
> complicated. ***Our Medicaid platform has six million lines of code
> in it***. And, there hasn't been a new Medicaid system that's been
> developed for a long time, over a decade. And now, so as we
> demonstrate that to people, they can, they are experts, they look at
> it and say, wow, ***it has functionality and features that are unique***.

192. Defendant Blodgett's statements set forth above in ¶¶ 190-91, touting the

competitive advantages of Health Enterprise, were materially false, or misleading because

Defendant Blodgett failed to disclose material information, when made. Rather than constituting

a singular "strong platform[]" with "functionality and features that are unique," for the reasons

set forth above in ¶¶ 177-78, Defendant Blodgett knew or recklessly disregarded that Health

Enterprise was not a transferable, reusable, replicable, or scalable platform with plug-and-play

characteristics at all, and instead, a custom system had to be built for each implementation.

### 5.   The March 2013 False or Misleading Statements

193.   On March 7, 2013, the Company hosted analysts and investors at its Healthcare Services Analyst Day. Defendant Scanlon repeatedly discussed how Health Enterprise purportedly provided Xerox with a competitive advantage by enabling the Company to expand easily into other states—a key feature of a transferable, reusable, replicable, and scalable platform with plug-and-play characteristics. Indeed, Defendant Scanlon explained that the Company had "a big presence in a large number of states," and that the "platform gives us the opportunity to expand."

194.   Defendant Scanlon also represented that Health Enterprise was a transferable and reusable platform by referring to its "plug-and-play" characteristics, and claiming that this unique attribute provided the Company with a competitive advantage:

> ***One of our competitive advantages that I wanted to spend a couple minutes on is our Health Enterprise platform***. This is a claims transaction engine that's designed specifically for Medicaid. We've invested in this. We've invested in the technology. It's a ground up. It's a service-oriented architected platform. ***And the reason why that's important is because it allows us to provide the states with a platform. If they want a plug-and-play with different capabilities that they have, they're allowed to do that***.

195.   The statements set forth above in ¶¶ 193-94, touting the competitive advantages of Health Enterprise, were materially false or misleading because Defendant Scanlon failed to disclose material information, when made. Far from being singular "platform" with "plug-and-play" capabilities, for the reasons set forth above in ¶¶ 177-78, Scanlon knew or recklessly disregarded that Health Enterprise was not a transferable, reusable, replicable, or scalable platform with plug-and-play characteristics at all, and instead, a custom system had to be built for each state implementation.

196.    Analysts relied on the Company's representations that Health Enterprise was a

transferable platform. For example, a J.P. Morgan report on March 8, 2013 noted:

> **Medicaid platform provides a competitive advantage in
> government health**. In government health (~$900M in revenue),
> the company highlighted the increased scope and spending in
> Medicaid as growth drivers. Here, Xerox is a market leader with
> #1 share in Medicaid Management Information Systems (MMIS)

197.    Similarly, a Piper Jaffray report on August 16, 2013 concluded:

> **Platform Solutions Offer Scale, Leverage**. Platform solutions in
> services involve software, systems and processes *that can be
> extended to additional customers with little incremental
> investment*. Notable platform solutions include Xerox's Medi-Cal
> platform . . . . Platform solutions represent a low-risk source of
> services revenue growth and significant source of margin leverage
> for Xerox. Growth in platform solutions, along with healthcare, is
> an important source of sustainable mid-to-high single digit revenue
> growth in services.

### 6.    The April 2013 False or Misleading Statements

198.    On April 23, 2013, during a conference call with analysts and investors to discuss

the Company's first-quarter 2013 financial results, Defendant Burns reported that the Company

was seeing "good news, particularly in healthcare" and that the Company's "profitability is

improving in that segment actually very, very well":

> *State government we are seeing some good news particularly in
> healthcare*. We have a strong position as you know in MMIS
> around the United States, and California is our big contract; New
> Hampshire just went live. *We're doing well there* . . . .
>
> So healthcare is a big segment for us. We do well there. *And our
> profitability is improving in that segment actually very, very well.
> So I'm bullish about healthcare[,] government healthcare
> services*.

199.    Analysts inquired about the progress of the Company's Health Enterprise

implementations, such as California, and whether these implementation contracts would

contribute positive cash flow in the current year. In response to an analyst question, Defendant Burns stated:

> You will – you could see strength in cash based on how effectively we bring those contracts and all other contracts that we have to maturity. So you could have some benefit in cash. I don't think that you'll see a negative in revenue. . . . Megadeals have – the mega deals that we've signed have a cash – as they mature, they have a cash benefit, right? So the most famous mega deal is California, right? ***And as California is maturing, thank God, and is doing fairly well I'm not going to say very well because very well always jinxes me of doing well and so as that matures, of course cash becomes easier to get out of the megadeal. But I don't think revenue will be down. I think cash has some opportunity*** . . . .

200.     Defendant Burns' statements set forth above in ¶¶ 198-99, regarding the profitability of the Company's government healthcare segment, and specifically about the putative current profitability of the California implementation contract, were materially false, or misleading because Defendant Burns failed to disclose material information, when made. For the reasons set forth above in ¶ 179, Defendant Burns knew or recklessly disregarded that the Company was not receiving *any* revenue for its implementation of Health Enterprise in California as of the date of her statements. In fact, the contract was generating losses due to the material expenses that were being incurred to customize Health Enterprise.

201.     Similarly, Defendant Burns' statements set forth above in ¶¶ 198-99, regarding the current progress of the California MMIS contract were materially false, or misleading because Defendant Burns failed to disclose material information, when made. For the reasons set forth above in ¶ 183, the Company's Health Enterprise implementation in California was not "maturing" or "doing fairly well" at any point.

### 7.     The October 2013 False or Misleading Statements

202.     On October 24, 2013, Xerox held a conference call with analysts and investors to discuss the Company's third-quarter 2013 financial results. Defendants yet again doubled down

on their materially false or misleading claims that Health Enterprise was a transferable, reusable,

replicable, and scalable platform with plug-and-play characteristics, and assured investors that

the implementations of Health Enterprise were "successful" and that any increased costs

associated with the ongoing state implementations were "transitionary and temporary." For

example, Defendant Mikells stated:

> We've also seen increased expenses associated with the roll out of
> our new Medicaid platform and healthcare exchange operation.
> ***We're very pleased with the successful implementations of these
> platforms, with Alaska's Medicaid Management Information
> System . . . launched successfully this past quarter***. As with many
> large new programs, there is an initial period of higher cost during
> roll out, including non-cash amortization of the platforms. ***We
> continue to*** be excited about these long-term healthcare related
> opportunities and ***expect to gain scale and experience efficiencies
> over time***.

203.     Defendant Mikells also stressed the growth opportunities in healthcare and touted

the purportedly successful implementations of Health Enterprise as evidence of the replicability

of the Company's signature government healthcare product:

> Yeah so within BPO [Business Process Outsourcing], healthcare is
> our fastest growing area and we're clearly benefiting from our
> number one position in MMIS, so on the Medicare side we're very
> strong. ***We were incredibly pleased that we've been actually
> standing up the new MMIS systems successfully***.
>
> ***
>
> So we continue to look at the changes that are occurring in
> healthcare generally in part driven by the Affordable Care Act and
> view it as just a really great opportunity. ***And the really nice thing
> about platforms is while – when you're putting a new one in
> place you clearly go through some of the pain of standing it up
> for the first time. This becomes a pretty replicable process for us
> and so we certainly think over time we're going to get scale and
> experience gains in that area***.

204.     While Defendant Mikells recognized the "increased expenses associated with the

roll out" of Health Enterprise to individual states, she promised investors that that the Company

was merely "in a transition period" and that the Company would soon recognize "sustainable margin improvement." Indeed, Defendant Mikells stressed that the margin pressure associated with the state-specific Health Enterprise implementations would be short-lived, stating that "*I view them as transitionary and temporary factors*."

205.    Defendant Mikells reiterated that, despite "a little more pressure on margin as we have stood up some of these new platforms," "*these things are now going to become for us repeatable processes*."

206.    Defendant Burns echoed Defendant Mikells statements regarding the purportedly successful implementations of Health Enterprise and temporary nature of the startup costs associated with the initial implementations:

> I'm very pleased that we've actually been able to stand up exchanges and MMIS system actually operating, taking customers' calls, et cetera. It costs a little bit more than we thought it would cost and that's one of the pressures that we saw in third and we'll see a little bit in fourth but *we have done it now*.
>
> *And so the bulk of the investment won't have to change. We have to modify for every engagement a little bit of the system but not as big a modification as before and that's one of the things that we are learning.* I think other people are learning it as well. So I'm actually pleased with healthcare. It's a big piece of our business and I think we have some proof points that'll show it will be good on a go-forward basis as well.

207.    In response to a question from Jim Suva, a Citigroup analyst, about whether the Company's predicted Services segment margin expansion in the coming year "also includes the additional cost of ramps," Defendants Burns said the margin expansion would not be affected, emphatically stating that "*[a]ll of the numbers look good from a go-forward basis, from a revenue perspective in Services, across all of the businesses*."

208.    The statements set forth above in ¶¶ 202-07, touting the replicability and transferability of Health Enterprise, were materially false, or misleading because Defendants

Burns and Mikells failed to disclose material information, when made. Rather than constituting a

singular "platform" that Defendants could readily "modify for every engagement a little bit," for

the reasons set forth above in ¶¶ 177-78, Defendants knew or recklessly disregarded that Health

Enterprise was not a transferable, reusable, replicable, or scalable platform with plug-and-play

characteristics at all, and instead, a custom system had to be built for each implementation.

209.     The statements set forth above in ¶¶ 202-07, touting the current and near-term

profitability of the Company's Health Enterprise contracts were materially false, or misleading

because Defendants Burns and Mikells failed to disclose material information when made. For

the reasons set forth above in ¶ 179, Defendants Burns and Mikells, as the Company's CEO and

CFO, respectively, knew or recklessly disregarded that the Company was not receiving *any*

revenue for its implementation of either the California or Montana MMIS systems as of the date

of their statements. In fact, these contracts were generating losses due to the material expenses

that were being incurred to build a custom system in each state.

210.     The statements set forth above in ¶¶ 202-07, touting the "successful"

implementations" of Health Enterprise were materially false, or misleading because Defendants

Burns and Mikells failed to disclose material information, when made. In addition to the reasons

set forth above in ¶ 183, additional facts demonstrate that the Company's Health Enterprise

implementations were not "successful" as of the date of Defendants' statements, nor were the

Health Enterprise implementations in California and Montana "successful" at any point, as

evidenced by the following contemporaneous findings, and later findings, each of which

reflected conditions that existed as of the time of the foregoing representations and thereafter:

      a.  A November 9, 2012 letter from the Interim Executive Director of the
          North Dakota DHS to Defendant Bywater informing the Company that the
          state was imposing ***liquidated damages*** on the Company due to multiple

missed contract milestones, which the state attributed to "Xerox's inability to resolve defects" with Health Enterprise.

b.   A February 14, 2013 letter from the Interim Executive Director of the North Dakota DHS to Defendant Bywater informing the Company that the state would be withholding full payment on a number of contract deliverables due to the Company's incomplete performance, and that the "*[t]otal liquidated damages accrued through February 14, 2013 on the late deliverables . . . is $687,000*."

c.   An October 2013 report by SLI Global Solutions, North Dakota's IV&V provider for the Company's North Dakota MMIS replacement contract, which reported that the project had been operating without an approved schedule since the Company failed to meet the original "Go Live" date of June 1, 2012. The report concluded that "*[t]he result is de facto inability to use the most basic project management principle of [a] schedule to evaluate if the project is on track and the associated level of risk associated for missed project milestones and deliverables*."

d.   A June 2013 Monthly Status Report to the Montana Department of Public Health and Human Services from Public Knowledge, an IV&V provider for the Company's Montana MMIS replacement contract, which reported that "*[t]he overall project status is red* due to out of scope gaps not addressed, resource over-allocation, [and] design, development and system testing delays."

e.   A June 2013 report to the Montana Legislative Finance Committee regarding the status of the Company's Health Enterprise implementation, which found that "*[t]he overall project status is red, which identifies that the project is experiencing both issues and risks that may affect the ability of Xerox (the MMIS DDI Contractor) to deliver the project on schedule*."

f.   A May 2014 report to the Montana Legislative Finance Committee that documented that "Public Knowledge . . . has reported *the Xerox MMIS DDI project performance status as 'Red' in all of their independent status reports since April 3, 2013*" and that "*Xerox has been engaged in a re-planning process since June 11, 2013 and the project has not made significant project progress as a result*."

g.   A January 18, 2014 email sent from the Commissioner of Alaska's DHSS to Defendant Blodgett and David Hamilton, Group President of Government Healthcare Solutions at the Company, informing the Company that both *the states' legislators and governor were demanding that action be taken to penalize Xerox for its failure to design and develop a functioning MMIS system*.

211.    CW 1 confirms that, contrary to Defendants' public statements, the Alaska Health

Enterprise implementation was not successful as of October 2013. CW 2 explained that Xerox

was unable to resolve all of the defects with Health Enterprise prior to going live in Alaska. As a

result, the system suffered from functionality issues when it went live. CW 2 stated that it was

apparent to CW 2 and to the employees CW 2 supervised that they were working in a "system

that was doomed." CW 2 recounted that a few days prior to Health Enterprise being launched in

Alaska, a big meeting was held with Xerox leadership, wherein Xerox leadership discussed the

fact that "Health Enterprise was not ready" for deployment and "was not going to work 100%" in

Alaska. However, Xerox leadership decided that, as with the New Hampshire system, the

Company would go live first and then attempt to resolve the defects with the system after it was

launched. CW 2 explained that the state client in Alaska was "shocked" at the large number of

defects that existed with Health Enterprise after it was launched.

## 8.    The December 2013 and January 2014
## False or Misleading Statements

212.    On December 3, 2013, the Company presented at the Credit Suisse Technology

Conference. Defendant Mikells continued the Company's material misinformation campaign,

telling investors that the Company had built "scale" and "experience," and that each state Health

Enterprise implementation was getting "more cost effective":

> ***We have other platforms in the healthcare space, specifically, our
> new Medicaid Management Information Platform that we are
> deploying in certain states, so we've deployed in New Hampshire,
> we have deployed in Alaska. We've got three others underway***.
> We are bidding on a number of others. And whenever you stand up
> ***a big new platform***, it's relatively expensive the first time you
> stand it up. ***You then build scale, you build experience, you get
> more efficient, more cost effective at it each time you stand it up***.
> So I think for us, the good news is we've had to stand up several
> new platforms in 2013. I'd expect that we will get more efficient as

we now stand them for up for the third and the fourth time into 2014.

213.     On January 24, 2014, during a conference call with analysts and investors to discuss the Company's fourth-quarter 2013 financial results, Defendants touted the near-term profitability of Health Enterprise due to its supposed transferability and replicability. Defendant Burns had the following exchange with George K.F. Tong ("Tong"), an analyst at Piper Jaffray:

> TONG: [L]ooking out in 2014, what areas are you targeting in terms of penetrating growth opportunities and how should those metrics translate into Services revenue performance?
>
> ***
>
> BURNS: . . . [G]overnment healthcare is an area that we're not – *we're making progress*. We're really focused, as I said, in responding to the first question on making sure that we get this right and we do not, like I said, put any additional risk or pressure on any state. But as we do that, *we are stabilizing more and more*. And so throughout 2014, this significant investment that we're making – that we made in 2013 and in the tail-end of 2012, should start to pay off with more accretive performance – accretive results to the company.

214.     The statements set forth above in ¶¶ 212-13, touting the "cost-effective[ness]" of the Company's successive implementations of Health Enterprise, were materially false, or misleading because Defendants Burns and Mikells failed to disclose material information, when made. Rather than constituting a singular "big new platform" that Defendants could cost-effectively "scale" for use in other states, for the reasons set forth above in ¶¶ 177-78, Defendants knew or recklessly disregarded that Health Enterprise was not a transferable, reusable, replicable, or scalable platform with plug-and-play characteristics at all, and instead, a custom system had to be built for each implementation.

215.     Defendants' statements regarding the current and near-term profitability of the Health Enterprise implementations were materially false, or misleading because Defendants

Burns and Mikells failed to disclose material information, when made. For the reasons set forth above in ¶ 179, Defendants Burns and Mikells, as the Company's CEO and CFO, respectively, knew or recklessly disregarded that the Company was not receiving *any* revenue for its implementation of the California MMIS replacement system as of the date of their statements. In fact, the contract was generating losses due to the material expenses that were being incurred to build a custom system in each state.

216.    Defendants' statements regarding the progress the Company was making with each of the Company's ongoing implementations of Health Enterprise were materially false, or misleading because Defendants Burns and Mikells failed to disclose material information, when made. For the reasons set forth above in ¶¶ 183 and 210-11, the Company's Health Enterprise implementations were not "making progress" or "get[ting] more efficient" as of the date of Defendants' statements, nor were the Health Enterprise implementations in California and Montana "making progress" at any point.

### 9.    The April 2014 False or Misleading Statements

217.    On April 22, 2014, the Company held a conference call with analysts and investors to discuss its first-quarter 2014 financial results. Defendant Burns noted that "Services margins . . . [are] an area of keen focus for investors and I can assure everyone an area of intense focus internally."

218.    Defendant Mikells assured investors that the Company was taking action to enhance the profitability of the ongoing implementations of Health Enterprise, which she described as "different implementations of the same platform":

> We're enhancing our program management under a single point of accountability that also serves to enable quicker learnings across different implementations of the ***same platform***.

219.    Defendant Burns highlighted the Company's implementation of Health Enterprise in California as one that was "going fairly well" and that was moving toward "increased profitability":

> We've been engaged in [California] for many years, and ***California is going fairly well, and MMIS is actually going pretty well and we're now at the point where we're starting to lean out our implementation on California and drive it to increased profitability***.

220.    Defendant Burns assured investors that the Company's other Health Enterprise implementations were likewise "driving towards profitability":

> ***[O]n MMIS it is literally just about continuing on the improvement path that we're on, which is very good already and driving towards profitability***. So it's a good market, a growing market, and one that I don't think that we can actually step away from. I know that we can't step away from because ***we have a history of success in this business***.

221.    Analysts relied on Defendants' repeated reassurances regarding the current state of the Company's Health Enterprise implementations in assessing the likelihood of future issues in this segment of the Company's portfolio. For example, in an April 23, 2014 report, J.P. Morgan noted that despite the increase in investment costs "XRX said MMIS (Medicaid) challenges are manageable." The report concluded that "such problem contracts [are] a cost of doing business in gov't IT services" and "do not necessarily imply structural issues in a vendor's delivery execution unless they keep repeating."

222.    Similarly, analysts at Piper Jaffray, in an April 22, 2014 report, stated:

> "[S]ervices margins fell short of expectations due to elevated government healthcare implementation costs related to Medicaid and health insurance exchange platforms. ***We view the implementation spend as investing for long-term growth and returns in Xerox's healthcare and broader services business***. Healthcare margins have a history of being margin accretive, ***so we see these investments as a precursor to margin upside over time***."

223.    The statements set forth above in ¶¶ 218-20, describing the Company's Health

Enterprise implementations as "different implementations of the same platform" were materially

false, or misleading because Defendants Burns and Mikells failed to disclose material

information, when made. Rather than constituting a singular "platform," for the reasons set forth

above in ¶¶ 177-78, Defendants knew or recklessly disregarded that Health Enterprise was not a

transferable, reusable, replicable, or scalable platform with plug-and-play characteristics at all,

and instead, a custom system had to be built for each implementation.

224.    The statements set forth above in ¶¶ 218-20, regarding the current and near-term

profitability of the Company's Health Enterprise implementations were materially false, or

misleading because Defendants Burns and Mikells failed to disclose material information, when

made. For the reasons set forth above in ¶ 179, Defendants Burns and Mikells, as the Company's

CEO and CFO, respectively, knew or recklessly disregarded that the Company was not receiving

*any* revenue for its implementation of the California and Montana MMIS replacement systems as

of the date of their statements. In fact, these contracts were generating losses due to the material

expenses that were being incurred to build a custom system for each state.

225.    The statements set forth above in ¶¶ 218-220, regarding the progress the

Company was making with the ongoing implementations of Health Enterprise were materially

false, or misleading because Defendants Burns and Mikells failed to disclose material

information, when made. For the reasons set forth above in ¶¶ 183 and 210-11, the Company's

Health Enterprise implementations were not "continuing on the improvement path," or "making

progress on improving . . . operational performance" as of the date of Defendants' statements,

nor were the Health Enterprise implementations in California and Montana "making progress" at

- 74 -

any point. Defendants' statements were materially false, or misleading because Defendants failed

to disclose material information, when made for the following additional reasons:

    a.   A February 2014 report to the Montana Legislative Finance Committee that reported a "Red" overall project health for the Company's Montana Health Enterprise implementation, "due to outstanding issues and risks related to project execution by our vendor Xerox." The report further documented that "***Xerox continues to struggle with executing effective design sessions in the 22 plus functional areas that support the Montana RFP requirements***."

    b.   An April 16, 2014 Monthly Status Report prepared for Montana by Public Knowledge on the Montana MMIS that reported that "[t]he overall project status is red due to delays in the re-planning process, six missed payment milestones . . . [and a] large number of Xerox action items not addressed." With respect to the missed contract milestone, the report documented that "Liquidated Damages have been accruing since Xerox missed their first Payment Milestone on November 5, 2013 . . . . ***As of 4/16/14 the total accrued amount of liquidated damages is $4,920,000***.

    c.   An April 2014 California IPOC report revealing that on January 21, 2014, the Company received approval from the California Department of Health Care Services to change its implementation approach to a new software development methodology in order to address the problems and delays the project had experienced up to that point. ***The April 2014 report detailed that as of April 2014, the project was executing a "system development methodology that is not fully documented nor developed" and that as a result, "[c]onfusion of roles, responsibilities and processes remain***."

    d.   On March 24, 2014, the Commissioner of Alaska's DHSS sent a letter to the Company addressed to Defendant Blodgett providing formal notice that Alaska would declare the Company in default of the Alaska MMIS contract if the deficiencies with its performance were not remedied. The letter detailed how "***[t]he reported number of system defects in a high to mid-high severity on 10/1[2013, the date the Alaska MMIS went live] was 44. . . . Within weeks of system Go Live the number of defects of a similar nature had climbed well over 500***." The letter concluded that the Company "seems unable to project" when the defects would be resolved.

    e.   On April 28, 2014, the Company responded to the foregoing letter, stating that "***we agree that work remains to stabilize the Alaska Medicaid Health Enterprise system***."

10.    **The July and September 2014 False or Misleading Statements**

226.    On July 25, 2014, the Company held a conference call with analysts and investors

to discuss the Company's second-quarter 2014 financial results.

227.    Analysts questioned the Company's ability to turn a profit on its Health Enterprise

implementations, and Defendants issued false or misleading assurances, including the following

representations by Defendant Burns:

> BACHMAN: Nobody makes any money who serves the healthcare
> industry in the government side, it doesn't seem. CSC [Computer
> Sciences Corporation] has been pretty vocal that they did not
> follow-up with a bid for the New York side because they didn't
> think they would make money in it. So, just philosophically, why
> not focus more on the commercial side and deemphasize the
> government healthcare-related activities, and thereby improve your
> sustainable profit levels?
>
> BURNS: I don't think that we are not focused more – or focused a
> lot on the commercial side, we are. But we also – the government
> healthcare market is a very attractive market. We went through one
> cycle when this market started many, many years ago, that showed
> that *we could invest in the new platform, stand that platform up,*
> *and have it last for many, many years, and continue to drive*
> *growth on the top line and profitability on the bottom line. That*
> *remains our expectation*.
>
> *And if you look at some of the contracts that are more mature,*
> *moving towards more maturity, California for example, we have*
> *been able to literally move that contract from investment phase to*
> *flat profitability, now to looking for growing profitability in a*
> *very predictable kind of a standard way. It took a little bit longer,*
> *but on a go-forward basis, California is going to be beautiful and*
> *we expect as we implement New York to be beautiful as well*.

228.    Defendants continued to tout the Company's near-term prospects, with respect to

Health Enterprise, at the Citi Global Technology Conference on September 2, 2014. Defendant

Zapfel stated:

> [O]bviously we're going to leverage what we've learned in some
> of our start off difficulties elsewhere. So that's a big thing
> obviously as we look ahead to New York. But *I think on our*

- 76 -

> *existing contracts, we've got a good path, we've got a good path*
> *to work through, kind of the final touches on some of the*
> *implementations and then get to a steady state model that then we*
> *can live with* . . . .

229.     The statements set forth above in ¶¶ 227-28, regarding the current and near-term

profitability of the Company's Health Enterprise implementations were materially false, or

misleading because Defendants Burns and Zapfel failed to disclose material information, when

made. For the reasons set forth above in ¶ 179, Defendants Burns and Zapfel knew or recklessly

disregarded that the Company was not receiving *any* revenue for its implementation of the

California and Montana MMIS replacement systems as of the date of their statements. In fact,

these contracts were generating losses due to the material expenses that were being incurred to

customize Health Enterprise for each state system.

230.     The statements set forth above in ¶¶ 227-28, regarding the progress the Company

was making with its ongoing Health Enterprise implementations, and the specific risks posed to

these implementations, were materially false, or misleading because Defendants Burns and

Zapfel failed to disclose material information, when made. For the reasons set forth above in

¶¶ 183, 210-11, and 225, the Company was not putting "the final touches" on its Health

Enterprise implementations or "getting [Health Enterprise] to operational maturity" as of the date

of Defendants' statements, nor were the Health Enterprise implementations in California and

Montana "moving towards more maturity" at any point. Defendants' statements were materially

false, or misleading because Defendants Burns and Zapfel failed to disclose material

information, when made for the following additional reasons:

   a.   On July 2, 2014, Alaska's Attorney General sent a demand for mediation
        to David Hamilton, Group President of Government Healthcare Solutions,
        and the Company's General Counsel, which notified the Company that
        "defects and performance problems with the MMIS persist" and that as a
        result, "the State of Alaska is escalating the dispute" due to the
        Company's "failure to provide a corrective action plan or otherwise cure

its performance deficiencies." The letter also informed the Company that "Xerox's failure to meet its obligations also results in the accrual of liquidated damages associated with missed deadlines."

**11.**      **The October 2014 False or Misleading Statements**

231.     Defendants held a conference call with analysts and investors on October 22, 2014 to discuss the Company's third-quarter 2014 financial results. On the call, Defendants informed the market that costs associated with the implementation of Health Enterprise were continuing to adversely affect Xerox's Services margins. For example, Defendant Burns stated that "Services margins were up sequentially, but lower than we anticipated, as a result of higher costs in government healthcare, as well as ongoing strategic investments."

232.     Despite this partial disclosure of adverse news which removed some of the artificial inflation in Xerox's stock price, *see infra* Section VI, its stock price remained artificially inflated due to Defendants' continuous affirmation of the viability of Health Enterprise (including that it was a replicable platform), the success of its implementations, and the segment's improvements and positive near-term outlook. Additionally, Defendants falsely represented that the "higher costs" were merely initial costs associated with state implementations of Health Enterprise the purportedly transferable, reusable, replicable, and scalable platform with plug-and-play characteristics as opposed to costs associated with having to build a custom system for each implementation.

233.     For example, Defendant Mikells stated during the October 22, 2014 conference call:

> *Within government healthcare, we're making good progress, but expense levels are still high as we continue to invest to improve the performance of the first platform implementation of our new Medicaid platform.*

234.    In response to a question from Credit Suisse analyst Kulbinder S. Garcha about the impact of higher costs in the Company's Health Enterprise business upon Services margins, Defendant Burns stated that "a major portion of the shortage that we see in margins is driven by Medicaid investments." Defendant Burns nevertheless assured analysts and investors that "***we are seeing sequential improvements in those investments***," and Defendant Mikells added that such investments "***should start to become a tailwind***."

235.    The statements set forth above in ¶¶ 232-34, regarding the "sequential improvements" in the profitability of the Company's Health Enterprise implementations were materially false, or misleading because Defendant Burns failed to disclose material information, when made. For the reasons set forth above in ¶ 179, Defendant Burns knew or recklessly disregarded that the Company was not receiving *any* revenue for its implementation of the California and Montana MMIS replacement systems as of the date of their statements. In fact, these contracts were generating losses due to the material expenses that were being incurred to build a custom system for each state.

236.    The statements set forth above in ¶¶ 232-34, regarding the progress the Company was making with its ongoing Health Enterprise implementations, and the nature of the Company's supposed "Medicaid investments," were materially false, or misleading because Defendants Burns and Mikells failed to disclose material information, when made. For the reasons set forth above in ¶¶ 183, 210-11, and 225, the higher costs associated with the Company's Health Enterprise implementations were not "investments" but rather a result of the Company's failure to effectively implement MMIS replacement systems according to the requirements of its state clients.

### 12.  The November 2014 False or Misleading Statements

237.   On November 11, 2014, the Company met with analysts and investors at the

Company's 2014 Investor Conference. Defendant Zapfel touted the "progress" the Company had

made in improving operating margins by "solidifying the enterprise MMIS platform":

> Now, our big focus is driving substantial improvement in our
> operating margins and a big component of that is our government
> healthcare business. I'll talk about that at some length today.
>
> ***But we've made progress both operationally in terms of
> solidifying the enterprise MMIS platform and financially in our
> third quarter*** results in GHS [Government Healthcare Solutions]
> showed an uptick even without kind of normalizing for the second
> quarter impairment that many of you are familiar with.

238.   Defendant Zapfel's presentation included a slide on the status of the Company's

Health Enterprise implementations, which represented that such implementations were

"performing well," with respect to New Hampshire and Alaska, and "progressing well overall,"

with respect to California:





239.    In presenting this slide, Defendant Zapfel stated:

So health enterprise in the new – the new Medicaid management platform is really a big, big investment for Xerox. And we've been – we've been at this and building it up over time.

What I wanted to – and so we have spent time on the earnings calls this year on, you know, we're not quite making our targets and this has been – this has been an area where we've made incremental investments because we want to make sure that we – you know, we've delivered to the key clients that we support and again, long term, this has been a very, very good historic franchise for us and we believe it will be one in the future.

*Now, in my view, we're making visible progress here. From a platform development, making the delivery milestones, code quality standpoint, we've made major investments this year. We're starting to see good progress*.

Ursula [Defendant Burns] and I are both personally engaged with the – you know, with many of these clients along with our business leader, David Hamilton, who run – who brings deep industry skill base and runs this business for us here in the U.S.

Now, on the right side of the chart, we kind of call out the specific clients that are – that are executing the enterprise platform.

***

So, you know, pretty good – you know, pretty good success story with our – you know, with our first client [New Hampshire]. *After some burning issues that we – you know, that we faced in Alaska, our operating performance today is solid*.

*California has had released one, implemented in the past 30 days. We just check pointed with them, I guess end of last week, and, you know, a very, very, very positive start. Both – you know, we're working closely with both North Dakota and Montana as they get ready for, you know, implementations in 2015 and beyond*.

240.    Analysts asked about the Company's ability to achieve the margin expansion plan it had announced and whether there were any undisclosed risks to the Company achieving its guidance. In response to an analyst question concerning the Company's level of confidence in its

projected increase in Services margins that would be achieved in 2015 as a result of the

Company's government healthcare recovery plan, Defendant Zapfel stated:

> [T]he thing I would share would be we have had erosion as we've
> been pretty visible about this year in terms of our GHS profitability
> as we've been investing in the enterprise platform and in a handful
> of states where we had things that we just had to get over in 2014.
>
> The 25 to 50 basis points would recover back, I mean, if you just
> choose kind of a midpoints all around to 40 for the midpoint for
> math simplicity would basically get back half of the deterioration
> that we've experienced this year.
>
> **A reasonable portion of that is not having another big
> impairment charge, which we had associated with Nevada and
> which is kind of completely behind us**. So in the rest it really is
> around and **we feel like we've got a good handle on this executing
> the handful of states that I showed on the map that you looked at.
> So each one of these things every day, you're working with the
> state**.

241.    In response to an analyst question regarding the risks posed to the plan, Defendant

Zapfel stated:

> **I would say from a risk standpoint, in any Services business,
> there is always the risk that there are some client situation that
> seems like everything is going great, and all of a sudden you're
> like – holly molly [sic], I got a big problem here, so we don't
> anticipate that**.

242.    Defendant Zapfel's statements set forth above in ¶¶ 237-41, regarding the

progress the Company was making with its ongoing Health Enterprise implementations, and the

specific risks posed to these implementations, were materially false, or misleading because

Defendant Zapfel failed to disclose material information, when made. In addition to the reasons

set forth above in ¶¶ 183, 210-11, 225, and 230, Defendant Zapfel's statements regarding the

current state of the Company's Health Enterprise implementations, including that "we've made

progress both operationally . . . and financially," Xerox was "making the delivery milestones,"

MMIS systems in New Hampshire, Alaska and California were "performing well," were

materially false or misleading for the following reasons:

> a. An October 2014 California IPOC report found that due to the Company's
>    failure to abide by the approved implementation schedule, "it is not
>    achievable to plan for future releases or to be able to determine the current
>    status for deployment." Contrary to Defendant Zapfel's statements that the
>    implementation was "progressing well overall," the report observed that
>    "there is a concern that the Release 2 implementation date [of June 26,
>    2015] is too aggressive for the amount of scope identified." Noting that
>    "[t]he project underwent a 'Course Correction' in June 2013 due to the
>    lack of compliance and understanding of the previous system development
>    approach" the California IPOC found that the implementation "could be at
>    risk again if there is not a fully developed and trained approach to follow."
>
> b. A November 15, 2014 report to the Montana Legislative Finance
>    Committee reported the overall MMIS project status as "Red," stating that
>    "Xerox continues to experience challenges executing the design sessions,"
>    and that "Xerox is experiencing schedule management issues resulting in
>    missed deliverables." Contrary to Defendant Zapfel's statement that the
>    Company was "[w]orking [a] joint action plan with the state," the report
>    documented that "[Montana Department of Public Health and Human
>    Services] expects the overall project status to remain "Red" until Xerox
>    improves the execution of the design sessions."

### 13.    The January 2015 False or Misleading Statements

243.    On January 30, 2015, Defendants held a conference call with analysts and

investors to discuss the Company's fourth-quarter 2014 financial results. During the call,

Defendants continued to misleadingly tout progress associated with and the near-term revenue

potential of Health Enterprise while simultaneously downplaying the known risks of future

contract problems resulting from the Company's unsuccessful implementations. In her opening

remarks, Defendant Burns stated:

> *We've made progress improving our government healthcare
> business, and in 2014, we committed resources to maturing our
> MMIS enterprise platform. While we still have work to do, the
> hard work of the team is paying off. We remain bullish about this
> market and its opportunities for us*.

244.    Defendant Mikells added:

Our results in government healthcare were in line with our expectations and ***we're seeing positive results from our investments to mature the platform and improve our operational performance. We're confident we're on the right track*** and we started some work ahead of finalizing the New York Medicaid contract to ensure we get off to the right start there.

245.    Analysts pressed the Company for details on any problems with the Company's current Health Enterprise implementations. Defendant Zapfel had the following exchange with James Friedman ("Friedman"), an analyst with Susquehanna Financial Group:

> FRIEDMAN: [A]re there any kind of problem contracts a-la Nevada or Texas that you'd call out at this point? Or if that's too specific if you could talk about the risk management at the firm overall, thank you.
>
> ZAPFEL: . . . ***Relative to the problem contract question, I would say we've made real progress in terms of the new systems implementations***. We've got a strong team that we've added in 2014 that's really been driving that. ***So you can never say never in terms of an issue in a given implementation. But overall, we've made very good progress there and we're optimistic that we won't have big financial hits as a result of future problem contracts***.

246.    Defendants' statements set forth above in ¶¶ 243-45, regarding the progress the Company was making with its ongoing Health Enterprise implementations, and the specific risks posed to these implementations, were materially false, or misleading because Defendants failed to disclose material information, when made. In addition to the reasons set forth above in ¶¶ 183, 210-11, 224, 230, and 242, Defendants' statements regarding the current state of the Company's Health Enterprise implementations, including that Xerox was "seeing positive results" and had "made real progress" with the state implementations, were materially false or misleading for the following reasons:

> a.    A February 19, 2015 California State Auditor Letter Report documented that despite the Company implementing the first major release of Health Enterprise in California at the end of 2014, "project oversight entities have raised ***significant concerns*** that the project must address to increase the likelihood that Xerox will produce a timely and high quality replacement

for CA-MMIS," including that the "first release was designed to provide a common infrastructure that will be leveraged in the four subsequent releases, but [the first release] only addressed 27 of the roughly 6,000 functional requirements that are estimated for all five releases." The Letter Report also documented that project oversight entities "have expressed persistent concerns regarding the insufficiency of detailed documentation describing the agile software development methodology" that the Company was attempting to deploy in designing the California MMIS replacement system.

b. To address these concerns, the 2015 California State Auditor Letter Report explained that *all future payments to Xerox would be conditioned* on Xerox delivering a platform with the functionality required by the state, documenting how the state was "working to amend its contract with Xerox to include 120 discrete pay points (deliverables that trigger payments to Xerox) . . . to ensure that Xerox is only paid for business functionality that it successfully delivers into production."

### 14.   The April 2015 False or Misleading Statements

247.    On April 24, 2015, the Company reported its first-quarter 2015 financial results. In a press release issued on this date, the Company announced that "Services margin was 7.5 percent, down 1.1 percentage points." The Company attributed the poor results primarily to higher costs associated with its Health Enterprise implementations. The press release quoted Defendant Burns as stating that "overall Services segment results fell short of our expectations *driven by higher implementation costs in certain Health Enterprise platform accounts*."

248.    During a conference call with analysts and investors held on April 24, 2015, Defendant Mikells attempted to soften the news of the Company's disappointing quarter by falsely representing that operating performance of its Services business was "continu[ing] to improve":

> [W]e failed to accurately call the incremental financial pressure we're experiencing in our Government Healthcare business from the rollout of our Health Enterprise Medicaid platform. *Our delivery quality and operating performance continue to improve, but the financials were a clear signal that we have more work ahead*.

249.    Despite this partial disclosure of previously misrepresented and concealed

material facts concerning Xerox's Health Enterprise business, *see infra* Section VI, its stock

price remained artificially inflated because Defendants continued to misrepresent and conceal

other material facts. For example, despite these newly disclosed risks to the Company's "most

famous mega deal," Defendant Mikells stated:

> [P]art of the reason earlier I talked about the fact that this area gets
> less risky for us as we complete more and more of these
> implementations with the states where we signed contracts three
> plus years ago. Once we get beyond the implementation, right,
> then the economics move to, I'll call it, the regular Medicaid
> transaction processing. Right? And in addition to that, we
> typically, and ***even in the couple of clients that we've already cut
> over with the new platform, we typically have the opportunity to
> then do add-on things and get additional revenue from those
> clients, which we have been successfully doing and will continue
> to do***.

250.    Defendant Mikells also made the following representation, which, while

conceding the need for "more work ahead to turnaround financial performance," still insisted that

the platform was "performing well." As such, Mikells failed to disclose that in the states where

Health Enterprise had been implemented, there were severe functional deficiencies:

> ***Operationally, the platform is performing well in the states where
> it's been rolled out and we're progressing on the
> implementations in other states***. However, we have more work
> ahead to turnaround the financial performance. We're taking a
> number of additional actions to improve the picture and have
> adjusted our expectations to reflect what we believe is required to
> meet our customer commitment. This is the main driver of our
> revised Services margin guidance.

251.    Moreover, in response to a question from Brean Capital analyst Ananda P. Baruah

concerning the risks to Xerox's Health Enterprise business from ongoing Health Enterprise

implementations, Defendant Mikells assured investors that one such contract was "pretty close to

the finish line." Defendant Mikells further claimed:

***And the closer you get to the finish line, basically, the less risk you have****. We talked about California and we made a big adjustment for California. Last year, we actually made an adjustment for the one other state that hasn't been cut over yet, so we had sort of resized what we thought our cost expectations were going to be. **So I would characterize as we've already taken a hit on California, we've adjusted the other state that hasn't yet been implemented and we're close on the one that we're going to cut over this year*.*

252.    The statements set forth above in ¶¶ 249-51, regarding the current and near-term profitability of the Company's Health Enterprise implementations were materially false, or misleading because Defendant Mikells failed to disclose material information, when made. For the reasons set forth above in ¶ 179, Mikells, as the Company's CFO, knew or recklessly disregarded that the Company was not receiving *any* revenue for its implementation of the California MMIS replacement system as of the date of her statements. In fact, these contracts were generating losses due to the material expenses that were being incurred to build customize systems for each state.

253.    The statements set forth above in ¶¶ 249-51, regarding the progress the Company was making with its ongoing Health Enterprise implementations, and the specific risks posed to these implementations, were materially false, or misleading because Defendant Mikells failed to disclose material information, when made. In addition to the reasons set forth above in ¶¶ 183, 210-11, 225, 230, 242, and 246, Defendants' statements regarding the current state of the Company's Health Enterprise implementations, including that Health Enterprise was "performing well in the states where it's been rolled out" and "progressing on the implementations in other states" were materially false or misleading for the following reasons:

        a.    A March 2015 California IPOC report, which found that "***continued funding [for the system replacement project] may be at risk if action is not taken immediately***" to address the Company's continuous inability to provide sufficient architectural documentation, because the California MMIS replacement project was funded by enhanced Federal Financial

Participation, for which "a comprehensive HE platform/product architecture definition and design is required."

b. An April 2015 California IPOC report, which found that a review of the Company's Health Enterprise source code produced "alarming" findings, with over 12,000 code issues being identified. The report concluded that "[the California DHCS] should not be making decisions without a clear understanding of the [system] architecture" being designed by the Company, and that "*[t]he state is not protecting their assets by allowing the continuation of a contract in place since 2010, to continue to miss dates and not deliver business value*."

c. A May 2015 California IPOC report, which documented that the system replacement project was 22 months behind schedule and concluded that "*to date Xerox has not been able to deliver business value to the stakeholders*." The report further concluded that "*unless there was an effort to immediately address disconnects, the project will continue to add great risk to the state*."

d. A May 21, 2015, email from the California DHCS Assistant Deputy Director of the CA-MMIS to the Company stating that "[i]t is extremely risky and goes against all industry best practices to assume that Xerox is going to bring a SME [subject matter expert] Architect expert in on the eleventh hour and construct an architecture in parallel with the ongoing system development. *This is not feasible to produce a quality product much less standup anything of significance*."

e. Minutes from a May 20, 2015 State User Group – Health Enterprise Systems Meeting, attended by representatives of California, Montana, New Hampshire, North Dakota, and New York that reveal that *the Montana and California representatives reported critical issues related to the Company's performance*. The Montana representative reported that the state "[c]ontinue[d] to struggle with Xerox on progress, reported low schedule performance," and that "Xerox is under Corrective Action Plan in 7 areas for material breech [sic] in three areas related to session preparation, execution and schedule management." Similarly, the California representative "[r]eported [a] struggle with Xerox being contractually compliant."

f. Contrary to Defendant Mikells' statement that the Company was "pretty close to the finish line" on the North Dakota Health Enterprise implementation, an April 2015 Report on the North Dakota MMIS reported that "new [code] defects continue to be identified in most [testing] lifecycles" and observed that "the percentage of defects directly related to quality is also very high, especially given the amount of testing already conducted in prior testing lifecycles." The report concluded that

that "*[t]he ND Health Enterprise MMIS has yet to be stabilized due to
continuing code changes that are still in development*."

254.    Defendants' materially false or misleading statements maintained artificial

inflation in the price of Xerox common stock until the previously misrepresented and concealed

material facts concerning the Company's Health Enterprise business were fully revealed and/or

the foreseeable risks concealed by Defendants' misstatements fully materialized on October 27,

2015, as alleged below in Section VI.

## VI.    LOSS CAUSATION

255.    As alleged herein, Defendants engaged in a scheme to deceive investors during

the Class Period by misrepresenting and omitting material facts concerning the capabilities,

performance, and profitability of the Company's Services segment, particularly the nature and

status of Health Enterprise and its implementation in various states. Defendants' materially false

or misleading statements and omissions of material fact, alleged above in Section V, caused the

price of Xerox common stock to be artificially inflated, and/or maintained such artificial inflation

during the Class Period, operating as a fraud or deceit upon Lead Plaintiff and other Class Period

purchasers of Xerox common stock.

256.    Relying upon the integrity of the market price for Xerox common stock and

public information relating to the Company, Lead Plaintiff and other Class members purchased

or otherwise acquired Xerox common stock at prices that incorporated and reflected Defendants'

misrepresentations and omissions of material fact alleged herein. Lead Plaintiff and other Class

members suffered actual economic loss and were damaged when the foreseeable risks of delays,

cost overruns, operating losses, and failed Health Enterprise implementations created and

concealed by Defendants' misstatements and omissions materialized through the public

disclosure of new information concerning the Company's Services segment, particularly Health

Enterprise—Xerox's purported transferable, reusable, replicable, and scalable platform with plug-and-play characteristics—and the Company's MMIS implementations with various states, on October 22, 2014, April 24, 2015, October 26, 2015, and October 27, 2015. As alleged above in ¶¶ 231-34 and 247-51 and in this Section, these partial corrective disclosures and/or materializations of the foreseeable risks concealed by Defendants' fraud caused foreseeable declines in the price of Xerox common stock by removing portions of the artificial inflation in the price of Xerox common stock that resulted from Defendants' fraud. The timing and magnitude of the declines in the price of Xerox common stock in response to the public disclosure of new, Company-specific news on each of the foregoing days, as alleged herein, negate any inference that the losses suffered by Lead Plaintiff and other Class members were caused by changed market conditions or other macroeconomic factors unrelated to Defendants' fraud.

257.    As set forth in ¶¶ 231-34 above, on October 22, 2014, the Company announced its financial results for third quarter of 2014, ended September 30, 2014, in a Form 8-K filed with the SEC. In the October 22, 2014 Form 8-K, Defendant Burns reported that "Services results were lower than planned."

258.    During a conference call with analysts and investors conducted on October 22, 2014, Defendant Burns further revealed that "Services margin results were lower than planned," and that these negative results arose "as a result of higher costs in government healthcare, as well as ongoing strategic investments." Defendant Mikells added "[w]ithin government healthcare, we're making good progress, but expense levels are still high as we continue to invest to improve the performance of the first platform implementation of our new Medicaid platform." Moreover, in response to a Piper Jaffray analyst's question regarding Services margins and any surprises

experienced during 3Q14, Defendant Zapfel stated "[f]rom a negative surprises standpoint, obviously, we came in a little bit short of where we had been, where we committed that we would come in. And *I would say from a negative surprise standpoint, we did make choices to invest more in a couple of the MMIS contracts*." In response to a Credit Suisse analyst's question concerning the impact of the Company's Medicaid (MMIS) business on Services margins, Defendant Burns revealed that "*[a] major portion of the shortage that we see in margins is driven by the Medicaid investments*."

259.   The disclosure of the significant additional investments that Xerox made in an effort to service foundering Health Enterprise implementations negatively impacted Services margins and were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions of material facts concerning the nature and status of Health Enterprise—Xerox's purported transferable, reusable, replicable, and scalable platform with plug-and-play characteristics—and the Company's MMIS implementations with various states. Moreover, the October 22, 2014 disclosures revealed new information that was previously concealed by Defendants' misstatements, omissions, and fraudulent course of conduct. These disclosures partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions concerning the nature and status of Health Enterprise and the Company's MMIS implementations with various states. Thus, the October 22, 2014 disclosures also partially (but incompletely) revealed the materialization of the known foreseeable risks surrounding the Company's Health Enterprise business that Defendants knowingly and/or recklessly concealed from investors.

260.   As a direct and proximate result of these partial corrective disclosures and/or materializations of foreseeable risks concealed by Defendants' fraud, the price of Xerox common

stock declined by $0.99 per share, or 7.5 percent, from a closing price of $13.20 on October 21,

2014 to a closing price of $12.21 on October 22, 2014 on heavy trading volume, thereby

removing a portion of the artificial inflation in the price of Xerox common stock.

261.    Despite this partial disclosure of previously misrepresented and/or concealed

material facts on October 22, 2014, the price of Xerox common stock remained artificially

inflated due to Defendants' failure to fully disclose known adverse material facts concerning the

Company's Services segment, particularly the nature and status of Health Enterprise—Xerox's

purported transferable, reusable, replicable, and scalable platform with plug-and-play

characteristics—and the Company's MMIS implementations with various states.

262.    As set forth above in ¶¶ 247-51, a second partial disclosure occurred on April 24,

2015, when Xerox reported its financial results for its first quarter of 2015, ended March 31,

2015, in a Form 8-K filed with the SEC. In the April 24, 2015 Form 8-K, Defendant Burns

reported that "overall Services segment results fell short of our expectations driven by higher

implementation costs in certain Health Enterprise platform accounts." In this regard, the

Company reported that its first-quarter 2015 Services margin decreased by 1.1 percentage points

primarily due to higher costs in Xerox's Health Enterprise platform implementations. Moreover,

Xerox revealed that its first-quarter 2015 operating margin likewise decreased by 1.1 percentage

points as a result of, among other things, "lower revenue and higher costs associated with our

Government Healthcare Health Enterprise platform implementations." In the Form 8-K, Xerox

further reported that it was adjusting downward its full year financial guidance due to

expectations that Services revenues would be adversely impacted by increased implementation

costs from its Health Enterprise accounts.

263.    During a conference call with analysts and investors conducted on April 24, 2015,

Defendants provided additional new information concerning the impact of Xerox's Health

Enterprise business upon the Company's performance and prospects. For example, Defendant

Mikells stated that "we failed to accurately call the incremental financial pressure we're

experiencing in our Government Healthcare business from the rollout of our Health Enterprise

Medicaid platform," and that "financial pressure from our Health Enterprise implementations"

was one of the "largest drivers" of the 18 percent decline in operating profit that Xerox reported

for first-quarter 2015. Defendant Mikells further revealed that:

> *the driver of the Services margin miss was lower revenue and*
> *more costs than anticipated with our Health Enterprise platform*
> *implementation. California had the largest impact on our results*
> *in the quarter*. We successfully implemented the first phase at the
> end of last year, however, recent estimates to deliver the remaining
> phases are higher.

264.    The negative impact that Xerox's Health Enterprise business had upon the

Company resulted from facts known to or recklessly disregarded by Defendants prior to the

beginning of the Class period, but misrepresented to and/or concealed from Class members until

the April 24, 2015 conference call. Namely, as Defendants revealed for the first time, Health

Enterprise *never was a transferable, reusable, replicable, or scalable platform with plug-and-*

*play characteristics*, as Defendants had consistently represented to investors. Instead, the

Company merely possessed a Medicaid claims processing technology that, unlike an actual

platform, was not transferable, reusable, replicable, scalable, or accurately characterized as

possessing "plug-and-play" functionality, as Defendants had repeatedly represented.

265.    For example, in her prepared remarks delivered during the April 24, 2015

conference call, Defendant Mikells revealed that, purportedly unlike the New York State MMIS

contract that was reportedly finalized during April 2015, Xerox's Health Enterprise

implementation contracts with other states, such as California, Montana, Alaska, and North

Dakota, "*were signed before we finished development of the core software program*."

According to Defendant Mikells:

> [w]e had delayed finishing the new platform and meeting client
> delivery dates resulting in cost increases. *In the case of California,
> as the new project plan was built out further, we recognized that
> the cost to complete the entire program would increase, which
> triggered an adjustment in the quarter. In contrast, New York
> was bid after the Health Enterprise platform was completed* and
> we've been investing ahead to position us for a strong start.

266.    In light of Xerox's disclosure that the Health Enterprise "core software platform"

was incomplete at the time the Company entered into all state MMIS contracts other than New

York, Defendant Mikells revealed:

> [W]e have more work ahead to turn around the financial
> performance. We're taking a number of additional actions to
> improve the picture and have adjusted expectations to reflect what
> we believe is required to meet our customer commitment. *This is
> the main driver of our revised Services margin guidance*.

267.    Securities analysts had numerous questions concerning Xerox's first-quarter 2015

results and Defendants' disclosure that the Company did not have a Health Enterprise platform

prior to April 2015, *which led Xerox to book a $30 million accounting adjustment in 1Q15 to*

*address costs and delays in its staged implementation of Health Enterprise projects,*

*particularly in California*. For example, in response to questions from a J.P. Morgan analyst

concerning "what went wrong" in Xerox's Health Enterprise implementations, Defendant

Mikells revealed that:

> [W]e had made a decision with the state of California to do this in
> a staged implementation rather than a single cutover, right, and that
> caused us to have to basically kind of restage and rework our
> project plan . . . . *And this is a contract that was signed years,
> years ago and in advance of our standard platform being
> completed*.

268.    In response to the same question, Defendant Zapfel added:

>   "[i]f I would just add on New York, ***I think the dominant
>   difference is that we were able to bid an already-working system
>   which as opposed to what we did in other states we hadn't
>   already completed the core software asset***.

269.    In response to a Piper Jaffray analyst's question concerning expenses in Xerox's

Government Healthcare business, Defendant Burns assured that "[o]nce we get past laying down

the platform, which is really complicated, and what we did for good, for better, for ugly, but the

facts are that we actually implemented a brand new platform in these five states that readies us

for the future."

270.    In response to a Morgan Stanley analyst's question concerning why Xerox

believed the implementation of the New York MMIS contract would proceed on a timeline

different from the other state implementation efforts, Defendant Zapfel stated:

>   [The New York MMIS contract is] a different situation in our view
>   compared to the ones that we have previously done with the Health
>   Enterprise platform because ***we are starting from a working code
>   base rather than starting from something that was still in design***.
>
>   ***
>
>   ***So really the previous contracts we have not yet completed the
>   code base.*** So there's been a three-year-plus gap between the last
>   one and now in New York. ***So the book of business that we signed
>   previously, we had some of the code base solidified, but some of
>   it's still, if you will, in design mode***. And for New York, it's not as
>   though we don't have some level of customization to do. It's not
>   just taking a software asset and making no modifications or
>   changes to it. But it is largely often existing proven code base that
>   we're running in one of the other states.

271.    The disclosure of new information revealing that the setbacks in the Company's

Services segment based upon delays and cost overruns in its Health Enterprise business resulted

from Health Enterprise not being a transferable, reusable, replicable, and scalable platform with

plug-and-play characteristics were foreseeable consequences of, and within the zone of risk

concealed by, Defendants' misrepresentations and omissions of material facts concerning the

nature and status of Health Enterprise—Xerox's purported transferable, reusable, replicable, and

scalable platform with plug-and-play characteristics—and the Company's MMIS

implementations with various states. Moreover, the April 24, 2015 disclosures revealed new

information that was previously concealed by Defendants' misstatements, omissions, and

fraudulent course of conduct. These disclosures partially (but incompletely) revealed some of the

relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions

concerning the nature and status of Health Enterprise—Xerox's purported transferable, reusable,

replicable, and scalable platform with plug-and-play characteristics—and the Company's MMIS

implementations with various states. Thus, the April 24, 2015 disclosures also partially (but

incompletely) revealed the materialization of the known foreseeable risks surrounding the

Company's Health Enterprise business that Defendants knowingly and/or recklessly concealed

from investors.

272.    Following the Company's announcement of its first-quarter 2015 financial results

and Defendants' belated disclosure that Xerox lacked an actual Health Enterprise platform prior

to April 2015, securities analysts issued reports. These reports confirmed that the negative

investor inferences drawn from the previously misrepresented and concealed information

disclosed on April 24, 2015, were caused by disclosure of this new information and/or a

foreseeable materialization of the risk concealed by Defendants' material misrepresentations and

omissions. For example:

- J.P. Morgan's April 27, 2015 report noted that Xerox "believes much of
  its recent MMIS platform issues stem from the company committing to
  implementing the Enterprise system even before it was developed." In this
  regard, the J.P. Morgan analyst observed that the Government healthcare
  business "***hurt revenue growth and margin profile for the services
  business as well [as] for the entire company***" and that the MMIS contract

with California was the "key surprise." The J.P. Morgan analyst further reported that Xerox "appeared more comfortable w/NY contract given it was signed after the Enterprise system was developed."

- Morgan Stanley's April 27, 2015 report similarly observed, "the decision to phase in deployment of the company's California healthcare contract led to an accounting charge . . . [t]he resulting lower Services revenue, margin hit from the charge, and guide down for the year resulted in ugly headlines for the stock."

- In its April 27, 2015 report, Credit Suisse noted that "management lowered their targets on services margins to 8.5% - 9% for the year. The company attributed this to cost of new Health Enterprise Platform implementation costs."

- Piper Jaffray's April 27, 2015 report noted that future changes were anticipated in light of the Company's disclosure that it did not have an actual HE/MMIS platform prior to April 2015. Specifically, Credit Suisse reported: "[w]e expect new MMIS implementations, including the recently finalized NY contract, to involve more predictable and less required investment as contracts are negotiated with upfront delivery of standardized platforms *instead of phased implementation of custom platforms*."

273.    As a direct and proximate result of these partial corrective disclosures and/or materializations of foreseeable risks concealed by Defendants' fraud, the price of Xerox common stock declined by $1.52 per share, or 11.57 percent, from a closing price of $13.14 on April 23, 2015 to a closing price of $11.62 on April 27, 2015 on heavy trading volume.

274.    Despite the April 24, 2015 partial disclosure of previously misrepresented and/or concealed material facts, the price of Xerox common stock remained artificially inflated due to Defendants' failure to fully disclose known adverse material facts concerning the Company's Services segment, particularly the nature and status of Health Enterprise—Xerox's purported transferable, reusable, replicable, and scalable platform with plug-and-play characteristics—and the Company's MMIS implementations with various states.

275.     A third partial disclosure occurred on October 26, 2015, when Xerox reported its

financial results for its third quarter of 2015 in a Form 8-K filed with the SEC. In the October 26,

2015 Form 8-K, Xerox announced that its Board of Directors had authorized "a review of the

Company's business portfolio and capital allocation options." Commenting on the announced

comprehensive review of Xerox's operations, Defendant Burns stated in the October 26, 2015

Form 8-K that:

> Although we already have taken steps to accelerate cost reductions
> and prioritize investments to drive improved productivity and
> higher margins, ***our Board determined that undertaking a
> comprehensive review of structural options for the company's
> portfolio is the right decision at this time***.

276.     During a conference call with analysts and investors conducted on October 26,

2015, Defendants provided additional new information concerning the impact of Xerox's Health

Enterprise business upon the Company's performance and prospects. In her prepared remarks,

Defendant Mikells disclosed that the Company's Health Enterprise implementations in

California and Montana were operating at a loss:

> As announced two weeks ago, this quarter we recorded a pre-tax
> charge of $389 million or $241 million after tax, reflecting that we
> no longer expect to fully complete the Health Enterprise platform
> projects in California and in Montana. ***This decision will improve
> Xerox's future financial performance, as these implementations
> were generating losses, and will remove an element of risk and
> volatility in the business***.

277.     Also during the October 26, 2015 conference call, Defendant Burns revealed that

the Company had previously decided to examine structural options for the Company, which

included as a significant precipitating factor "a fundamental change in our Government

Healthcare strategy, particularly in Health Enterprise," but had delayed disclosing this

information to investors. In this regard, Defendant Burns had the following exchange with

Shannon S. Cross of Cross Research ("Cross"):

> CROSS: [W]hat made the change? In your mind looking at how the businesses, what made it happen or be announced this quarter versus prior? Is there anything significant that changed, or how did this come about?
>
> BURNS: I think that the board decided and I'm a member of the board, obviously, the Chairman of the Board – ***we decided to make it public. We decided as a group to make it public***.

278.     The disclosure of new information concerning the losses that Xerox suffered under its MMIS contracts with California and Montana and that the Xerox Board was now conducting a "comprehensive review of structural options" for the Company that included as a significant precipitating factor "a fundamental change in our Government Healthcare strategy, particularly around Health Enterprise," were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions of material facts concerning the nature and status of Health Enterprise—Xerox's purported transferable, reusable, replicable, and scalable platform with plug-and-play characteristics—and the Company's MMIS implementations with various states. Moreover, the October 26, 2015 disclosures revealed new information, and/or were the materialization of the risk that was previously concealed by Defendants' misstatements, omissions, and fraudulent course of conduct, *i.e.*, that Xerox's entire Health Enterprise business was unprofitable because Health Enterprise ***never was a transferable, reusable, replicable, or scalable platform with plug-and-play characteristics***, despite representing on April 24, 2015 that the platform was finally complete. These disclosures therefore revealed a portion of the remaining relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions concerning the Company's Health Enterprise business.

279.     Securities analyst reports issued after Xerox's October 26, 2015 disclosures confirmed that the negative investor inferences drawn from the previously concealed information

disclosed on October 26, 2015, resulting in a 3 percent decline in the price of Xerox common

stock on extremely heavy trading volume on October 26, 2015 (alleged below in ¶ 281), were

caused by disclosure of this new information and/or a foreseeable materialization of the risk

concealed by Defendants' material misrepresentations and omissions. For example, BMO

Capital Markets issued a report on October 26, 2015 noting that Xerox's "challenges in the

Health Enterprise (HE) division have led to the announced business portfolio review."

280.     On October 27, 2015, Fitch Ratings downgraded Xerox's credit rating to "Rating

Watch Negative" based on the Company's announcement that it was conducting a

comprehensive review of its structural options. In issuing the downgrade, Fitch Ratings noted

that its credit concerns included "higher than expected costs associated with government

healthcare contracts" and that "increased investments should constrain meaningful operating

profit margin expansion." Similarly, Standard & Poor's Ratings Services revised the outlook for

Xerox to negative from stable. S&P noted that "[t]he outlook revision reflects our view of the

uncertainties of the company's strategic review, which could result in a business separation or

adoption of a more aggressive financial policy."

281.     As a direct and proximate result of these partial corrective disclosures and/or

materializations of foreseeable risks concealed by Defendants' fraud, the price of Xerox common

stock declined by $0.31 per share, or 3 percent, from a closing price of $10.34 on October 23,

2015 to a closing price of $10.03 on October 26, 2015 on heavy trading volume, thereby

removing a portion of the artificial inflation in the price of Xerox common stock. The price of

Xerox common stock declined by $0.74 per share, or 7.38 percent, from a closing price of

$10.03 on October 26, 2015 to a closing price of $9.29 on October 27, 2015 on heavy trading

volume, thereby removing a portion of the artificial inflation in the price of Xerox common stock.

282. The material misrepresentations and omissions alleged above had the effect of causing the prices for Xerox common stock to be artificially inflated throughout the Class Period. Lead Plaintiff and other Class members purchased or otherwise acquired Xerox common stock at prices that were artificially inflated as a result of Defendants' misrepresentations and omissions of material fact alleged herein.

283. Defendants' wrongful conduct directly and proximately caused the damages suffered by Lead Plaintiff and other Class members. Throughout the Class Period, the prices at which Lead Plaintiff and other Class members purchased Xerox common stock were artificially inflated as a result of Defendants' materially false or misleading statements and omissions of material fact concerning among other things, the nature and status of Health Enterprise—Xerox's purported transferable, reusable, replicable, and scalable platform with plug-and-play characteristics—and the Company's MMIS implementations with various states. Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Lead Plaintiff and other Class members would not have purchased or otherwise acquired Xerox common stock at the artificially inflated prices that they paid. It was entirely foreseeable to Defendants that misrepresenting and concealing these material facts and risks from the public would cause the prices of Xerox common stock to be artificially inflated, or maintain existing artificial inflation. It was also foreseeable that the ultimate disclosure of this information, and/or the materialization of the risks concealed by Defendants' material misstatements and omissions, would cause the price of Xerox common stock to decline, as the inflation resulting from

Defendants' earlier materially false or misleading statements and omissions of material fact was removed from the price of Xerox common stock.

284.    Accordingly, Defendants' conduct, as alleged herein, proximately caused foreseeable losses to Lead Plaintiff and to the other members of the Class who purchased or otherwise acquired Xerox common stock during the Class Period.

285.    The economic losses, *i.e.*, damages, suffered by Lead Plaintiff and other Class members are direct and foreseeable results of: (i) Defendants' materially false or misleading statements and omissions of material fact, which caused the price of Xerox common stock to be artificially inflated; and (ii) the subsequent significant decline in the price of Xerox common stock when the truth was gradually revealed and/or the risks previously concealed by Defendants' fraud gradually materialized on October 22, 2014, April 24, 2015, October 26, 2015 and October 27, 2015, removing portions of the artificial inflation from the price of Xerox common stock.

## VII.    POST-CLASS-PERIOD DEVELOPMENTS

### A.    Xerox Spins-Off Its Business Process Outsourcing Business, Creating A Publicly Traded Company Called Conduent

286.    After announcing on October 26, 2015 that the Company would review its portfolio of business and allocation of capital, Xerox ultimately determined that it would spin off its Business Process Outsourcing business. On January 29, 2016, Xerox issued a press release in which it "announced the results of its review of the company's portfolio and capital allocation options announced in October 2015." The press release continued: "The Board of the company has unanimously approved management's plan to separate Xerox into two independent publicly-traded companies, each of which will be a leader in its respective industry." Pursuant to this plan, Xerox would separate its Business Process Outsourcing business from its Document Technology

and Document Outsourcing business. Each of the businesses would then operate as an independent, publicly-traded company.

287.    On November 8, 2016, Xerox announced that the separation would occur by means of a distribution to Xerox shareholders of 100 percent of the outstanding shares of the spun-off Business Process Outsourcing unit, which would be a publicly traded company called Conduent Incorporated. The announcement explained that on the distribution date of December 31, 2016, Xerox shareholders would receive one share of Conduent common stock for every five shares of Xerox common stock they held as of the close of business on December 15, 2016, the record date for the distribution.

288.    On January 3, 2017, Xerox announced that it had completed the spin off. Conduent is now an independent public company listed and traded on the New York Stock Exchange ("NYSE") under the symbol "CNDT."

### B.    Conduent Announces It Likely Would Not Complete the New York Contract

289.    On February 16, 2017, Conduent announced that, after discussions with the State of New York regarding the status and scope of the Health Enterprise implementation, "it is probable that it will not fully complete the implementation of the platform in New York."

290.    Because it was likely not to complete the New York implementation, Conduent also announced that it would record a pre-tax charge of approximately $161 million (approximately $98 million after-tax or ($0.48) per share) in its fourth-quarter 2016 results reflecting estimated asset impairments, wind down costs and other impacts from this project. The charge included approximately $115 million for the write-off of receivables and other related assets and non-cash impairment charges, with the remainder of the charge expected to be cash outflows in future quarters for wind down and related costs.

291.    On February 22, 2017, Conduent issued a press release in which it announced its fourth-quarter and full-year 2016 financial results. On an earnings conference call discussing those results, Conduent's CEO, Ashok Vemuri, reiterated that Conduent believed it "will not fully complete the implementation of the platform [in New York] as originally designed."

292.    Conduent's announcement meant that each one of Xerox's Health Enterprise implementations was either not completed or was completed only after extensive cost overruns and delays—further demonstrating that Health Enterprise never was a transferable, reusable, replicable, or scalable platform with plug-and-play characteristics, as Xerox had represented throughout the Class Period.

## VIII.   ADDITIONAL ALLEGATIONS OF SCIENTER

293.    In addition to the allegations set forth above in Sections IV and V, numerous additional facts give rise to a strong inference that, throughout the Class Period, Defendants knew or recklessly disregarded that (i) Health Enterprise was not a transferable, reusable, replicable, and scalable platform with plug-and-play characteristics, and thus was not a product that could easily be transferred from state to state or easily adapted to meet each state's MMIS requirements; (ii) Health Enterprise was not operating effectively in the states where it had been or was being implemented; and (iii) Health Enterprise was not capable of being implemented profitably in the states where the Company had been awarded contracts pursuant to terms that were premised on the Company being in possession of a transferable, reusable, replicable, and scalable platform with plug-and-play characteristics.

294.    For example, Defendants' scienter can be inferred from the fact that Health Enterprise was central to Defendants' goal to transform Xerox from a technological hardware-focused company into a services-focused business. As Defendant Burns stated in the April 23, 2012 press release, "Services now ***represents more than half of our total revenue and will***

***continue to be the growth engine of our company as we expand our BPO offerings***." Similarly, Defendant Blodgett stated during the Barclays Capital Global Technology, Media, and Telecommunications Conference on May 23, 2012, that Services margins were "of critical, critical importance."

295.    Defendants' repeated statements as to the growth opportunities available in government healthcare and the competitive advantages offered by Health Enterprise continued throughout the Class Period, further demonstrating that this was an area upon which Defendants particularly focused, had a duty to monitor, and therefore knew or recklessly disregarded that Health Enterprise was not a reusable or transferable platform. For example:

(a)    On May 17, 2012 during the Company's presentation at the J.P. Morgan Global Technology, Media, and Telecom Conference, Defendant Maestri stated that because the Company had a platform it could "reuse" the "cost of delivery of [new MMIS] contracts are going to be significantly lower than what [the Company's] competitors can offer."

(b)    On March 7, 2013, Defendant Scanlon stated during the Company's Healthcare Services Analyst Day that Xerox had "a big presence in a large number of states," and that the Health Enterprise "platform gives us the opportunity to expand."

(c)    On November 13, 2012, Defendant Burns stated during the Company's annual Investor Conference that the purported Health Enterprise platform "helps us differentiate ourselves from our competitors."

(d)    On October 24, 2013, during an earnings call, Defendant Mikells stated that "within BPO, healthcare is our fastest growing area."

(e)    On April 22, 2014, during an earnings call, Defendant Burns described the MMIS market as "a growing market."

(f)     On July 25, 2014, during an earnings call, Defendant Burns stated that "the government healthcare market is a very attractive market."

(g)     On November 11, 2014, Defendant Zapfel stated during the Company's annual Investor Conference that government healthcare was a "big, growing, indisputably growing market."

296.    Defendants' own statements confirm that they paid particularly close attention to the status of each specific implementation of Health Enterprise. Defendants were thus aware or recklessly disregarded that, contrary to their public statements, Health Enterprise (i) was not a transferable, reusable, replicable, and scalable platform with plug-and-play characteristics that could be easily transferred and adapted in each state; (ii) was plagued with implementation problems, including cost overruns and delays; and (iii) was not driving and could not drive higher margins for the Company. For example:

(a)     On October 6, 2011, Defendant Burns sent a letter a letter to the Executive Director of the North Dakota Department of Human Services (copying Defendants Blodgett and Bywater) stating: "I wanted to take this opportunity to assure you that *I have been kept fully informed of the status of the implementation*. . . . Successful completion and implementation of the Health Enterprise solution is *one of my foremost priorities*."

(b)     On April 23, 2012 Defendant Maestri explained on an earnings call that "*we follow all these contracts at the granular level so each one of them, and we've got specific, you know, actions for all of them, starting from California, but all the other big ones that we are starting up* . . ."

(c)     On November 12, 2013, at Xerox's annual investor conference, Defendant Burns explained that "we're going to spend a lot of time making sure that we get the margin

outcome from those contracts right, ***which is all about implementation and working closely with the client. So we're going to have a huge amount of focus on that***."

(d)     On April 22, 2014, Defendant Burns stated on an earnings call that she knew that "Services margins . . . is an area of keen focus for investors and I can assure everyone ***an area of intense focus internally***."

(e)     On November 11, 2014, at the Company's annual Investor Conference, Defendant Zapfel stated during a presentation on the Company's Health Enterprise business that "Ursula [Defendant Burns] and I are both personally engaged with . . . many of these clients" and that "we're working closely with both North Dakota and Montana as they get ready for, you know, implementations in 2015 and beyond." Defendant Zapfel added that on "***each one of these [Health Enterprise implementations] every day, you're working with the state***."

297.     Furthermore, Defendants Xerox, Zapfel, and Mikells admitted on April 24, 2015 that Xerox did not have a transferable, reusable, replicable, and scalable platform with plug-and-play characteristics throughout the Class Period, despite Defendants' representations to the contrary. Specifically, they conceded that "***[w]ith the exception of the New York Medicaid contract, these [Health Enterprise] deals were signed before [Xerox] finished development of the core software platform***." and that as of April 24, 2015, Xerox was "***working to consolidate the customized instances into a standardized platform that would then be less costly to implement and manage going forward***." Defendants further admitted that with respect to each of Xerox's previous Health Enterprise implementations, the Company did not have "***a working code base***" and was attempting to implement "***something that was still in design***."

298.     A strong inference of Defendants' scienter also arises from the documents obtained pursuant to the FOIA Requests. While Defendants touted the purported success of the

Company's government healthcare business in an attempt to maintain the illusion of Xerox's

successful transformation into a services-led business, Defendants' knew and/or recklessly

disregarded that the Company was experiencing significant problems with each state

implementation of the Company's Health Enterprise system. These problems, which were

concealed from the public, reflected the problems encountered by having to develop a custom

solution for each state. For example:

> *California*

> (a)     A December 2012 California IPOC report, which concluded that "[b]ased

on our assessment of the current [MMIS system replacement] schedule, the overall project

performance [against the schedule] will most likely continue in the negative."

> (b)     California IPOC reports issued between January 2013 and April 2015

which raised concerns about the lack of system technical architecture documentation, ultimately

leading the California IPOC to conclude: "Xerox's continuous inability to provide sufficient

architectural documentation and/or communication related to the code, design,

interdependencies, constraints, and other key documentation [of Health Enterprise] are an

indication of an incomplete, or even worse, immature product" and that this ***raised questions as***

***to the "existence of a true transfer system."***

> (c)     A February 25, 2014 California State Auditor Letter Report, which

documented that due to implementation problems, "beginning in September 2013, Health Care

Services' executives started meeting with Xerox corporate executives every month in

Sacramento to discuss the status of the system replacement project and any Xerox staff

turnover."

(d)        An October 2014 California IPOC report found that due to the Company's failure to abide by the approved implementation schedule, "it is not achievable to plan for future releases or to be able to determine the current status for deployment."

(e)        A February 19, 2015 California State Auditor Letter Report, which documented that "project oversight entities have raised **_significant concerns_** that the project must address to increase the likelihood that Xerox will produce a timely and high quality replacement for CA-MMIS." The Report also documented that due to concerns about Xerox's software development methodology, all future payments to Xerox would be conditioned on Xerox delivering a platform with the functionality required by the state. As reflected in a May 2015 California IPOC report, Xerox had failed to deliver a functioning product as of May 2015, and accordingly, had not received any compensation for its work implementing Health Enterprise in California.

(f)        Minutes from a May 20, 2015 State User Group – Health Enterprise Systems Meeting, attended by representatives of California, Montana, New Hampshire, North Dakota, and New York that reveal that **_the Montana and California representatives reported critical issues related to the Company's performance_**.

**_North Dakota_**

(g)        A November 9, 2012, letter from the Interim Executive Director of the North Dakota DHS to Defendant Bywater notifying Xerox that North Dakota intended to impose liquidated damages on Xerox for multiple missed contract milestones attributable to Xerox's "inability to resolve defects" with the Health Enterprise implementation.

(h)        A February 14, 2013, letter from the Interim Executive Director of the North Dakota DHS to Defendant Bywater explaining that North Dakota would withhold full

payment on a number of contract deliverables and that the "[t]otal liquidated damages accrued through February 14, 2013 on the late deliverables . . . is $687,000."

(i)     An April 2015 Report on the North Dakota MMIS reporting that "new [code] defects continue to be identified in most [testing] lifecycles" and observing that "the percentage of defects directly related to quality is also very high, especially given the amount of testing already conducted in prior testing lifecycles." The report concluded that that "*[t]he ND Health Enterprise MMIS has yet to be stabilized due to continuing code changes that are still in development*."

*Alaska*

(j)     A January 18, 2014 email from the Commissioner of the Alaska DHSS to Defendant Blodgett and others informing the Company of the questions being asked by the state's legislators and governor regarding the Health Enterprise implementation which stated: "The Governor has indicated that Xerox leadership needs to be at the [House Finance Meeting]. Your lobbyist will not do and I will expect one or more of you to be there."

(k)     A March 24, 2014, letter from the Commissioner of the Alaska DHSS to Defendant Blodgett threatening to declare Xerox in default of the Alaska MMIS contract if the hundreds of defects identified after the system went live were not remediated. On April 28, 2014, Xerox responded to the foregoing letter, stating that "*we agree that work remains to stabilize the Alaska Medicaid Health Enterprise system*."

(l)     A July 2, 2014 email to Defendant Zapfel forwarding a July 2, 2014 mediation demand letter sent by Alaska's Attorney General to Xerox's General Counsel, which cited Xerox's "failure to provide a corrective action plan or otherwise cure its performance deficiencies."

*Montana*

(m)     An April 2014 Monthly Status report on the Montana Health Enterprise implementation, which documented that Xerox had not been paid any money for its work in that state due to multiple missed contract milestones, and that liquidated damages had been accruing since November 2013 and ***totaled nearly $5 million dollars*** as of April 16, 2014.

(n)     A May 2014 report to the Montana Legislative Finance Committee that documented that "Public Knowledge . . . has reported ***the Xerox MMIS DDI project performance status as 'Red' in all of their independent status reports since April 8, 2013***."

(o)     A November 15, 2014, report to the Montana Legislative Finance Committee that documented that as of that date, Xerox had not been paid any money related to the contract payment milestones for the Montana Health Enterprise implementation. The report also documented that "Xerox continues to experience challenges executing the design sessions," and that the state "expects the overall project status to remain "Red' until Xerox improves the execution of the design sessions."

(p)     Minutes from a May 20, 2015 State User Group – Health Enterprise Systems Meeting, in which the Montana representative reported that "Xerox is under Corrective Action Plan in 7 areas for material breech [*sic*] in three areas related to session preparation, execution and schedule management."

299.    Additionally, a strong inference of Defendants' scienter can be inferred from Defendants' willingness to mislead customers in order to obtain MMIS business. Defendants made such misleading statements in connection with their attempt to win a contract with New York State:

(a)      On June 25, 2013, the New York State Department of Health ("New York DOH") solicited proposals for a contractor to replace New York's current MMIS.

(b)      In response to from the New York DOH, Xerox mischaracterized the Alaska Health Enterprise implementation as "remarkably smooth," and failed to disclose the ongoing problems the Company was experiencing with each of its current Health Enterprise implementations.

(c)      Consistent with its misrepresentations to the public, Xerox described Health Enterprise as "scalable" throughout its proposal, and misrepresented that the product was "a fully developed solution."

300.      Further demonstrating Defendants' scienter is their willingness to mislead investors about alleged successes in the Company's government healthcare business not related to MMIS, as part of their effort to maintain the illusion that Xerox's services businesses were succeeding. Such misrepresentations occurred in connection with a Nevada project (not related to MMIS and not otherwise part of the operative claims in this Complaint) where Defendants falsely asserted that the project was successfully implemented when, in fact, they knew it was not:

(a)      In July 2012, Nevada selected Xerox as the vendor to design and build an insurance exchange to allow the implementation of the Affordable Care Act in Nevada. This was different from the MMIS programs Xerox had been working on, but was part of its overall strategy of creating growth in its government healthcare services business. The launch date of the new exchange was set by the federal government as October 1, 2013.

(b)      At no point did Xerox's implementation of the contract go well. An independent verification and validation report dated August 30, 2013 shows that, with only four

weeks to go, "only 22 simple applications (out of 235 scenarios) were fully executed . . . . All of those applications failed."

(c)     Despite the fact that the system simply was not ready, on October 24, 2013, in connection with the third-quarter 2013 earnings announcement, Defendant Mikells announced that Xerox had successfully implemented the Nevada system.

(d)     Just 6 months later, however, on April 22, 2014, Xerox was forced to acknowledge that it was not competently providing service to Nevada and that the Nevada Health Exchange "**has not gone well**."

(e)     Finally, at year end, on December 17, 2014, at the Tech Summit sponsored by Stanford Bernstein, Defendant Zapfel admitted that the Nevada project had failed: "*Nevada was a pretty unique kind of one-off implementation of a platform that we were unsuccessful with.*"

301.    In light of the foregoing, and in particular (i) the importance of Health Enterprise to Xerox's overall strategy to transform the Company into a services-driven business; (ii) Defendants' public statements touting the purported competitive advantages offered by Health Enterprise, the purported transferable, reusable, replicable, and scalable platform with plug-and-play characteristics; (iii) Defendants' public statements regarding their personal knowledge of the Company's Health Enterprise contracts; (iv) Defendants' concessions toward the latter part of the Class Period concerning the status of completion of a transferable, reusable, replicable, and scalable platform with plug-and-play characteristics, and (v) the significant and consistent concerns that Xerox's customers raised privately with the Company regarding Xerox's contractual performance throughout the Class Period, a strong inference exists that Defendants knew or recklessly disregarded that Health Enterprise was not a transferable, reusable, replicable,

or scalable platform with plug-and-play characteristics that could readily be implemented in multiple states, and that as a result, the Company's Health Enterprise contracts, which were premised on the existence of such a platform, were neither successful nor profitable.

## IX.   PRESUMPTION OF RELIANCE

302.    At all relevant times, the market for Xerox common stock was efficient for the following reasons:

(a)    Xerox common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Xerox filed periodic reports with the SEC and NYSE;

(c)    Xerox regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Xerox was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

303.    As a result of the foregoing, the market for Xerox common stock promptly digested current material information regarding Xerox from all publicly available sources and reflected such information in Xerox's stock price. Under these circumstances, all purchasers of Xerox common stock during the Class Period suffered similar injury through their purchase of Xerox common stock at artificially inflated prices, and a presumption of reliance applies.

304.     Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Lead Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## X.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

305.     The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the materially false or misleading statements pleaded in this Complaint.

306.     None of the statements complained of herein was a forward-looking statement. Rather, each was historical a statement or a statement of purportedly current facts and conditions at the time such statement was made.

307.     To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement. As alleged above in detail, then-existing facts contradicted Defendants' statements that (i) Xerox had a transferable, reusable, replicable, and scalable platform with plug-and-play characteristics; (ii) the Health Enterprise implementations were going well; and (iii) those implementations were profitable. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Xerox were not sufficient to insulate Defendants from liability for their materially false or misleading statements.

308.     To the extent that the statutory safe harbor does apply to any forward-looking statement pleaded herein, Defendants are liable for any such statement because at the time such statement was made, the particular speaker actually knew that the statement was false or misleading.

## XI.   CLASS ACTION ALLEGATIONS

309.   Lead Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all persons or entities who purchased or otherwise acquired Xerox common stock between April 23, 2012 and October 27, 2015, inclusive (the "Class"), and who were damaged thereby. Excluded from the Class are: (i) Defendants (as set forth herein); (ii) present or former executive officers and directors of Xerox, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing entities' and individual's legal representatives, heirs, successors or assigns; and (iv) any entity in which Defendants have or had a controlling interest, or any affiliate of Xerox. For the avoidance of doubt, "affiliates" are persons or entities that directly, or indirectly through one or more intermediaries, control, are controlled by or are under common control with one of the Defendants, and include any employee benefit plan organized for the benefit of Xerox's employees.

310.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Xerox common stock was actively traded on the NYSE. As of June 30, 2016, Xerox had 1,013,303,609 shares of common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds-of-thousands of members of the proposed Class. Class members who purchased Xerox common stock may be identified from records maintained by Xerox or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

311.    Lead Plaintiff's claims are typical of other Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

312.    Lead Plaintiff will fairly and adequately protect Class members' interests and has retained competent counsel experienced in class actions and securities litigation.

313.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts;

(c)    whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether Defendants acted with scienter; and

(e)    the proper way to measure damages.

314.    A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damages suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such Class members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

## XII.   CAUSES OF ACTION

### COUNT I

### FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5 PROMULGATED THEREUNDER (Against All Defendants)

315.   Lead Plaintiff repeats and re-alleges every allegation set forth above as if fully set herein.

316.   This Count is asserted by Lead Plaintiff on behalf of itself and all other members of the Class against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

317.   During the Class Period, Defendants disseminated or approved the materially false or misleading statements alleged herein, among others, which they knew or recklessly disregarded were misleading in that they misrepresented and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

318.   Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Xerox common stock during the Class Period. As alleged herein, the material misrepresentations contained in, or the material facts omitted from, those statements included, but were not limited to the following:

(a)   Xerox's representations that it possessed a Health Enterprise "platform" that was cost-efficient, reusable, replicable, transferable, and had "plug-and-play features";

(b)     Xerox's representations that its implementation contracts were going "well"; and

(c)     Xerox's representations that its implementation contracts were profitable and would continue to improve the Company's Services segment margins.

319.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class; made materially false statements and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Xerox common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiff and the other Class members, regarding, among other things, Health Enterprise; (b) artificially inflate and maintain the market price of Xerox common stock; and (c) caused Lead Plaintiff and other members of the Class to purchase Xerox common stock at artificially inflated prices and to suffer losses when the true facts became known.

320.    Defendant Xerox is liable for all materially false or misleading statements made during the Class Period, as alleged above.

321.    The Individual Defendants are liable for the false or misleading statements they made and for which they were responsible, as alleged above.

322.    As alleged above, the Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with reckless disregard for the truth. The material misrepresentations and omissions of material facts alleged herein,

which presented a danger of misleading buyers or sellers of Xerox common stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

323.    The above allegations, as well as the allegations pertaining to the overall scope and breadth of the fraud at Xerox, establish a strong inference that Defendants acted with scienter in making the materially false or misleading statements alleged above during the Class Period.

324.    Lead Plaintiff and the other Class members have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Xerox common stock, which inflation was removed from their price when the true facts became known. Lead Plaintiff and other Class members would not have purchased Xerox common stock at the prices they paid if they had been aware that the market price had been artificially and falsely inflated by Defendants' materially false or misleading statements.

325.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages attributable to the fraud alleged herein in connection with their purchases and/or acquisitions of Xerox common stock during the Class Period.

## COUNT II

### FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
### (Against the Individual Defendants)

326.    Lead Plaintiff repeats and re-alleges every allegation set forth above as if fully set herein.

327.    This Count is asserted by Lead Plaintiff on behalf of itself and all other members of the Class against each of the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

328.    During their tenures as officers and/or directors of Xerox, each of the Individual Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. By reason of their respective positions of control and authority as officers and/or directors of Xerox, each of the Individual Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. Each Individual Defendant was able to and did control, directly and indirectly, the content of the public statements made by Xerox during the Class Period, including the materially false or misleading statements alleged herein, thereby causing the dissemination of the false or misleading statements and omissions of material facts as alleged herein.

329.    In their capacities as senior corporate officers of the Company, and as more fully alleged above in ¶¶ 34-46, the Individual Defendants each had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions. Moreover, the Individual Defendants were each directly involved in providing false information and certifying and/or approving the materially false or misleading statements disseminated by Xerox during the Class Period. As a result of the foregoing, the Individual Defendants, as a group and individually, were controlling persons of Xerox within the meaning of Section 20(a) of the Exchange Act.

330.    As alleged above, Xerox violated Section 10(b) of the Exchange Act by its material misrepresentations and omissions as alleged in this Complaint. By virtue of their

positions as controlling persons of Xerox and as a result of their own aforementioned conduct, the Individual Defendants are each liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Xerox common stock. Moreover, as alleged above, during the respective times that the Individual Defendants served as officers and/or directors of Xerox, each of the Individual Defendants culpably participated in the material misstatements and omissions made by Xerox, as set forth above.

331.    As a direct and proximate result of the Individual Defendants' conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases or acquisitions of Xerox common stock.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

(a)     Declaring the action to be a proper class action pursuant to Fed. R. Civ. P. 23;

(b)     Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)     Awarding such equitable, injunctive, and other relief as the Court may deem just and proper.

## XIV.   **JURY TRIAL DEMANDED**

Lead Plaintiff hereby demands a trial by jury of all issues so triable.

DATED: May, 1 2017

Respectfully submitted,

LABATON SUCHAROW LLP

By: /s/ Michael W. Stocker
      Michael W. Stocker
      Ira A. Schochet
      Alfred L. Fatale III
      Ross M. Kamhi

140 Broadway
New York, NY  10017
Telephone:  (212) 907-0700
Facsimile:   (212) 818-0477
mstocker@labaton.com
ischochet@labaton.com
afatale@labaton.com
rkamhi@labaton.com

*Liaison Counsel for the Class*

KESSLER TOPAZ MELTZER
  & CHECK LLP

Andrew L. Zivitz (*pro hac vice pending*)
Geoffrey C. Jarvis
Johnston de F. Whitman, Jr.

280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
azivitz@ktmc.com
gjarvis@ktmc.com
jwhitman@ktmc.com

*Lead Counsel for Lead Plaintiff and the
Class*

## CERTIFICATION

I, Frank J. Wills, III, on behalf of Arkansas Public Employees Retirement System ("APERS" or "Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff did not purchase the securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

2.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

3.      Plaintiff's Class Period purchase and sale transactions in the Xerox Corporation securities that are the subject of this action are attached in Schedule A.

4.      APERS has full power and authority to bring suit to recover for the investment losses listed in the attached Schedule A.

5.      Plaintiff has fully reviewed the Amended Class Action Complaint for Violations of the Federal Securities Laws and authorizes its filing.

6.      I, Jay Wills, Deputy Director of APERS, am authorized to make legal decisions on Plaintiff's behalf.

7.      Plaintiff intends to actively monitor and vigorously pursue these actions for the benefit of the Class.

8.      Plaintiff will endeavor to provide fair and adequate representation and work directly with the efforts of Class counsel to ensure that the largest recovery for the Class consistent with good faith and meritorious judgment is obtained.

9.      Along with the instant action, *Oklahoma Firefighters Pension and Retirement System v. Xerox Corporation, et al.*, No. 1:16-cv-8260 (S.D.N.Y.), Plaintiff is currently serving or has served as a representative party in the following class actions filed under the federal securities laws during

the three years prior to the date of this Certification:

> *Kohut v. KBR, et al.*, No. 4:14-cv-1287 (S.D. Tex.)
>
> *In re The Bancorp Inc. Securities Litigation*, No. 1:14-cv-952 (D. Del.)
>
> *Baker v. SeaWorld Entertainment, Inc., et al.*, No. 4:14-cv-2129 (S.D. Cal.)
>
> *Schwartz v. Opus Bank, et al.*, No. 2:16-cv-7991 (C.D. Cal.)

10.     Plaintiff sought to serve (but was not appointed) as a representative party in the following class actions filed under the federal securities laws during the three years prior to the date of this Certification:

> *Kramer v. Chemical and Mining Company of Chile Inc., et al.*, No. 2:15-cv-2250 (C.D. Cal.)
>
> *Villella v. Chemical and Mining Company of Chile Inc., et al.*, No. 1:15-cv-2106 (S.D.N.Y.)
>
> *Blasco v. Keurig Green Mountain, Inc., et al.*, No. 3:15-cv-2766 (N.D. Cal.)
>
> *Lord Abbett Affiliated Fund, Inc., et al. v. Navient Corporation, et al.*, No. 1:16-cv-112 (D. Del.)

11.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _____ day of May 2017.

> **Arkansas Public Employees Retirement System**
>
> By: _____
>
> Frank J. Wills, III
> *Deputy Director*

## SCHEDULE A

| Security | Buy/Sell | Date | Quantity | Price |
|----------|----------|------|----------|-------|
| Common Stock | Buy | 5/9/2012 | 1,500 | $7.63 |
| Common Stock | Buy | 6/7/2012 | 2,000 | $7.55 |
| Common Stock | Buy | 9/13/2012 | 3,000 | $7.68 |
| Common Stock | Buy | 8/14/2013 | 500 | $10.52 |
| Common Stock | Buy | 1/9/2014 | 63,000 | $11.99 |
| Common Stock | Buy | 3/20/2014 | 14,800 | $10.94 |
| Common Stock | Buy | 3/21/2014 | 61,800 | $11.16 |
| Common Stock | Buy | 3/24/2014 | 33,000 | $10.95 |
| Common Stock | Buy | 3/25/2014 | 23,000 | $10.99 |
| Common Stock | Buy | 3/26/2014 | 21,600 | $10.98 |
| Common Stock | Buy | 3/27/2014 | 18,000 | $10.86 |
| Common Stock | Buy | 3/28/2014 | 15,800 | $11.07 |
| Common Stock | Buy | 3/31/2014 | 14,300 | $11.29 |
| Common Stock | Buy | 4/1/2014 | 14,300 | $11.33 |
| Common Stock | Buy | 4/2/2014 | 10,700 | $11.54 |
| Common Stock | Buy | 4/3/2014 | 32,900 | $11.71 |
| Common Stock | Buy | 4/22/2014 | 9,400 | $11.30 |
| Common Stock | Buy | 4/30/2014 | 20,300 | $12.06 |
| Common Stock | Buy | 4/30/2014 | 6,400 | $12.06 |
| Common Stock | Buy | 5/1/2014 | 14,600 | $12.11 |
| Common Stock | Buy | 5/1/2014 | 4,500 | $12.11 |
| Common Stock | Buy | 5/2/2014 | 5,200 | $12.06 |
| Common Stock | Buy | 5/2/2014 | 16,600 | $12.06 |
| Common Stock | Buy | 5/5/2014 | 2,700 | $11.99 |
| Common Stock | Buy | 5/5/2014 | 8,725 | $11.99 |
| Common Stock | Buy | 5/21/2014 | 4,200 | $11.83 |
| Common Stock | Buy | 5/21/2014 | 30,800 | $11.83 |
| Common Stock | Buy | 5/22/2014 | 11,300 | $11.86 |
| Common Stock | Buy | 7/25/2014 | 51,700 | $13.17 |
| Common Stock | Buy | 7/28/2014 | 14,100 | $13.11 |
| Common Stock | Buy | 8/20/2014 | 4,100 | $13.55 |
| Common Stock | Buy | 8/20/2014 | 39,000 | $13.53 |
| Common Stock | Buy | 9/22/2014 | 5,400 | $13.58 |
| Common Stock | Buy | 9/22/2014 | 21,000 | $13.63 |
| Common Stock | Buy | 9/23/2014 | 5,800 | $13.71 |
| Common Stock | Buy | 10/15/2014 | 35,500 | $12.50 |
| Common Stock | Buy | 10/15/2014 | 800 | $12.50 |
| Common Stock | Buy | 10/16/2014 | 14,100 | $12.52 |
| Common Stock | Buy | 10/22/2014 | 14,200 | $12.40 |
| Common Stock | Buy | 10/22/2014 | 38,200 | $12.39 |
| Common Stock | Buy | 11/19/2014 | 500 | $13.49 |

| | | | | |
|---|---|---|---|---|
| Common Stock | Buy | 12/9/2014 | 8,300 | $13.95 |
| Common Stock | Buy | 12/12/2014 | 40,900 | $13.55 |
| Common Stock | Buy | 12/22/2014 | 500 | $13.95 |
| Common Stock | Buy | 2/18/2015 | 500 | $13.76 |
| Common Stock | Buy | 2/27/2015 | 29,100 | $13.62 |
| Common Stock | Buy | 3/2/2015 | 11,500 | $13.67 |
| Common Stock | Buy | 3/2/2015 | 14,800 | $13.57 |
| Common Stock | Buy | 4/17/2015 | 22,400 | $12.84 |
| Common Stock | Buy | 4/24/2015 | 35,500 | $11.94 |
| Common Stock | Buy | 4/24/2015 | 43,800 | $11.90 |
| Common Stock | Buy | 4/30/2015 | 14,700 | $11.46 |
| Common Stock | Buy | 5/1/2015 | 2,000 | $11.58 |
| Common Stock | Buy | 5/1/2015 | 10,000 | $11.56 |
| Common Stock | Buy | 8/6/2015 | 14,900 | $11.04 |
| Common Stock | Sell | 7/16/2012 | 2,500 | $7.27 |
| Common Stock | Sell | 9/24/2012 | 12,290 | $7.72 |
| Common Stock | Sell | 10/9/2012 | 21,500 | $7.16 |
| Common Stock | Sell | 2/7/2014 | 8,500 | $10.39 |
| Common Stock | Sell | 5/16/2014 | 13,400 | $11.79 |
| Common Stock | Sell | 7/1/2014 | 2,900 | $12.39 |
| Common Stock | Sell | 7/29/2014 | 4,400 | $13.13 |
| Common Stock | Sell | 7/29/2014 | 1,536 | $13.04 |
| Common Stock | Sell | 8/13/2014 | 18,500 | $13.54 |
| Common Stock | Sell | 9/16/2014 | 7,429 | $13.47 |
| Common Stock | Sell | 9/16/2014 | 2,486 | $13.43 |
| Common Stock | Sell | 9/16/2014 | 2,485 | $13.46 |
| Common Stock | Sell | 10/27/2014 | 12,100 | $12.68 |
| Common Stock | Sell | 1/28/2015 | 6,075 | $13.41 |
| Common Stock | Sell | 2/25/2015 | 1,397 | $13.66 |
| Common Stock | Sell | 4/28/2015 | 648 | $11.51 |
| Common Stock | Sell | 5/27/2015 | 8,200 | $11.39 |
| Common Stock | Sell | 7/2/2015 | 60,000 | $10.62 |
| Common Stock | Sell | 7/2/2015 | 11,801 | $10.55 |
| Common Stock | Sell | 7/21/2015 | 36,700 | $10.61 |
| Common Stock | Sell | 7/21/2015 | 1,300 | $10.66 |
| Common Stock | Sell | 7/22/2015 | 30,600 | $10.68 |
| Common Stock | Sell | 7/22/2015 | 4,800 | $10.69 |
| Common Stock | Sell | 7/23/2015 | 43,100 | $10.76 |
| Common Stock | Sell | 7/24/2015 | 16,300 | $10.96 |
| Common Stock | Sell | 8/12/2015 | 30,500 | $10.97 |
| Common Stock | Sell | 8/13/2015 | 18,600 | $10.96 |
| Common Stock | Sell | 8/14/2015 | 29,300 | $10.98 |
| Common Stock | Sell | 8/17/2015 | 24,300 | $11.20 |
| Common Stock | Sell | 8/17/2015 | 1,100 | $11.20 |
| Common Stock | Sell | 8/18/2015 | 15,300 | $11.34 |

| | | | | |
|---|---|---|---|---|
| Common Stock | Sell | 8/19/2015 | 21,300 | $11.25 |
| Common Stock | Sell | 8/19/2015 | 6,000 | $11.25 |
| Common Stock | Sell | 8/20/2015 | 3,900 | $11.11 |
| Common Stock | Sell | 8/20/2015 | 13,900 | $11.11 |
| Common Stock | Sell | 8/20/2015 | 400 | $11.20 |
| Common Stock | Sell | 8/20/2015 | 1,300 | $11.20 |
| Common Stock | Sell | 8/21/2015 | 2,200 | $10.75 |
| Common Stock | Sell | 8/21/2015 | 1,200 | $10.94 |
| Common Stock | Sell | 8/21/2015 | 4,300 | $10.94 |
| Common Stock | Sell | 8/21/2015 | 7,700 | $10.75 |
| Common Stock | Sell | 8/24/2015 | 4,600 | $10.08 |
| Common Stock | Sell | 8/24/2015 | 104,700 | $10.08 |
| Common Stock | Sell | 8/24/2015 | 1,300 | $10.08 |
| Common Stock | Sell | 8/25/2015 | 1,200 | $10.03 |
| Common Stock | Sell | 8/25/2015 | 300 | $10.03 |
| Common Stock | Sell | 8/25/2015 | 26,400 | $10.03 |
| Common Stock | Sell | 8/26/2015 | 7,900 | $9.77 |
| Common Stock | Sell | 8/26/2015 | 41,800 | $9.77 |
| Common Stock | Sell | 8/26/2015 | 300 | $9.69 |
| Common Stock | Sell | 8/26/2015 | 100 | $9.77 |
| Common Stock | Sell | 8/26/2015 | 400 | $9.77 |
| Common Stock | Sell | 8/26/2015 | 1,600 | $9.69 |
| Common Stock | Sell | 8/27/2015 | 100 | $10.19 |
| Common Stock | Sell | 8/27/2015 | 100 | $10.14 |
| Common Stock | Sell | 8/27/2015 | 300 | $10.14 |
| Common Stock | Sell | 8/27/2015 | 3,100 | $10.19 |
| Common Stock | Sell | 8/27/2015 | 38,400 | $10.14 |
| Common Stock | Sell | 8/27/2015 | 16,400 | $10.19 |
| Common Stock | Sell | 8/27/2015 | 7,300 | $10.14 |
| Common Stock | Sell | 8/28/2015 | 3,700 | $10.31 |
| Common Stock | Sell | 8/28/2015 | 19,600 | $10.31 |
| Common Stock | Sell | 8/28/2015 | 200 | $10.31 |
| Common Stock | Sell | 8/31/2015 | 300 | $10.23 |
| Common Stock | Sell | 8/31/2015 | 100 | $10.23 |
| Common Stock | Sell | 8/31/2015 | 7,000 | $10.23 |
| Common Stock | Sell | 8/31/2015 | 36,700 | $10.23 |
| Common Stock | Sell | 9/1/2015 | 23,900 | $9.90 |
| Common Stock | Sell | 9/1/2015 | 200 | $9.90 |
| Common Stock | Sell | 9/1/2015 | 100 | $9.90 |
| Common Stock | Sell | 9/1/2015 | 4,500 | $9.90 |
| Common Stock | Sell | 9/2/2015 | 900 | $9.92 |
| Common Stock | Sell | 9/2/2015 | 100 | $9.88 |
| Common Stock | Sell | 9/2/2015 | 200 | $9.92 |
| Common Stock | Sell | 9/2/2015 | 200 | $9.88 |
| Common Stock | Sell | 9/2/2015 | 4,800 | $9.88 |

| Common Stock | Sell | 9/2/2015  | 25,600 | $9.88   |
| Common Stock | Sell | 9/3/2015  | 28,300 | $10.05  |
| Common Stock | Sell | 9/3/2015  | 5,400  | $10.05  |
| Common Stock | Sell | 9/3/2015  | 17,000 | $10.07  |
| Common Stock | Sell | 9/3/2015  | 200    | $10.07  |
| Common Stock | Sell | 9/3/2015  | 200    | $10.05  |
| Common Stock | Sell | 9/3/2015  | 100    | $10.05  |
| Common Stock | Sell | 9/3/2015  | 3,200  | $10.07  |
| Common Stock | Sell | 9/4/2015  | 1,790  | $9.93   |
| Common Stock | Sell | 9/4/2015  | 100    | $9.93   |
| Common Stock | Sell | 9/4/2015  | 9,460  | $9.93   |
| Common Stock | Sell | 10/1/2015 | 4,560  | $9.59   |