USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/20/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                          :

OKLAHOMA FIREFIGHTERS PENSION AND   :
RETIREMENT SYSTEM, individually and on behalf of   :
all others similarly situated,   :
                                          :

                        Plaintiff,   :

                  -v-   :

XEROX CORPORATION, URSULA M. BURNS,   :
LUCA MAESTRI, KATHRYN M. MIKELLS, LYNN R. :
BLODGETT, ROBERT K. ZAPFEL, DAVID H.   :
BYWATER, and MARY SCANLON,   :

                      Defendants.   :

------------------------------------------------------------------------X

16 Civ. 8260 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

      The lead plaintiff in this putative class action claims that Xerox Corporation ("Xerox")

violated federal securities laws by dissembling about the challenges it faced as it struggled to

make profitable a new business venture. Xerox had purchased Affiliated Computer Services,

Inc. ("ACS") in 2010, and then sought to develop ACS's Medicaid Management Information

System, known as Health Enterprise, into a platform Xerox could profitably market to state

governments. The putative plaintiff class consists of purchasers of Xerox's common stock

between April 23, 2012 through October 27, 2015 (the "Class Period"). Lead plaintiff the

Arkansas Public Employees Retirement System ("APERS") alleges that Xerox falsely claimed

that it had a replicable, "plug-and-play" "platform" that could be readily reused by Xerox's state

clients; that implementation of the Health Enterprise system was "going well"; and that

implementation of Health Enterprise was profitable. APERS alleges that Xerox's share price

was artificially inflated for more than three-and-a-half years by these alleged falsehoods and that,

when Xerox eventually revealed, over several disclosures, that implementation of Health Enterprise was going badly, Xerox's share price dropped from a high of $14.32 to $9.29 on the last day of the Class Period. APERS sues Xerox as well as corporate officers Ursula M. Burns, Luca Maestri, Kathryn A. Mikells, Lynn R. Blodgett, Robert Zapfel, David H. Bywater, and Mary Scanlon (the "individual defendants," and, with Xerox, the "defendants").

Xerox and all individual defendants except Zapfel have filed a joint motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). Zapfel has separately moved to dismiss under Rule 12(b)(6).

For the reasons that follow, the Court grants both motions to dismiss.

## I. Background[1]

### A. The Parties

#### 1. The Lead Plaintiff

APERS is a public pension fund providing retirement benefits for certain public employees of the state of Arkansas. Am. Compl. ¶ 32. As of June 2016, APERS managed assets

---

[1] These facts are drawn primarily from the Amended Complaint ("Am. Compl.") For the purpose of resolving the motion to dismiss, the Court assumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiffs. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). The Court also considered the documents attached to the declaration of Stefan Atkinson, Dkt. 67 ("Atkinson Decl."). Because these documents were incorporated into the Amended Complaint by reference, or are matters of public record, they are properly considered on a motion to dismiss. *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014) (in resolving a motion to dismiss, the court may consider, *inter alia*, "any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit") (citation omitted). The Court considered these documents "not for the truth of the matters asserted therein," but only "for the fact that the statements were made." *Clark v. Kitt*, No. 12 Civ. 8061(CS), 2014 WL 4054284, at *7 (S.D.N.Y. Aug. 15, 2014); *see also, e.g., Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents.") (emphasis omitted).

exceeding $7.3 billion on behalf of approximately 93,000 members. *Id.* APERS purchased Xerox common stock during the Class Period. *Id.*

### 2. The Defendants

Xerox is a New York corporation with its principal place of business in Norwalk, Connecticut. Its common stock is listed on the NYSE. *Id.* ¶ 33. Xerox provides document management solutions—including its eponymous copying machines—as well as business process outsourcing services. *Id.*

Ursula M. Burns became Xerox's Chairman of the Board and CEO on July 1, 2009, and remained CEO throughout the Class Period. *Id.* ¶ 34.

Luca Maestri was Xerox's Chief Financial Officer between February 16, 2011 and February 28, 2013. *Id.* ¶ 35. Maestri was succeeded by Kathryn A. Mikkels, who served as CFO and Executive Vice President between May 2, 2013 and the end of the Class Period. *Id.* ¶ 36.

Lynn R. Blodgett was ACS's President and CEO until Xerox acquired ACS in 2010. *Id.* ¶ 37. He then served as President of Xerox's Business Services division between February 2010 and April 1, 2014. *Id.*

Robert Zapfel succeeded Blodgett as President of Business Services on April 1, 2014, and served in that role through the end of the Class Period. *Id.* ¶ 38.

David H. Bywater was Xerox's Chief Operating Officer of State Government between February 2010 and July 2013 and Corporate Vice President between February 2012 and July 2013. *Id.* ¶ 39.

Mary Scanlon served as Xerox's Senior Vice President of National Sales and Business Development for Government Health Care Solutions between August 2009 and October 2014. *Id.* ¶ 40.

**B.    Xerox Buys ACS**

In February 2010, Xerox acquired ACS for $6.4 billion. *Id.* ¶¶ 3, 59. ACS specialized in business-process outsourcing. This entailed providing for clients various back-office services, including call centers, claims processing, and information technology. *Id.* ¶ 4.

Chief among ACS's customers were government clients, from which ACS generated approximately 40 percent of its revenue. *Id.* ¶¶ 4, 6, 62. ACS provided a range of services to such clients, including—relevant here—developing, designing, and implementing Medicaid Management Information Systems ("MMIS"). *Id.* ¶ 6. As described by APERS, an MMIS is a computer system that manages the processing of payments to healthcare providers, the storing of beneficiary information, and all other aspects of a state's Medicaid program. *Id.* ¶ 7. States are required by law to have such a system, *id.* ¶ 62; these allow states to process payments to healthcare providers participating in the state Medicaid program, *id.* ¶ 67. The federal government provides 90 percent of the financing for the design and development of a state's MMIS and 75 percent of the financing for its operation. *Id.*

ACS offered to state governments a proprietary software product—known as Health Enterprise—that served as a replacement for states' existing MMISs. *Id.* ¶¶ 8, 69. Health Enterprise was intended to perform four key functions for state governments: (1) benefit plan administration, (2) financial management, (3) information storage and retrieval, and (4) reporting. *Id.* ¶ 9.

The acquisition of ACS helped transform Xerox—historically a manufacturer and distributor of photocopiers and other hardware—into a service business. *Id.* ¶ 53. Of Xerox's two primary business segments—Document Technology, home to the company's hardware business, and Services—the service segment became, after the acquisition of ACS, the largest

segment in the company, accounting for between 52 and 56 percent of total revenue per year during the Class Period. *Id.* Within the Services segment, Xerox offered three distinct services: (1) business process outsourcing, (2) information technology outsourcing, and (3) document outsourcing. *Id.* ¶ 54. Business process outsourcing—which represented a significant majority of the total Services revenue—included Xerox's "Government Healthcare Solutions" offering. *Id.* ¶ 56.

### C.    Implementation Issues in Six States

At the time of Xerox's acquisition of ACS, ACS had contracted to provide its Health Enterprise software to New Hampshire, North Dakota, and Alaska. *Id.* ¶¶ 9, 70. Pursuant to its acquisition of ACS, Xerox took control of these contracts. *Id.* ¶ 65. Plaintiffs allege that ACS, and from 2012 forward Xerox, experienced delays and cost overruns as they performed these contracts.

In late 2005, ACS contracted with New Hampshire to provide the state a new MMIS system. *Id.* ¶ 73. ACS initially projected that the MMIS would be implemented by 2008; the system was completed (after Xerox had acquired ACS) in April 2013. *Id.* ¶ 75. ACS had proposed that implementation of the New Hampshire MMIS would cost $60 million; the actual cost exceeded $117 million. *Id.* ¶ 76.

Also in late 2005, ACS contracted with North Dakota to implement the state's MMIS. *Id.* ¶ 77. The North Dakota MMIS was scheduled to be completed by July 2009. *Id.* ¶ 78. ACS—and later Xerox—missed that deadline, *see id.* ¶¶ 79–83; Xerox instead completed the North Dakota MMIS in October 2015, *id.* ¶ 87. This six-year delay was attributable to Xerox's efforts to conform the computer code from the New Hampshire MMIS for use in North Dakota.

*Id.* ¶ 89. The cost of implementing the North Dakota MMIS increased from $37 million, as projected in June 2006, to $65 million as of its 2015 completion. *Id.* ¶ 91.

In October 2007, ACS contracted with Alaska to replace the state's MMIS. *Id.* ¶ 93. Implementation of that MMIS, too, suffered from delays and cost overruns. Implementation was scheduled to conclude on June 1, 2010. *Id.* But the MMIS first went "Live" on October 1, 2013. *Id.* ¶ 97. Through 2014, Xerox continued to address ongoing defects in the MMIS. *Id.* ¶¶ 97–100. The cost of implementation grew from an original estimate of $32 million to a final cost of approximately $146 million. *Id.* ¶ 102.

In March 2010—shortly after acquiring ACS in February 2010—Xerox was awarded a $1.7 billion contract to implement a MMIS for California. *Id.* ¶ 119. The California MMIS Independent Project Oversight Consultant (IPOC)—a third-party observer—issued several reports detailing Xerox's progress on the project. *See id.* ¶¶ 121–31. These described a series of delays. *See id.* As a result, as of May 2015, California had not paid Xerox for its work on the project. *Id.* ¶ 131. In April 2016, California terminated its contract with Xerox. *Id.* ¶ 134. Xerox and California reached a settlement of their claims against each other, under which Xerox was required to pay the state $123 million. *Id.* ¶ 135.

In April 2012, Xerox was awarded a contract to implement a MMIS for Montana. *Id.* ¶ 105. That process, too, was marked by delays. The MMIS was originally scheduled to be implemented by February 2015. *Id.* But throughout 2013 and 2014, Xerox missed milestones and Montana refused to make interim milestone payments. *Id.* ¶¶ 106–112. On July 18, 2014, Xerox and Montana renegotiated their contract and set a May 2017 completion deadline. *Id.* ¶ 113. Through 2015, Xerox continued to miss interim milestone deadlines. *Id.* ¶¶ 114–15. Xerox did not complete implementation of the Montana MMIS. *Id.* ¶ 116.

Finally, in April 2015, Xerox was awarded a $564 million contract to implement a MMIS for New York. *Id.* ¶ 138. Xerox never completed the New York MMIS project. *Id.* ¶ 140.

**D.     Xerox Spins Off Business Process Outsourcing**

On October 26, 2015, at the conclusion of the Class Period, Xerox announced that it would review its portfolio of businesses. *Id.* ¶ 286. Following that review, on January 29, 2016, Xerox announced that it would separate the company into two separate businesses: a business-process outsourcing company and another company focused on document technology and document outsourcing. *Id.* On November 8, 2016, Xerox announced that it would effect this reorganization by spinning off its business-process outsourcing services into a new company to be called Conduent Incorporated. *Id.* ¶ 287. On January 3, 2017, Xerox announced that it had completed that spin-off. *Id.* ¶ 288.

**E.     Alleged Misstatements**

While Xerox was struggling to implement Health Enterprise in the six states in which it had been awarded MMIS contracts, APERS alleges, Xerox officers made materially false or misleading statements about the company's progress. APERS groups these statements into three categories: (1) that Xerox had a platform that was transferrable, reusable, replicable, and scalable, and possessed plug-and-play characteristics (the "Platform Statements"); (2) that implementation of Health Enterprise was successful and/or going well (the "Success Statements"); and (3) that implementation of Health Enterprise had or would become profitable, and that profitability would be achieved because of the low-cost nature of the Health Enterprise

platform (the "Profitability Statements"). *See id.* ¶ 141. The Court summarizes these statements below.[2]

### 1. Platform Statements

First, APERS alleges that Xerox officers made a series of statements during the Class Period that falsely or misleadingly described Health Enterprise as a "platform."

Beginning at the start of the Class Period, Xerox officers described the MMIS application as a "platform" and extolled the benefits the company expected to enjoy from that platform. *See, e.g.*, Am. Compl. ¶ 172, Appendix Nos. 3, 4; Am. Compl. ¶ 143. In particular, Xerox officers predicted that the company would be able to "reuse" the MMIS platform, lowering Xerox's costs on future contracts. *See* Am. Compl. ¶¶ 145, 175; Appendix No. 7; *see also, e.g.*, Am. Compl. ¶¶ 146, 184 (alteration omitted); Appendix Nos. 13, 14 ("Platforms across the board help us to have repeatable solutions."). Company officers continued to describe Health Enterprise as a platform and to attribute Xerox's competitive advantage to that platform throughout 2013 and into 2014. *See, e.g.*, Am. Compl. ¶¶ 190, 191, 194; Appendix Nos. 23, 24, 25, 27. Xerox officers also explained to investors and analysts that, as Xerox implemented Health Enterprise on future contracts, the company would be able to "modify for every engagement a little bit of the system but not as big a modification as before," resulting in efficiencies. Am. Compl. ¶ 206; *see* Appendix Nos. 40, 41, 42; *see also, e.g.*, Am. Compl. ¶ 203; Appendix Nos. 35, 36; Am. Compl. ¶ 212; Appendix No. 44.

---

[2] In an appendix to its reply brief, Xerox has indexed 70 statements alleged in the Amended Complaint, *see* Def. Reply. Br. App'x, which the Court has reproduced in modified form as an appendix to this Opinion (the "Appendix"). The Court refers to alleged misstatements with citations to the Amended Complaint and the Court's Appendix. The Amended Complaint adds emphasis to many of the statements it alleges are actionable. The Court omits all such added emphasis. The Amended Complaint includes alterations of many quotations. The Court has endeavored to correct such alterations.

### 2. Success Statements

Second, APERS alleges that, during the Class Period, Xerox officers made several false or misleading statements about the company's success in implementing Health Enterprise.

Throughout the Class Period, Xerox officers discussed the progress the company was making in implementing Health Enterprise for its several state clients. At times, Xerox officers spoke generally about the company's success. For example, in describing Xerox's fourth quarter 2013 results, Burns said that the company was "making progress" on "government healthcare" and was "stabilizing more and more." Am. Compl. ¶ 213; Appendix Nos. 45, 46; *see also, e.g.*, Am. Compl. ¶ 233; Appendix No. 56 ("Within government healthcare, we're making good progress, but expense levels are still high as we continue to invest to improve the performance of the first platform implementation of our new Medicaid platform.").

Xerox officers also provided updates on the implementation of Health Enterprise in particular states. Beginning in May 2012, Xerox officers described the implementation of Health Enterprise in California as going "well," *see, e.g.*, Am. Compl. ¶ 181; Appendix No. 10 ("We're happy the State of California implementation has gone very well."), and continued to do so through 2013 and 2014, *see, e.g.*, Am. Compl. ¶ 199; Appendix No. 31 ("And as California is maturing, thank God, and is doing fairly well I'm not going to say very well because very well always jinxes me."); Am. Compl. ¶ 219; Appendix No. 50 ("California is going fairly well, and MMIS is actually going pretty well and we're now at the point where we're starting to lean out our implementation on California and drive it to increased profitability."). Xerox officers made similar statements about Alaska, Am. Compl. ¶ 202; Appendix No. 32, and New Hampshire, *see* Am. Compl. ¶¶ 238–39; Appendix No. 60, 61.

### 3. Profitability Statements

Third and finally, APERS alleges, Xerox officers made several false or misleading statements about the present-day profitability of Health Enterprise and the company's expectations for its future profitability.

During the Class Period, Xerox officers made a series of statements predicting that the company's margins on implementation of Health Enterprise would improve over time, leading to increased profitability for the company as a whole. *See, e.g.*, Am. Compl. ¶ 162; Appendix No. 1; Am. Compl. ¶ 171; Appendix No. 2 ("[W]e're shifting a lot of our work to platforms, our new MMIS platform that was a significant investment is the kind of thing that will help drive higher margins."). The company also represented that implementation of Health Enterprise would entail high up-front costs, followed by a period of lower costs and increased profitability. *See, e.g.*, Am. Compl. ¶ 174; Appendix No. 5 ("[A] lot of the start-up cost, the ramp being of –the investment in platforms that we made on some of the services business have already taken place and now we're getting to a much more normalized level of margins on a lot of these new contracts."); *see also, e.g.*, Am. Compl. ¶ 181; Appendix Nos. 10–11; Am. Compl. ¶ 205; Appendix No. 39.

During the Class Period, Xerox officers also represented that the profitability of the company's Health Enterprise contracts was currently improving. For example, on an April 23, 2013, conference call with analysts and investors to discuss the company's financial results from the first quarter of 2013, Burns said:

> State government we are seeing some good news particularly in healthcare. We have a strong position as you know in MMIS around the United States, and California is our big contract; New Hampshire just went live. We're doing well there . . . . So healthcare is a big segment for us. We do well there. And our profitability is improving in that segment actually very, very well. So I'm bullish about healthcare[,] government healthcare services.

Am. Compl. ¶ 198; Appendix Nos. 28, 29. Later, in 2014, Burns added that Xerox had achieved "flat profitability" on its California contract and expected, going forward, "growing profitability in a very predictable kind of a standard way." Am. Compl. ¶ 227; Appendix Nos. 52, 53.

**F.    Disclosures**

APERS alleges that the series of statements summarized above caused the common stock of Xerox to be artificially inflated during the Class Period. *Id.* ¶ 255. And when Xerox made public disclosures of new information about Health Enterprise on October 22, 2014, April 24, 2015, October 26, 2015, and October 27, 2015—disclosures APERS describes as each partially correcting the company's earlier misstatements—Xerox's stock price dropped. *Id.* ¶ 256.

On October 22, 2014, Xerox filed a Form 8-K, reporting the company's results for the third quarter of 2014. *Id.* ¶ 257. In the 8-K, and in the ensuing conference call with investors, Xerox and Burns told the market that the company's services business—including Health Enterprise—had been less successful than expected. *Id.* ¶¶ 257–59.

On April 24, 2015, Xerox filed another Form 8-K, reporting financial results for the first quarter of 2015. *Id.* ¶ 262. Xerox again reported that its services business had performed worse than expected. *Id.* In a conference call that same day, Mikells explained that "the driver of the Services margin miss was lower revenue and more costs than anticipated with our Health Enterprise platform implementation. California had the largest impact on our results in the quarter." *Id.* ¶ 263. On that conference call, Mikells and Zapfel made further statements which, APERS alleges, revealed that Xerox's Health Enterprise system had never been a "platform" at all. *See id.* ¶¶ 265–70. As a result of these disclosures, APERS claims, Xerox's share price dropped from $13.14 on April 23, 2015, to $11.62 on April 27, 2015. *Id.* ¶ 273.

On October 26, 2015, Xerox filed another Form 8-K. *Id.* ¶ 275. In a conference call that day, Mikells told analysts and investors that Xerox's Health Enterprise contracts in Montana and California were operating at a loss. *Id.* ¶ 276. Those disclosures, APERS alleges, led Xerox's stock price to drop from $10.34 on October 23, 2015 to $9.29 on October 27, 2015. *Id.* ¶ 281.[3]

### G. Procedural History

On October 21, 2016, the Oklahoma Firefighters Pension and Retirement System filed the original complaint in this case. Dkt. 1. On December 23, 2016, several plaintiffs, including APERS, moved to be appointed lead plaintiff. *See* Dkts. 20–31. On December 28, 2016, the Court entered a stipulation extending the deadline to respond to the complaint until after a lead plaintiff had been appointed and a schedule had been set for the filing of an amended complaint and a motion to dismiss. Dkt. 32. On February 28, 2017, the Court appointed APERS as lead plaintiff, its counsel, Kessler Topaz Meltzer & Check LLP as lead counsel, and Labaton Sucharow LLP as liaison counsel. Dkt. 38.

On May 1, 2017, APERS filed an amended complaint, the currently operative complaint. Dkt. 48. On June 30, 2017, Zapfel filed his motion to dismiss, Dkt. 59, a memorandum of law, Dkt. 60 ("Zapfel Br."), and a supporting declaration, Dkt. 61. That same day, Xerox and the other individual defendants filed their motion to dismiss, Dkt. 65, a memorandum of law, Dkt. 66 ("Def. Br."), and supporting declaration, Dkt. 67.

---

[3] The Amended Complaint alleges that an October 27, 2015 disclosure caused Xerox's share price to fall, *see id.* ¶ 256, but it does not allege any disclosures by Xerox or an officer of Xerox on that date. Rather, it alleges, that day, in response to the company's disclosures of October 26, 2015, the agencies Fitch Ratings and Standard & Poor's Ratings Services downgraded Xerox's credit rating and outlook, respectively. *Id.* ¶ 280.

On August 29, 2017, APERS filed its briefs in opposition. Dkts. 68 ("Pl. Br."); 69 ("Pl. Op. to Zapfel"). On October 13, 2017, defendants filed their replies. Dkts. 70 ("Zapfel Reply Br."); 71 ("Def. Reply Br.").

## II.    Applicable Legal Standards

### A.    Standards for Resolving a Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Although the court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor, *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet "is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321–23 (2007).

First, a complaint alleging securities fraud must meet the requirements of Federal Rule of Civil Procedure 9(b). *See ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

13

Fed. R. Civ. P. 9(b). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI*, 493 F.3d at 99.

Second, such a complaint must comply with the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b). *See ECA*, 553 F.3d at 196. In particular, where a plaintiff's claims depend upon allegations that the defendant has made an untrue statement of material fact or that the defendant omitted a material fact necessary to make a statement not misleading, the plaintiff "shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u– 4(b)(1). Thus, in order to plead a claim of securities fraud, plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). In addition, the plaintiff "shall, with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u– 4(b)(2).

### B. Elements of Plaintiff's Claims

APERS asserts claims under §§ 10(b) and 20(a) of the Exchange Act, and Rule 10b-5. Am. Compl. ¶¶ 315–25; *id.* ¶¶ 326–31.

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). The SEC's implementing rule, Rule 10b-5, provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make

the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R, § 240.10b–5.

To state a claim under § 10(b) of the Exchange Act, a plaintiff must adequately plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (internal quotation marks and citation omitted).

To state a claim under § 20(a) of the Exchange Act, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *ATSI*, 493 F.3d at 108) (internal quotation marks omitted). If a plaintiff has not adequately alleged a primary violation, *i.e.*, a viable claim under another provision of the Exchange Act, then the § 20(a) claims must be dismissed. *See id.*

## C.     Scienter

As noted, Rule 9(b) and the PSLRA require plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged.'" *ATSI*, 493 F.3d at 99 (quoting *Tellabs*, 551 U.S. at 324) (alteration and emphasis in original).

The requisite mental state is one "embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (internal quotation marks and citation omitted). Plaintiffs "may satisfy

this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99. However, where plaintiffs do not sufficiently allege—or decline to allege at all—that defendants had a motive to defraud the public, they "must produce a stronger inference of recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 143 (2d Cir. 2001).

Recklessness is "a state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (citation and emphasis omitted). To qualify as reckless, defendants' conduct must have been "highly unreasonable" and "an extreme departure from the standards of ordinary care." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)) (internal quotation marks omitted). An alleged "refusal to see the obvious, or to investigate the doubtful," must be "egregious" to be actionable. *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (citation omitted).

Plaintiffs can establish recklessness by adequately alleging that "defendants knew facts or had access to non-public information contradicting their public statements" and therefore "knew or should have known they were misrepresenting material facts." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (citing *Novak*, 216 F.3d at 308). However, an inference of scienter does not follow from the mere fact of non-disclosure of relevant information. *In re Sanofi Sec. Litig. ("Sanofi I")*, 87 F. Supp. 3d 510, 534 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi ("Sanofi II")*, 816 F.3d 199 (2d Cir. 2016). "Instead, to adequately plead scienter, plaintiffs must also provide sufficient factual allegations to indicate that defendants understood that their public statements were inaccurate, or were 'highly unreasonable' in failing to

appreciate that possibility." *Id.* (quoting *Novak*, 216 F.3d at 308). "The key, of course, is the honest belief of the management in the truth of information issued to the public." *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 470 (S.D.N.Y. 2008), *aff'd sub nom. State Univ. Ret. Sys. of Ill. v. Astrazeneca PLC*, 334 Fed. App'x 404 (2d Cir. 2009) (summary order).

### D. Material Misrepresentation

To survive a motion to dismiss, a complaint must adequately plead "that the defendant made a statement that was 'misleading as to a material fact.'" *Matrixx Initiatives*, 563 U.S. at 38 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)) (emphasis omitted). Significantly, § 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information." *Id.* at 44; *see also Basic*, 485 U.S. at 239 n.17. "Disclosure of . . . information is not required . . . simply because it may be relevant or of interest to a reasonable investor." *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002). An omission of information not affirmatively required to be disclosed is, instead, actionable only when disclosure of such information is "necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b–5(b)) (ellipses in original); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239–40 (2d Cir. 2016) ("'Pure omissions'" of information, absent a duty to disclose, are not actionable, but "'[h]alf-truths—statements that are misleading . . . by virtue of what they omit to disclose," are).

The materiality requirement "is satisfied when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *Matrixx Initiatives*, 563 U.S. at 38 (quoting *Basic*, 485 U.S. at 231–32). As the Supreme Court has explained, a lower

standard—such as defining a "material fact" as any "fact which a reasonable shareholder might consider important"—would lead corporations to "bury the shareholders in an avalanche of trivial information[,] a result that is hardly conducive to informed decisionmaking." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49 (1976). The "materiality hurdle" is, therefore, "a meaningful pleading obstacle." *In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013). However, because of the fact-intensive nature of the materiality inquiry, the Court may not dismiss a complaint "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA*, 553 F.3d at 197 (internal quotation marks and citation omitted).

### E.     Statements of Opinion

Not only objective statements of material fact, but also subjective statements of opinion can be actionable as fraud. As the Supreme Court has recently clarified, such statements of opinion can give rise to liability in two distinct ways. First, "liability for making a false statement of opinion may lie if either 'the speaker did not hold the belief she professed' or 'the supporting fact she supplied were untrue.'" *See Sanofi II*, 816 F.3d at 210 (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015)). "It is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events." *In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 489 (S.D.N.Y. 2004). "The Second Circuit has firmly rejected this 'fraud by hindsight' approach." *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 156 (S.D.N.Y. 2004) (citing *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 85 (2d Cir. 1999)).

Second, "opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Sanofi II*, 816 F.3d at 210 (citing *Omnicare*, 135 S. Ct. at 1332). To adequately allege that a statement of opinion was misleading through the omission of material information, "[t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 209 (quoting *Omnicare*, 135 S.Ct. at 1332). As the Second Circuit has explained, "a reasonable investor, upon hearing a statement of opinion from an issuer, 'expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at a time.'" *Id.* at 210 (quoting *Omnicare*, 135 S.Ct. at 1329). "The core inquiry," then, "is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" *Id.* (quoting *Omnicare*, 135 S.Ct. at 1329).

As the Supreme Court has emphasized, however, the doctrine under which material omissions of facts may render a statement of opinion actionable should not be given "an overly expansive reading," and establishing liability on such a theory "is no small task for an investor" to meet. *Id.* (quoting *Omnicare*, 135 S. Ct. at 1332) (internal quotation marks omitted). "Reasonable investors understand that opinions sometimes rest on a weighing of competing facts, . . .[and do] not expect that every fact known to an issuer supports its opinion statement." *Id.* (quoting *Omnicare*, 135 S. Ct. at 1329) (alterations and internal quotation marks omitted). "[A] statement of opinion 'is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way.'" *Id.* (quoting *Omnicare*, 135 S. Ct. at 1329). Further,

statements of opinion must be considered in the context in which they arise. "'[T]he investor takes into account the customs and practices of the relevant industry,' and . . . 'an omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame.'" *Id.* (quoting *Omnicare*, 135 S.Ct. at 1330).

### F. The PSLRA Safe Harbor

The PSLRA amended the Exchange Act to provide a safe harbor for forward-looking statements. *See* 15 U.S.C. § 78u–5(c). Forward-looking statements are defined as those that contain, among other things, "a projection of revenues, income, [or] earnings," "plans and objectives of management for future operations," or "a statement of future economic performance." *Id.* § 78u–5(i)(1). A forward-looking statement is not actionable if it "is identified and accompanied by meaningful cautionary language or is immaterial or the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010). Because the statute is written in the disjunctive, statements are protected by the safe harbor if they satisfy any one of these three categories. *Id.* Materiality is defined above; the other two categories are defined as follows:

*Meaningful cautionary language*: To qualify as "meaningful," cautionary language "must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements." *Id.* at 771 (quoting H.R. Conf. Rep. 104-369, at 43 (1995)). Language that is "vague" or "mere boilerplate" does not suffice. *Id.* at 772. "To determine whether cautionary language is meaningful, courts must first 'identify the allegedly undisclosed risk' and then 'read the allegedly fraudulent materials—including the cautionary language—to determine if a reasonable investor could have been misled

20

into thinking that the risk that materialized and resulted in his loss did not actually exist.'" *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 333 (S.D.N.Y. 2014) (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002)). Plaintiffs may establish that cautionary language is not meaningful "by showing, for example, that the cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss." *Halperin*, 295 F.3d at 359.

*Actual knowledge*: The scienter requirement for forward-looking statements—actual knowledge—is "stricter than for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity." *Slayton*, 604 F.3d at 773 (quoting *Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 274 (3d Cir. 2009)). Under the heightened pleading standards that apply to both scienter requirements, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

## III.    Analysis

The Court begins with Xerox's motion to dismiss. Xerox argues that, for two reasons, APERS' Amended Complaint fails to state a Section 10(b) claim: First, it fails to allege any actionable misstatements because none of the statements at issue was false or misleading; and second, it fails to plead loss causation. And, because the Amended Complaint fails to state a 10(b) claim, Xerox argues, APERS' derivative Section 20(a) claim must also be dismissed.[4]

The Court's analysis begins—and ends—with Xerox's first argument. Xerox argues that the statements in each of the three categories at issue (Platform Statements, Success Statements,

---

[4] Unlike defendant Zapfel, Xerox and the other individual defendants do not contend that the Amended Complaint fails to adequately allege scienter.

and Profitability Statements) are not actionably false or misleading, both because the Amended Complaint does not plead falsity with the required particularity, and because the statements are non-actionable puffery. For the reasons that follow, the Court agrees the challenged statements are not actionable. This holding obviates the need to address Xerox's alternative argument based on the pleadings as to loss causation, and Zapfel's arguments particular to himself.

The Court begins by eliminating certain statements whose theory of falsity the Amended Complaint does not explain or which qualify as puffery. The Court then analyzes, category by category, the remaining statements at issue.

### A.    Statements Lacking Particularized Allegations of Falsity

As to certain statements, APERS alleges only conclusorily, and with far from the required particularity, how the given statement was false or misleading.

For example, APERS faults Blodgett's statement at the Barclays Capital Global Technology, Media, and Telecommunications Conference on May 23, 2012, that "the sole driver of margin decline had to do with the significant set up in bookings and in growth rates" and that this growth rate "was driven almost exclusively by the State of California and by a couple of other major contracts." *See* Am. Compl. ¶ 180; Appendix No. 9. But the Amended Complaint does not explain *why* this statement was, ostensibly, misleading. It states only that this statement (and several others) was "materially false or misleading because Defendants failed to disclose material information, when made." Am. Compl. ¶ 183. Such an allegation does not state a claim under Section 10(b). To plead falsity, a complaint must instead "specify . . . the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B); *see Rombach*, 355 F. 3d at 174 (plaintiff "must demonstrate with specificity why and how" a statement was false or misleading).

The same deficiency—conclusory pleading—affects other statements which plaintiffs term false or misleading.[5] The Court puts these statements aside as a basis for liability.

## B.     Statements Consisting of Mere Puffery

Many statements APERS faults—across all three categories—are puffery. Statements are mere puffery, and non-actionable, when they are "too general to cause a reasonable investor to rely upon them." *ECA*, 553 F.3d at 206; *accord Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37 (2d Cir. 2012); *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013).

One set of the statements at issue that were too general to cause a reasonable investor to rely upon them include those broadly reciting "[Xerox's] belief in its 'competitive advantage.'" *Steinberg v. PRT Grp., Inc.*, 88 F. Supp. 2d 294, 305 (S.D.N.Y. 2000). Such statements "cannot reasonably be found to be misleading." *Id.* Burns's general statement at the November 13, 2012 Investor Conference is a good example. There, Burns stated: "This idea of platform is something that we spend a lot of time talking about that it's important that you understand that helps us differentiate ourselves from our competitors around the world." Am. Compl. ¶ 184; Appendix No. 13. This statement suggested nothing more than Xerox's confidence in its competitiveness. *Accord, e.g.*, *Norfolk Cnty. Ret. Sys. v. Tempur-Pedic Int'l, Inc.*, 22 F. Supp. 3d 669, 684 (E.D. Ky. 2014) (claim of "strengthened competitiveness" held puffery), *aff'd sub nom. Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*, 614 F. App'x 237 (6th Cir. 2015); *In re Cable & Wireless, PLC Sec. Litig.*, 321 F. Supp. 2d 749, 768 (E.D. Va. 2004) (claim of competitive

---

[5] *See, e.g.*, Appendix Nos. 1, 6, 8, 19, and 35. Certain statements are listed in the defendants' reply brief appendix, and reproduced in the Appendix for completeness, although it is not clear that APERS alleges that these were misleading at all. *See* Appendix Nos. 37, 48, 51, 54, 67, and 68. These statements, too, do not support a claim under Section 10(b).

advantage held puffery). This and similar statements, *see, e.g.*, Appendix No. 25 ("I think we win [contracts] because we have great technology"), are not actionable. [6]

Another set of similarly ineligible statements are those that vaguely and enthusiastically described Xerox's performance, expectations of business success, or the fact of its business focus on Health Enterprise. Statements of this nature do not give a reasonable investor meaningful information on which to rely. *See, e.g.*, *Boca Raton Firefighters*, 506 F. App'x at 37 (holding puffery claim that company was able to "compete successfully in an increasingly global and complex market, and that is true today and we are confident it will be so in the future"); *SE Pennsylvania Transp. Auth. v. Orrstown Fin. Servs., Inc.*, No. 1:12-CV-00993, 2015 WL 3833849, at *30 (M.D. Pa. June 22, 2015) (claim of experience held puffery); *Sequans Commc'ns*, 2013 WL 214297, at *14 (statement that company was "early leader" held puffery); *Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1071 (C.D. Cal. 2012) (claim of a deep executive bench held puffery); *In re Xinhua Fin. Media, Ltd. Sec. Litig.*, No. 07 CIV. 3994 LTS/AJP, 2009 WL 464934, at *8 (S.D.N.Y. Feb. 25, 2009) (claim that management team was "strong," "experienced," and "capable" held puffery).

Here, for example, Xerox noted its "successful implementation" of Health Enterprise or stated that it had "launched successfully" a state MMIS contract. *See, e.g.*, Am. Compl. ¶ 202; Appendix No. 32. This and similar statements conveyed "no meaningful, objective data that an investor would rely upon," *Billhofer v. Flamel Techs., S.A.*, No. 07 CIV. 9920, 2012 WL 3079186, at *9 (S.D.N.Y. July 30, 2012), except to the extent that they truthfully represented that Xerox had commenced its MMIS contracts.[7]

---

[6] *See, e.g.*, Appendix Nos. 2, 12, 13, 14, 23, and 25.

[7] *See, e.g.*, Appendix Nos. 10, 16, 20, 21, 22, 28, 31, 34, 42, 43, 45, 46, 56, 59, 64, 65, and 69.

The key distinction between these and potentially actionable statements is that these statements were non-verifiable. *See Novak*, 216 F.3d at 315. To describe the initial launch of a Health Enterprise implementation in a given state as a "success" does not give an investor an assessment that can be measured or verified. For this reason, corporate statements that a company is "moving forward well," *Billhofer*, 2012 WL 3079186, at *9, that "things are going well," *In re Nevsun Res. Ltd.*, No. 12 CIV. 1845 PGG, 2013 WL 6017402, at *9 (S.D.N.Y. Sept. 27, 2013), that the company is "well positioned," *id.*, or that its operations are "successful," *id.*, are classically non-actionable unless "the statements addressed concrete and measurable areas of the defendant company's performance," *id.* Xerox's optimistic musings about the early success of its implementations of Health Enterprise were not of such a concrete nature.[8]

Plaintiffs, finally, note that investment analysts at times repeated Xerox's puffery. Pl. Br. at 18–19; *see* Am. Compl. ¶¶ 194, 196. But the fact of recapitulation by analysts did not make these statements actionable. *See Rombach*, 355 F.3d at 175. To be sure, a corporate officer may be liable for "intentionally foster[ing] a mistaken belief concerning a material fact" where this statement was then incorporated in and disseminated via analyst reports. *Novak*, 216 F.3d at 314. But the analyst report must incorporate *material* facts. A report that merely recaps corporate puffery does not convert that puffery into a material misstatement. *See Rombach*, 355 F.3d at 176 (statements of "puffery or misguided optimism" repeated in analyst reports not actionable).

---

[8] APERS rightly contrasts such statements with assertions by Xerox about increased profitability. *See* Pl Br. 19. Such assertions form an alternative basis for APERS's Section 10(b) claim, and cannot be put aside as puffery, because corporate profitability is concrete and measurable. The Court analyzes these claims below. *See* Section III.D, *infra*.

### C. Platform Statements

The Court next considers the Platform Statements. During the Class Period, Xerox and its officers made a series of statements about its Health Enterprise system, including statements that simply described the software as a "platform"[9] and statements that supplied detail about the features or capabilities of the platform (some consisting of puffery, some not).[10] Neither set of Platform Statement, however, is an actionable violation of Section 10(b).

### 1. Statements Representing That Xerox Had a Platform

Statements that merely asserted, without more, that Xerox had a platform were not misleading for a simple reason: Health Enterprise was a "platform." For example, at Xerox's November 13, 2012 annual investor conference, Burns stated, "We have [a] platform we call Enterprise. Enterprise is the newest Medicaid platform." Am. Compl. ¶ 185; Appendix No. 15. Similarly, at the December 3, 2013 Credit Suisse Technology Conference, Mikells told analysts and investors that Xerox had "other platforms in the health care space, specifically, our new Medicaid Management Information platform that we're deploying in certain states." Am. Compl. ¶ 212; Appendix. No. 44.

Statements of this kind were not misleading because Health Enterprise was justifiably termed a "platform." As Xerox notes, a "platform" is simply computer architecture upon which other applications may run. *See* Def. Br. at 11 (citing, *inter alia*, *American Heritage Dictionary* (2017)). APERS notes criticisms of Health Enterprise levied by some of Xerox's customers, and on this basis argues that Health Enterprise never was a "platform." *See* Pl. Br. at 10–11. But those criticisms went to the *quality* of Xerox's platform, not to its existence. Relevant too,

---

[9] These statements include Appendix Nos. 3, 4, 6, 15, 24, 26, 44, 47, 49, and 54.

[10] These statements include Appendix Nos. 7, 23, 25, 27, and 36.

Xerox's own descriptions of its product, reviewed in the next section, did not ever define "platform" in such a way as to exclude Health Enterprise from that definition. *Contra S.E.C. v. Enterprises Sols., Inc.*, 142 F. Supp. 2d 561, 576–77 (S.D.N.Y. 2001).

For this reason, statements that extolled the benefits of Xerox's Health Enterprise platform in vague and enthusiastic terms—which the Court earlier held inactionable as puffery, *see* Section III.A, *supra*; *Steinberg*, 88 F. Supp. 2d at 305—are not are made actionable simply because they embedded a description of Health Enterprise as a platform.[11] Xerox, again, *did* have a platform. Plaintiffs, for example, fault Blodgett's February 12, 2013, address to the Goldman Sachs Technology & Internet Conference. There, he stated:

> I think we win [contracts] because we have great technology. People look at our platforms and they realize that this stuff's pretty complicated. Our Medicaid platform has 6 million lines of code in it, and, there hasn't been a new Medicaid system that's been developed for a long time, in over a decade. And so now, as we demonstrate that to people, they can—they're experts. They look at it and [] say, 'Wow, it has functionality and features that are unique.'

Am. Compl. ¶ 191; Appendix No. 25. Similarly, plaintiffs fault Scanlon's statement, at Xerox's March 7, 2013 Healthcare Services Analyst Day, that Xerox "had a big presence in a large number of states" which the Health Enterprise "platform gives us an opportunity to expand." Am. Compl. ¶ 193; Appendix No. 26. But those statements, to the extent they described Health Enterprises as a platform, were not misstatements, and to the extent they expressed enthusiasm for that platform, were non-actionable puffery. Such statements were not false or misleading.

### 2.    Statements Describing the Platform

During the Class Period, Xerox officers also made statements describing the Health Enterprise platform's features or functionality. In assessing these statements, the Court focuses on the statements themselves, not plaintiff's recasting of them. *See In re Centerline Holding Co.*

---

[11] *See* Appendix Nos. 23, 24, 25, 26, and 65.

*Sec. Litig.*, 380 F. App'x 91, 94 (2d Cir. 2010). The Court, therefore, considers the statements as made, not APERS's repeated claim in its brief that Xerox falsely held out Health Enterprise as a "platform that was transferrable, reusable, replicable, and scalable, and possessed plug-and-play characteristics." Although Xerox officers represented Health Enterprise using some of those terms, APERS does not point to any statement in which they used that phrase in its entirety (or anything like it). Instead, at various points, Xerox officers either described features of Health Enterprise or identified ways in which Xerox expected Health Enterprise to benefit Xerox in the future.

APERS's central argument is that Xerox's Platform Statements are actionable because they "create[d] a false impression that [the] company [had] a developed, tested and presently available product." Pl. Br. at 9 (quoting *SEC v StratoComm Corp.*, 2 F. Supp. 3d 240, 253 (N.D.N.Y 2014), *aff'd* 652 Fed. App'x 35 (2d Cir. 2016)). APERS focuses on certain claims by Xerox officers about Health Enterprise's capabilities. In particular, APERS notes Maestri's claim at the 2012 J.P. Morgan Conference that Xerox could "reuse that platform as we acquire new contracts," Am. Compl. ¶¶ 145, 175; Appendix No. 7, Mikell's claim on the October 24, 2013 conference call that implementing Health Enterprise was a "pretty replicable process for us," Am. Compl. ¶ 203; Appendix No. 36, Scanlon's representation, at Xerox's 2013 Healthcare Services Analyst Day, that Health Enterprise allowed Xerox to provide states with "a plug-and-play with different capabilities that they have," Am. Compl. ¶ 194; Appendix No. 27, and Burns's claim, on the October 24, 2013 call, that, as a result of Health Enterprise's replicability, "the bulk of the investment won't have to change," Am. Compl. ¶ 206, Appendix No. 41. Drawing on these statements, APERS charges that Xerox falsely claimed to have a product "that

was transferrable, reusable, replicable, and scalable, and possessed plug-and-play characteristics." *E.g.*, Am. Compl. ¶ 141.

But these statements do not give rise to Section 10(b) liability, a point, in fact, well underscored by comparison with two of the cases on which APERS relies: *SEC v. e-Smart Techs., Inc.*, 85 F. Supp. 3d 300 (D.D.C. 2015); and *StratoComm*, 2 F. Supp. 3d 240. In *e-Smart*, the company had falsely represented specific, concrete features of its technology—it falsely stated that the "smart cards" at issue had a particular fingerprint sensor that could recognize fingerprints at particular rates of accuracy, and that the cards could receive an electrical charge wirelessly, for example. *See id.* at 315, 317–18. These claims, the district court held, were "at the heart of e-Smart's representations" about its smart-card technology. *Id.* at 318. Accordingly, the court held, e-Smart had claimed to have a product it did not have, and these statements therefore could rise to Section 10(b) liability. In *StratoComm*, the company had represented that it was selling its "Transitional Telecommunications System" product to clients around the world when, in fact, it had no such product at all and had entered into no such sales contracts. 2 F. Supp. 3d at 254–57.

The statements by Xerox about its platform that APERS challenges were far less specific than the factual claims at issue in *e-Smart*. In those statements, Xerox claimed that Health Enterprise could be "reused," that implementing Health Enterprise was a "pretty replicable process" in which "the bulk of the investment [wouldn't] have to change" and that Health Enterprise would give state clients "a plug-and-play with different capabilities." And to the extent that these statements are susceptible to verification or refutation, they are not concretely pled to have been untrue (let alone untrue when made). Quite the contrary: Plaintiffs do not dispute that Health Enterprise existed and that it was intended to be used for the purpose Xerox

described. Nor do plaintiffs anywhere contend that Xerox's Health Enterprise was incapable of being "reused." On the facts pled, Health Enterprise clearly was capable of being reused, albeit (as Xerox did not hide) with modifications customized for the needs to the particular state. Plaintiffs also do not dispute the accuracy of Xerox's statements to the effect that the platform gave states the opportunity to build their own features onto the base architecture.

Nor did Xerox's statements represent that the company had a product that it in fact lacked. To be sure, the process of implementation and state-specific integration of Health Enterprise, as pled and as Xerox's statements over time revealed, proved more difficult and costly than Xerox had forecast. But those later adverse developments did not make untrue—and certainly not at the time made—Xerox's broad descriptions of Health Enterprise as a platform it could "reuse . . . as we acquire new contracts," as involving a "pretty replicable" implementation process, or as enabling Xerox to provide states "a plug and play with different capabilities than they have." Xerox's claims are thus a far cry from those held actionable in *StratoComm*, whose product "did not even exist." 2 F. Supp. 3d at 255. Unlike the plaintiffs in *e-Smart* and *Stratocomm*, APERS fails to identify any concrete statement that materially misrepresented facts about the corporate defendant's product.

### 3. Forward-Looking Statements

Finally, during the Class Period, Xerox officers described ways in which Health Enterprise was anticipated to benefit the company in the future. APERS, noting that the Health Enterprise venture ultimately failed, bases its Section 10(b) claims, in part, upon these statements. Xerox counters that these forward-looking Platform Statements are not actionable, given the ample cautionary language accompanying them, including with regard to the need for Xerox to customize Health Enterprise to the circumstances presented by specific states. APERS

counters that the PSLRA's safe harbor does not apply because Xerox's statements were not forward-looking but instead contained representations about the current state of Health Enterprise, and because, to the extent Xerox's statements were forward-looking, they were unaccompanied by meaningful disclosures. Pl. Br. at 17–18.[12]

As to the first objection, the PSLRA safe harbor provision applies to all forward-looking statements where they were accompanied by meaningful cautionary language, were not material, or were made without actual knowledge that they were false or misleading. *Slayton*, 604 F.3d at 766.[13] On the Court's review, Xerox's forward-looking statements at issue satisfied those requirements.

Illustrative is the October 24, 2013 conference call, on which APERS focuses. There, Mikells stated that "the really nice thing about platforms" was that—while "standing [them] up" involves some "pain"—future implementation "becomes a pretty replicable process" that leads to "scale and experience gains in that area." Am. Compl. ¶ 203; Appendix No. 36. Mikells added that she anticipated that the investments associated with implementing Health Enterprise contracts

---

[12] APERS separately argues that even if the safe harbor for forward-looking statements applied, it should not here, in light of the Amended Complaint's claim that the Xerox officers who spoke had "actual knowledge" their statements were false or misleading. But that argument is wrong as a matter of law. The PSLRA safe harbor is available so long as the forward-looking statement at issue was immaterial or was accompanied by meaningful cautionary language, without regard to the scienter with which it was made. A material, forward-looking statement *un*accompanied by meaningfully cautionary language may *also* be non-actionable if the plaintiff fails to prove that it was made with actual knowledge of its falsity or misleading nature. But, "[t]he safe harbor is written in the disjunctive; that is, a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton*, 604 F.3d at 766.

[13] The statements must also have been identified as forward-looking. *Slayton*, 604 F.3d at 769. That element has not been put in significant dispute here.

(like other factors bearing on Xerox's profits) would be "transitionary and temporary factors" in "2014 and beyond." Am. Compl. ¶ 204; Appendix No. 38. Those statements were forward-looking—they described Xerox's expectations as to how implementation of Health Enterprise would benefit the company in the future—and were accompanied by meaningful cautionary language. On the same call, Mikells cautioned that "standing up these systems is not particularly easy." Atkinson Decl., Ex. 27 at 8; *see also id.* at 12. Indeed, Burns noted, doing so had "cost a little bit more than we thought." *Id.* at 14. But, Mikells predicted that, implementing "new platforms" would "become for us repeatable processes." *See* Am. Compl. ¶ 205; Appendix No. 39. APERS faults that statement as misleading. But in making this predictive, forward-looking statement, Mikells noted the challenges presented by "standing these things up," including cost challenges, and disclosed that Xerox expected to have "year-over-year margin *decline*" in its Services business. Atkinson Decl., Ex. 27 at 16 (emphasis added).[14]

APERS separately faults a statement by Burns on that same October 24, 2013 call. There, Burns elaborated on her expectations for the future implementation of Health Enterprise. She predicted that "the bulk of the investment won't have to change." Am. Compl. ¶ 206; Appendix No. 41. Like Mikells' statements, however, Burns's prediction was accompanied by sufficiently

---

[14] On that same call, Burns opined that the most difficult stage of the Health Enterprise implementation process was behind the company. She stated: "I'm very pleased that we've actually been able to stand up exchanges and MMIS system actually operating, taking customers' calls, et cetera. It costs a little bit more than we thought[ i]t would cost and that's one of the pressures that we saw in third [quarter] and we'll see a little bit in fourth but we have done it now." Am. Compl. ¶ 206; Appendix No. 40. While aspects of this statement can be read as forward-looking and/or as statements of opinion, one aspect—Burns's representation that Xerox "ha[d] done it now"—was factual and related to present events. But that representation is not actionable because it is not alleged to have been untrue. On the contrary, as APERS admits, as of October 24, 2013, Xerox *had* implemented Health Enterprise, in that the New Hampshire implementation had been completed in April 2013, Am. Compl. ¶ 75, and the Alaska MMIS went live on October 1, 2013. *Id.* ¶ 97.

meaningful cautionary language to bring it within the PSLRA safe harbor. Burns stated: "We have to modify for every engagement a little bit of the system but not as big a modification as before and that's one of the things that we are learning." *Id.* APERS disputes Burns's cautionary admonition because she described the part of the system that would require modification as "little." *See* Pl. Br. at 12 & n.10. But "Section 10–b is not concerned with such subtle disagreements over adjectives and semantics." *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 298 (S.D.N.Y. 2013); *see also id.* (distinction between "relatively hard" and "very hard" ore not meaningful); *In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 392 (S.D.N.Y. 2010), *aff'd sub nom. Wilson v. Merrill Lynch & Co.*, 671 F.3d 120 (2d Cir. 2011) ("semantic distinction [between "routinely" and "systematically"] is not persuasive"); *In re Xinhua Fin. Media, Ltd. Sec. Litig.*, 2009 WL 464934, at *8 ("[S]oft adjectives are nothing more than puffery."). Burns's cautionary language was sufficient, as a matter of law, to warn investors of the risk that, as Xerox implemented its Health Enterprise platform in other states, it would be required, each time, to modify it.[15]

### D.     Success Statements

Throughout the Class Period, Xerox officers made numerous statements describing the company's success in implementing Health Enterprise pursuant to its six state contracts. Of the Success Statements that are not non-actionable puffery, *see* Section III.B, *supra*, the remainder are non-actionable opinion statements or statements of fact that were not false or misleading.

---

[15] Xerox's other forward-looking statements about the company's expectations for the future implementation of Health Enterprise are similarly inactionable. *See* Appendix Nos. 44, 52, and 55.

## 1.    Statements of Opinion

Xerox executives, while often using qualifying language, repeatedly opined—for example on the January 24, 2014 and October 22, 2014 conference calls with analysts and investors—that the implementation of Health Enterprise was going well. *See, e.g.*, Am. Compl. ¶ 213; Appendix Nos. 45, 46; Am. Compl. ¶ 233; Appendix No. 56 ("Within government healthcare, we're making good progress, but expense levels are still high as we continue to invest to improve the performance of the first platform implementation of our new Medicaid platform."). Xerox officials also touted—at, for example, the December 7, 2012 BMO Capital Markets IT Services Day or the September 2, 2014 Citi Global Technology Conference—the implementation of Health Enterprise in specific states as reasonably successful. *See, e.g.*, Am. Compl. ¶ 187; Appendix No. 16 ("I think [California's] operating well."); Am. Compl. ¶ 199; Appendix Nos. 30, 31 ("And as California is maturing, thank God, and is doing fairly well I'm not going to say very well because very well always jinxes me . . . . But I don't think revenue will be down."); Am. Compl. ¶ 228; Appendix No. 55 ("I think on our existing contracts, we've got a good path to work through kind of the final touches on some of the implementations and then get to a steady state model that we can live with."); Am. Compl. ¶¶ 238–39; Appendix No. 60, 61 ("Now, in my view, we're making visible progress here."); Am. Compl. ¶ 240; Appendix No. 62 ("[W]e feel like we've got a good handle on this executing the handful of states that I showed on the map that you looked at."). These evaluative assessments are quintessential statements of opinion. *Omnicare*, 135 S. Ct. at 1325–26; *see In re Gen. Elec. Co. Sec. Litig.*, 856 F. Supp. 2d 645, 657 (S.D.N.Y. 2012); *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011).[16]

---

[16] As the Supreme Court has explained:

As reviewed earlier, statements of opinion may give rise to liability in two ways: first, "if either 'the speaker did not hold the belief she professed' or 'the supporting fact she supplied were untrue,'" *see Sanofi II*, 816 F.3d at 210 (quoting *Omnicare*, 135 S. Ct. at 1327), and, second, even if sincerely held, "if the speaker omits information whose omission makes the statement misleading to a reasonable investor," *id.* "The core inquiry" thus "is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" *Id.* (quoting *Omnicare*, 135 S. Ct. at 1329).

APERS does not argue that these statements fall within the first category of opinions *Omnicare* recognizes as actionable: APERS does not allege that Xerox's officers held beliefs other than those they professed, or that the facts embedded in these opinions were untrue.[17] *See* Pl. Br. at 12–14. Rather, APERS argues that Xerox had a duty to disclose information whose omission made the statements misleading. *See generally Omnicare*, 135 S. Ct. at 1329–30.

Instead, APERS pursues the second route identified in *Omnicare*, in which a statement of opinion may be actionably misleading because Xerox omitted material contrary facts. APERS

---

A fact is "a thing done or existing" or "[a]n actual happening." Webster's New International Dictionary 782 (1927). An opinion is "a belief[,] a view," or a "sentiment which the mind forms of persons or things." *Id.,* at 1509. Most important, a statement of fact ("the coffee is hot") expresses certainty about a thing, whereas a statement of opinion ("I think the coffee is hot") does not. See *ibid.* ("An opinion, in ordinary usage ... does not imply ... definiteness ... or certainty"); 7 Oxford English Dictionary 151 (1933) (an opinion "rests[s] on grounds insufficient for complete demonstration"). Indeed, that difference between the two is so ingrained in our everyday ways of speaking and thinking as to make resort to old dictionaries seem a mite silly.

*Omnicare*, 135 S. Ct. at 1325–26.

[17] APERS argues that the defendants (other than Zapfel) have conceded they disbelieved their opinion statements because they have not moved to dismiss on grounds of scienter. Pl. Br. at 20. But the Amended Complaint does not allege that Xerox officers disbelieved the opinions they espoused. APERS cannot meet its pleading obligations by drawing inferences from defendants' litigation strategy in pursuing dismissal.

likens this case to *In re Hi-Crush Partners L.P. Security Litigation*, No. 12 CV 8557 (CM), 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013). There, Judge (now-Chief Judge) McMahon held that Hi-Crush, as pled, had misled investors by touting its relationship with Baker Hughes while failing to disclose that its contract with Baker Hughes—which accounted for 18.2% of the company's revenues—had been terminated. *Id.* at *14. The failure to disclose Baker Hughes's termination, Judge McMahon held, had become misleading once Hi-Crush's dispute with Baker Hughes had "ripened" to the point where Baker Hughes formally repudiated the contract. *Id.* at *13. Before that point, Judge McMahon held, although the relationship with Baker Hughes was "strained," Hi-Crush had no obligation to disclose. *Id.* at *12–13; *see id.* at *8.

Applied here, Judge McMahon's analysis undercuts, rather than supports, APERS's claim that Xerox had a duty to disclose its challenges implementing Health Enterprise alongside its generally positive statements of opinion. APERS, notably, does not allege that Xerox failed to disclose the rupture of any state contract or any such decisive event. And it cannot so allege: as pled, there was no repudiation of these contracts by any of Xerox's state clients until California did so in April 2016, some six months after the Class Period ended.

APERS instead faults Xerox for not disclosing "the litany of current adverse facts known" to it. Pl. Br. at 14. But, as Judge McMahon's explanation of why Hi-Crush had not had a duty to disclose its strained relationship with its contract partner reflects, Xerox here did not have a duty to disclose the implementation challenges it was confronting. *See, e.g.*, *In re Express Scripts Holding Co. Sec. Litig.*, No. 16 CIV. 3338 (ER), 2017 WL 3278930, at *13 (S.D.N.Y. Aug. 1, 2017) (no duty to disclose before dispute with contract partner ripened).

Notably, too, in viewing Xerox's statements of opinion, these statements are properly cast as guardedly optimistic. Viewed together, they were far from unconditionally positive or

euphoric, a circumstance in which a duty to disclose the more complex business reality arguably might have arisen. And, notably, Xerox, at various points, did disclose, albeit in general terms, challenges it was encountering. For example, on the October 24, 2013 call, Mikells stated that "standing up these systems is not particularly easy," and that implementation costs had exceeded expectations. *See* Atkinson Decl., Ex. 27 at 8; *id.* at 12. Especially when viewed in light of the Supreme Court's cautionary reminders in *Omnicare* about attempts to establish liability for statements of opinion based on the nondisclosure of associated facts—that doing so "is no small task for an investor to meet," that "a [r]easonable investor does not expect that *every* fact known to an issuer supports its opinion statement," and that an opinion statement "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way," 135 S. Ct. at 1329, 1332—Xerox's opinion statements here, as pled, were not actionably misleading.

### 2. Statements of Fact

APERS next faults Xerox for statements its officers made about the implementation of Health Enterprise in California. These Success Statements are not properly classed as opinions (or forward looking). They are factual statements regarding current reality.

APERS faults Xerox for statements that described the California implementation in favorable terms. It notes that Xerox ultimately failed to implement the platform there. Representative of these statements is Blodgett's statement on May 23, 2012, at the Barclays Capital conference, to the effect that "the State of California has gone very well." Am. Compl. ¶¶ 163, 181; Appendix No. 10. For the reasons covered earlier, this statement was non-actionable puffery because it conveyed "no meaningful, objective data that an investor would rely upon." *Billhofer*, 2012 WL 3079186, at *9. But even if Blodgett's statement were treated as potentially actionable, APERS does not plausibly allege that this statement, at the time made, was untrue.

APERS's case is instead built on hindsight. It relies on reports from the California IPOC, which post-date Blodgett's May 23, 2012 statement, as evidence that the California project was going poorly at the time of the statement. *See* Am. Compl. ¶ 183. But those reports, as alleged, did not identify difficulties in the implementation of the California MMIS as of the time of that statement (let alone difficulties known to the speaker, Blodgett). *See id.* APERS does not adduce particular facts supporting the claim that, as of May 23, 2012, Blodgett or anyone else at Xerox knew of any fact—indeed, that any fact existed—that would call into question the general assessment that implementation in California was going well.

The same is true of the statements made at Xerox's December 7, 2012, presentation at the BMO Capital Markets IT Services Day, which APERS also faults. *See* Am. Compl. ¶ 187. There, in response to an analyst's question whether California would turn a profit in the fourth quarter of 2012, Bywater stated: "It's definitely getting closer. So it's improving." *Id.*; Appendix No. 17. APERS alleges this statement was false or misleading because Bywater ostensibly knew that Xerox was not receiving any revenue for the California implementation as of December 2012. *Id.* ¶ 188. But APERS again relies only on reports from the California IPOC that post-date Bywater's December 2012 statement. *See* Am. Compl. ¶ 188 (citing *id.* ¶ 179). APERS does not anywhere allege that Bywater's view that the California implementation was "improving," whether treated as a statement of opinion or as a statement of fact, was false or misleading.

### E. Profitability Statements

The third category of challenged statements, Xerox's Profitability Statements, are also all non-actionable. For the most part, Xerox officers in the Class Period described the company's expectations as to the *future* profitability of Health Enterprise. These statements were forward

looking and, as discussed below, fall within the PSLRA's safe harbor. On other occasions, Xerox officers made statements about the *current* profitability of the company's MMIS business. These are non-actionable for a separate reason: As pled, they were not misleading.

### 1. Forward Looking Statements About Profitability

On several occasions, Xerox officers made statements articulating the expectation that Health Enterprise in general, particular state contracts, or the company's Service business would become profitable.[18] These forward-looking statements, however, are clearly non-actionable, as they were accompanied by meaningful cautionary language.

Among the statements predicting that the company would enjoy improved margins or improved profitability in the later years of its MMIS contracts are the following. (In each case, the Court notes Xerox's cautionary language in the ensuing footnote.)

- At the May 17, 2012 J.P. Morgan Conference, Maestri said, "[A]s we enter 2013, we're going to be entering at a significantly higher level of operating margins on the services side. And the reason for that is that, a lot of the startup costs, the ramping of the investment in platforms that we made on some of the services business have already taken place, and now we're getting into a much more normalized level of margins on a lot of these new contracts." Am. Compl. ¶ 174; Appendix No. 5.[19]

---

[18] *See* Appendix Nos. 4, 5, 7, 11, 18, 66, 68, and 70.

[19] As to cautionary language, Maestri, in the same presentation, warned that service contracts take considerable time to become profitable. Atkinson Decl., Ex. 5 at 7 ("From a profit perspective, the time to profit on a services contract is longer than the time to revenue. The typical margin profile of a services contract typically starts with very low margins, which tend to expand over time as you put efficiencies into the outsourcing contract."). Maestri's other forward-looking statements at the conference were accompanied by this cautionary language. *See* Appendix No. 7. To the extent Maestri's forward-looking statement also contained a statement about a current condition—"investment in platforms that [Xerox] made"—that statement is not pled as false. *See* Section III.C.1, *supra.* Blodgett made a similar statement to Maestri's at the May 23, 2012 Barclays Conference. Am. Compl. ¶ 181; Appendix No. 11 ("[W]e're confident that just the—that the natural progression will bring margins up."). It, too, was accompanied by meaningful cautionary language. *See* Atkinson Decl., Ex. 6 at 7–8 ("Last year, we had a drag on cash flow because of California . . . . It was a large investment in cash.").

- On the April 23, 2013 conference call, Burns stated: "You will—you could see strength in cash based on how effectively we bring those contracts and all other contract[s] that we have to maturity. So you could have some benefit in cash. I don't think that you'll see a negative in revenue. Mega deals have—the mega deals that we've signed have a cash—as they mature, they have a cash benefit, right?" Am. Compl. ¶ 199; Appendix No. 30.[20]

- On April 22, 2014, Xerox held a conference call to discuss its Q1 2014 results. Am. Compl. ¶ 217. On that call, Burns commented on the progress the company was making in implementing Health Enterprise in California and noted the "path . . . towards profitability" that the California project was on. *Id.* ¶¶ 219–20; Appendix No. 50; *see id.* ¶¶ 224–25.[21]

These statements fall within the PSLRA's safe-harbor provision for forward-looking statements. Each articulated Xerox's projections for future profitability, rather than making a factual representation about the company's current state. Each was identified as forward-looking. And Xerox accompanied each with meaningful cautionary language.[22] These statements are not, therefore, actionable under Section 10(b).

---

[20] As to cautionary language, Burns stated on the same call that decision-making in the implementation of government contracts takes "a little bit longer," Atkinson Decl., Ex. 21, at 8–9, and that mega deals in particular "take a long time to ramp [up]," *id.* at 10.

[21] As to cautionary language, on the April 22, 2014 call, Mikells explained the company's disappointing margins. *See* Atkinson Decl., Ex. 34 at 5. She cautioned: "The work involved with implementing these new platforms is significant and we faced greater challenged than anticipated getting new clients to a good level of operating performance and then costing down the ongoing maintenance of the program. While we're making progress on improving our operational performance, it's costing more than we expected. And it's going to take us more time before we can lean out the resources supporting these projects." *Id.* at 5–6; *see also id.* at 6 ("We know it's going to take us longer and will cost us more to get these implementations right . . ."); *id.* at 8 ("[R]equired additional spending in our government healthcare business has triggered a revision to our guidance.").

[22] *See also* Appendix Nos. 33 ("As with many large new programs, there is an initial period of higher cost during roll out, including non-cash amortization of the platforms. We continue to be excited about these long-term healthcare related opportunities and expect to gain scale and experience efficiencies over time."); 44 ("And whenever you stand up a big new platform, it's relatively expensive the first time you stand it up. You then build scale, you build experience, you get more efficient, more cost effective at it each time you stand it up."). To the extent that APERS argues that forward-looking statements accompanied by adequate cautionary language

## 2. Statements About Xerox's Current Financial Status

Other statements in this category concerned Xerox's current financial status. These, however, are non-actionable because, as pled, they were neither false nor misleading.

First, on an April 23, 2012, conference call, Burns said, "[a]nd our profitability is improving in th[e healthcare] segment  actually very, very well.  So I'm bullish about healthcare, government healthcare services." Am. Compl. ¶ 198; Appendix No. 29.  Burns thus represented that Xerox's profitability was improving.  And because her statement articulated facts about a verifiable metric of significance to investors—the current state of Health Enterprise's profitability—it is, in theory, a viable target for a claim of falsity.

Burns's statement, however, is not adequately pled as false or misleading.  APERS bases its claim of falsity on the allegation that Xerox's profitability in *California* was not then improving.  *See* Am. Compl. ¶ 200.  But Burns's statement was not limited to California.  Her statement instead was that the profitability of the company's healthcare segment as *a whole* was improving.  *See* Am. Compl. ¶ 198 ("Our profitability is improving *in that segment* actually very, very well.").  And the Amended Complaint does not allege why, factually, that statement was false.  On the contrary, on the same call, Burns gave a detailed summary of the company's Q1 2013 results.  She explained that "services" revenue had increased 4%, that 60% of Services revenue came from Business Process Outsourcing, and that that segment was "benefitting from strong growth in transactional processing and state government services." Atkinson Decl., Ex. 21 at 3–4.  Those allegations provide data support for Burns's statements, and the Amended Complaint does not plead any facts that call this data into question.

---

fall outside the PSLRA's safe harbor because defendants have not challenged the factual adequacy of the Amended Complaint's scienter allegations, that argument fails for the reasons addressed earlier. *See* Section III.C.3 & n.12, *supra* (citing *Slayton*, 604 F.3d at 766).

Second, on July 25, 2014, Xerox held a conference call to discuss its Q2 2014 results. Am. Compl. ¶ 226. On that call, Burns again commented on implementation in California. She stated:

> And if you look at some of the contracts that are more mature, moving towards more maturity, California for example, we have been able to literally move that contract from investment phase to flat profitability, now to looking for growing profitability in a very predictable kind of a standard way. It took a little bit longer, but on a go-forward basis, California is going to be beautiful and we expect as we implement New York to be beautiful as well.

*Id.* ¶ 227; Appendix No. 53. Much of that statement, including the "beautiful" future that Burns anticipated for the company's contracts in California and New York, is classic puffery. APERS, however, faults Burns for claiming that Xerox had "been able to literally" convert the California MMIS contract "from investment phase to flat profitability." *See id.* ¶ 229.

That statement provides a viable basis for a Section 10(b) claim, insofar as it is not puffery, opinion, or forward-looking. It makes a verifiable claim about a financial metric: whether the California contract was then in the "investment" phase—*i.e.* losing money in anticipation of future earnings—or whether it had achieved "flat profitability," presumably meaning it was no longer losing money. Burns represented the latter. APERS faults this statement, noting that Xerox had yet to receive any revenue on the California contract at the time Burns spoke. Xerox counters that this statement was not false or misleading. As Xerox explains, it was authorized, under applicable accounting rules, to recognize revenue based on the percentage of the contract that it had completed, without regard to whether the company had yet actually received any cash from its customer. It therefore could fairly claim to have moved beyond the "investment phase," and, as a result of its recognition of revenue, its financial statements accordingly were consistent with "flat profitability." *See* Def. Reply Br. at 9.

42

The Court holds with Xerox on this point, too. Burns's statement to the effect that Xerox had moved beyond the "investment phase" to "flat profitability" did not embed any other factual representations. Burns did not, for example, represent that the company was then taking in cash receipts. Nor did she state that the company's cash flow on the project was positive or flat. And APERS does not allege any concrete manner in which Burns's statement was factually false. To be sure, Burns's colloquial use of the somewhat indistinct terms "investment phase" and "flat profitability" left room for interpretation. Different listeners might make different assumptions about what precisely those phrases connoted. But an indistinct statement does not inherently constitute a false or misleading statement. And APERS does not plead facts calling into question Xerox's proposition that, under the accounting rules, it was entitled to recognize revenue on the California contract at that juncture. Nor does APERS challenge Xerox's financial statements or claim that these were inconsistent with "flat profitability." Indeed, APERS does not challenge any numeric statement or accounting results reported in the company's various 8-K and 10-K filings, including as to revenue recognition. Under these circumstances, there was a factual basis for Burns's statement. That Xerox had reached the point where it was entitled to recognize revenue on the California contract gave Burns a valid factual basis on which to claim to have moved past the "investment phase" in connection with that contract, and APERS does not allege facts exposing as false her accompanying claim of "flat profitability."

For the reasons above, the Court holds that none of the challenged statements in the Amended Complaint satisfies the fundamental requirement of a Section 10(b) claim: that it be false or misleading. Each challenged statement instead was either puffery, a non-actionable statement of opinion, a protected forward-looking statement, or otherwise not factually pled as a

false or misleading statement of fact. Accordingly, the Amended Complaint fails to state a claim under Section 10(b).

### F. Loss Causation

Because the Court holds that the Amended Complaint fails to allege any material misrepresentation or omission by the defendants, the Court has no occasion to reach defendants' alternative argument that the Amended Complaint does not adequately plead loss causation.

### G. Section 20(a) Claim

To state a claim under § 20(a), a plaintiff must adequately allege "a primary violation by the controlled person." *Carpenter Pension Trust Fund*, 750 F.3d at 236 (quoting *ATSI*, 493 F.3d at 108). Because APERS has not done so, its § 20(a) claim must also be dismissed. *See, e.g., In re Lions Gate Entm't Corp. Sec. Litig.*, No. 14 Civ. 5197 (JGK), 2016 WL 297722, at *18 (S.D.N.Y. Jan. 22, 2016) (dismissing § 20(a) claim based on failure to allege a primary violation).

### H. Zapfel's Motion to Dismiss

Zapfel adopted Xerox's arguments for dismissal. *See* Zapfel Br. at 1 n.2. In light of the Court's holding that no statement attributed to Zapfel[23] (or any other defendant) in the Amended Complaint was actionable under Section 10(b), the Court has no occasion to consider the additional arguments Zapfel makes for dismissal.

## CONCLUSION

For all of the foregoing reasons, the Court grants defendants' motions to dismiss. Dkts. 59, 65. The Clerk of Court is respectfully directed to close this case.

---

[23] *See* Appendix Nos. 55, 59, 60, 61, 62, 63, and 66.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: March 20, 2018
       New York, New York

# Appendix

| No. | Compl. / Ex.[1]. | Date | Forum (+ Speaker) | Statement |
|---|---|---|---|---|
| 1 | ¶ 162 / Ex. 2 at 12 | Apr. 23, 2012 | Conference Call (Maestri) | "We essentially follow these contracts, and I'll let Lynn [Blodgett] expand on it, but we follow all these contracts at the granular level so each one of them, and we've got specific, you know, actions for all of them, starting from California, but all the other big ones that we are starting up and I think it's just going to be the way that we go through the year that some of those [margin] pressures are going to mitigate as we actually get these contracts to a steady state." |
| 2 | ¶¶ 143, 171 / Ex. 2 at 12 | Apr. 23, 2012 | Conference Call (Blodgett) | "We are doing a number of things, we think, to continue to drive margin improvement. . . . [W]e're shifting a lot of our work to platforms, our new MMIS platform that was a significant investment is the kind of thing that will help drive higher margins." |
| 3 | ¶¶ 144, 172 / Ex. 2 at 17 | Apr. 23, 2012 | Conference Call (Blodgett) | "[T]he other thing that's happening is that the use of the platforms that we've made significant investments in, you know, the MMIS application that has taken us a long time to build. It's the first new MMIS system that's been built in 15 years, and it's compliant with all of the new regs and everything . . . ." |
| 4 | ¶¶ 144, 172 / Ex. 2 at 17 | Apr. 23, 2012 | Conference Call (Blodgett) | "[T]hat is a major, a major accomplishment to get that in [building the MMIS] and as we put applications or states on that new platform we'll see improved margins." |
| 5 | ¶ 174 / Ex. 5 at 7 | May 17, 2012 | J.P. Morgan Conference (Maestri) | "[A]s we enter 2013, we're going to be entering at a significantly higher level of operating margins on the services side. And the reason for that is that, a lot of the startup costs, the ramping of the investment in platforms that we made on some of the services business have already taken place, and now we're getting into a much more normalized level of margins on a lot of these new contracts." |

---

[1] Citations to paragraphs are to the Amended Complaint. Citations to exhibits are to the Atkinson Declaration.

| No. | Compl. / Ex[1]. | Date | Forum (+ Speaker) | Statement |
|---|---|---|---|---|
| 6 | ¶¶ 145, 175 / Ex. 5 at 9 | May 17, 2012 | J.P. Morgan Conference (Maestri) | "[W]e've made platform investments that our competitors have not made. So for example, we have spent [a] significant amount of money during 2010 and 2011 to deliver a specific platform, to deliver healthcare processing services to the states, here in the U.S." |
| 7 | ¶¶ 145, 175 / Ex. 5 at 9-10 | May 17, 2012 | J.P. Morgan Conference (Maestri) | "And so obviously, now that we've got the platform, we can reuse that platform as we acquire new contracts. And therefore, our cost of delivery of those contracts is going to be significantly lower than what our competitors can offer." |
| 8 | ¶¶ 163, 180 / Ex. 6 at 4 | May 23, 2012 | Barclays Conference (Blodgett) | "Obviously, the [services] margins are a critical, critical importance to us." |
| 9 | ¶ 180 / Ex. 6 at 4 | May 23, 2012 | Barclays Conference (Blodgett) | "[T]he sole driver of margin decline had to do with the significant step up in bookings and in growth rates. . . . [This growth] was driven almost exclusively by the State of California and by a couple of other major contracts that we were starting up in our financial services area. So we knew that we'd see some downward pressure. The way that, that becomes resolved is that we just continue to work through the startup phase." |
| 10 | ¶¶ 155, 163, 181 / Ex. 6 at 4 | May 23, 2012 | Barclays Conference (Blodgett) | "We're happy to say that California implementation has gone very well, and we're just working now through the – we kind of go through the stage of assimilating it, and then you go through the refining process where we can help bring down costs, and then you really do to – go to the ultimate full implementation phase of it. We're right in the middle of those." |

| No. | Compl. / Ex[1]. | Date | Forum (+ Speaker) | Statement |
|---|---|---|---|---|
| 11 | ¶¶ 155, 181 / Ex. 6 at 4 | May 23, 2012 | Barclays Conference (Blodgett) | "[S]o we're confident that just the – that natural progression will bring margins up. Expect to see a slight uptick from last quarter and see it again next quarter, and then by fourth quarter we'll be exiting out of a less smaller target run rate for margins." |
| 12 | ¶ 184 / Ex. 13 at 6 | Nov. 13, 2012 | Xerox Annual Conference (Burns) | "The second is – second area of strength is operational excellence. This is something that came in spades when we bought ACS, when we bought Business Process Outsourcing Company that was steep in developing repeatable solutions into very complex problems. This is all about platforms." |
| 13 | ¶¶ 146, 184 / Ex. 13 at 7 | Nov. 13, 2012 | Xerox Annual Conference (Burns) | "This idea of platform is something that we spend a lot of time talking about that it's important that you understand that helps us differentiate ourselves from our competitors around the world." |
| 14 | ¶ 184 / Ex. 13 at 7 | Nov. 13, 2012 | Xerox Annual Conference (Burns) | "Platforms across the board help us to have repeatable solutions." |
| 15 | ¶ 185 / Ex. 13 at 12 | Nov. 13, 2012 | Xerox Annual Conference (Burns) | "We have [a] platform we call Enterprise. Enterprise is the newest Medicaid platform." |
| 16 | ¶ 187 / Ex. 14 at 14 | Dec. 7, 2012 | BMO Capital Markets IT Services Day (Bywater) | "Yes. [California is a] great client, a very large client. I think it's operating well. We're continuing to drive efficiencies into that business, and I'm encouraged by the trend. Very encouraged by the trend on that business unit." |
| 17 | ¶ 187 / Ex. 14 at 14 | Dec. 7, 2012 | BMO Capital Markets IT Services Day (Bywater) | "[The California implementation is] definitely getting closer [to turning a profit], so it's improving." |
| 18 | ¶ 187 / Ex. 14 at 14 | Dec. 7, 2012 | BMO Capital Markets IT Services Day (Horsley) | "Yes, and I don't think we've given of late any specifics on [the California implementation]. But I think what David [Bywater] is saying is the trend keeps improving and we are confident that we are going to see a sequential positive on the California deal." |

| No. | Compl. / Ex[1]. | Date | Forum (+ Speaker) | Statement |
|-----|-----------------|------|-------------------|-----------|
| 19 | ¶ 187 / Ex. 14 at 14 | Dec. 7, 2012 | BMO Capital Markets IT Services Day (Bywater) | "These contracts, as you know, are – some Medicaid contracts will run 10, 15, 20 years and they're – it's a very profitable piece of my portfolio." |
| 20 | ¶ 187 / Ex. 14 at 14 | Dec. 7, 2012 | BMO Capital Markets IT Services Day (Bywater) | "So [MMIS implementation] has not improved as quickly as we wanted it to, but it's definitely on a steady improvement, which is [] very encouraging for us." |
| 21 | ¶ 187 / Ex. 14 at 14 | Dec. 7, 2012 | BMO Capital Markets IT Services Day (Bywater) | "And we are making the investments to make sure [MMIS implementation] is a long-term, very positive relationship and accretive relationship for all parties." |
| 22 | ¶ 187 / Ex. 14 at 15 | Dec. 7, 2012 | BMO Capital Markets IT Services Day (Bywater) | "And then we had – so as a result, we had to drive down our efficiencies – drive our efficiencies faster. We've made good progress but you can only go so fast and make sure you continue to drive and deliver [a] very solid performance for the client, which is our first priority." |
| 23 | ¶ 190 / Ex. 17 at 5 | Feb. 12, 2013 | Goldman Sachs Conference (Blodgett) | "I think the overall competitive advantage that we have . . . as an overall general statement, we have strong platforms." |
| 24 | ¶ 190 / Ex. 17 at 5 | Feb. 12, 2013 | Goldman Sachs Conference (Blodgett) | "If you look at our Medicaid business, for example, . . . we're just introducing our new enterprise platform. It's going live here in a couple of months." |
| 25 | ¶¶ 147, 191 / Ex. 17 at 6 | Feb. 12, 2013 | Goldman Sachs Conference (Blodgett) | "I think we win [contracts] because we have great technology. People look at our platforms and they realize that this stuff's pretty complicated. Our Medicaid platform has 6 million lines of code in it, and, there hasn't been a new Medicaid system that's been developed for a long time, in over a decade. And so now, as we demonstrate that to people, they can – they're experts. They look at it and [] say, 'Wow, it has functionality and features that are unique.'" |

| No. | Compl. / Ex[1]. | Date | Forum (+ Speaker) | Statement |
|---|---|---|---|---|
| 26 | ¶ 193 / Ex. 19 at 11 | Mar. 7, 2013 | Xerox Healthcare Services Analyst Day (Scanlon) | "[W]e have a big presence in a large number of states and that platform gives us the opportunity to extend". |
| 27 | ¶¶ 148, 194 / Ex. 19 at 16-17 | Mar. 7, 2013 | Xerox Healthcare Services Analyst Day (Scanlon) | "One of our competitive advantages that I wanted to spend a couple of minutes on is our health enterprise platform. This is a claims transaction engine that's designed specifically for Medicaid. We've invested in this. We've invested in the technology. It's a ground up, it's a service oriented architected platform, and the reason why that's important is because it allows us to provide the states with a platform. If they want a plug and play with different capabilities that they have, they're allowed to do that." |
| 28 | ¶ 198 / Ex. 21 at 8 | Apr. 23, 2013 | Conference Call (Burns) | "State government we are seeing some good news particularly in healthcare. We have a strong position as you know in MMIS around the United States, and California is our big contract; New Hampshire just went live. We're doing well there . . . . So healthcare is a big segment for us. We do well there." |
| 29 | ¶ 198 / Ex. 21 at 8-9 | Apr. 23, 2013 | Conference Call (Burns) | "And our profitability is improving in th[e healthcare] segment actually very, very well. So I'm bullish about healthcare, government healthcare services. What we are seeing though is that any new decision, any decision in the government takes a little bit longer, a lot more discussions, a lot more engagement, a lot more senior level engagement with state officials and by us." |
| 30 | ¶ 199 / Ex. 21 at 19 | Apr. 23, 2013 | Conference Call (Burns) | "You will – you could see strength in cash based on how effectively we bring those contracts and all other contract[s] that we have to maturity. So you could have some benefit in cash. I don't think that you'll see a negative in revenue. Mega deals have – the mega deals that we've signed have a cash – as they mature, they have a cash benefit, right?" |

| No. | Compl. / Ex[1]. | Date | Forum (+ Speaker) | Statement |
|---|---|---|---|---|
| 31 | ¶ 199 / Ex. 21 at 20 | Apr. 23, 2013 | Conference Call (Burns) | "So the most famous mega deal is California, right? And as California is maturing, thank God, and is doing fairly well, I'm not going to say very well because very well always jinxes me of doing well so as that matures of course cash becomes easier to get out of the mega deal. But I don't think revenue will be down. I think cash has some opportunity . . . ." |
| 32 | ¶¶ 156, 202 / Ex. 27 at 4 | Oct. 24, 2013 | Conference Call (Mikells) | "We've also seen increased expenses associated with the roll out of our new Medicaid platform and healthcare exchange operation. We're very pleased with the successful implementations of these platforms, with Alaska's Medicaid Management Information System . . . launched successfully this past quarter." |
| 33 | ¶ 202 / Ex. 27 at 4 | Oct. 24, 2013 | Conference Call (Mikells) | "As with many large new programs, there is an initial period of higher cost during roll out, including non-cash amortization of the platforms. We continue to be excited about these long-term healthcare related opportunities and expect to gain scale and experience efficiencies over time." |
| 34 | ¶¶ 156, 203 / Ex. 27 at 8 | Oct. 24, 2013 | Conference Call (Mikells) | "Yeah so within BPO [Business Process Outsourcing], healthcare is our fastest growing area and we're clearly benefiting from our number one position in MMIS, so on the Medicare side we're very strong. We were incredibly pleased that we've been actually standing up the new MMIS systems successfully. I think if you look in the newspapers recently if there's one thing that's clear standing up these systems is not particularly easy. And so while it's certainly come with a little bit higher cost that's pressuring margin, we continue to look at our overall position in healthcare and feel very good about the fact that we're participating across a number of different sectors." |

| No. | Compl. / Ex[1]. | Date | Forum (+ Speaker) | Statement |
|-----|-----------------|------|-------------------|-----------|
| 35 | ¶ 203 / Ex. 27 at 8 | Oct. 24, 2013 | Conference Call (Mikells) | "So we continue to look at the changes that are occurring in healthcare generally in part driven by the Affordable Care Act and view it as just a really great opportunity." |
| 36 | ¶ 203 / Ex. 27 at 8 | Oct. 24, 2013 | Conference Call (Mikells) | "And the really nice thing about platforms is while – when you're putting a new one in place you clearly go through some of the pain of standing it up for the first time. This becomes a pretty replicable process for us and so we certainly think over time we're going to get scale and experience gains in that area." |
| 37 | ¶ 204 / Ex. 27 at 4-5 | Oct. 24, 2013 | Conference Call (Mikells) | "We've also seen increased expenses associated with the roll out of our new Medicaid platform and healthcare exchange operation. . . . [W]e're in a transition period where we're pressured by line of business mix and investments. At our November Investor Conference, we'll walk through in detail the Services business dynamics and actions that we're taking to drive sustainable margin improvement." |
| 38 | ¶ 204 / Ex. 27 at 12 | Oct. 24, 2013 | Conference Call (Mikells) | "[MMIS systems] are not easy to stand up and so we're making more investments there. . . . [A]s I look at all of those things and I look forward into 2014 and beyond I view them as transitionary and temporary factors." |
| 39 | ¶¶ 165, 205 / Ex. 27 at 17 | Oct. 24, 2013 | Conference Call (Mikells) | "We've had a little more pressure on margin as we have stood up some of these new platforms. That's not unusual, but these things are now going to become for us repeatable processes, right? We will get better because of experience and we'll get better because of scale. So as I look forward into 2014, I think we've got great opportunities in the healthcare sector." |

| No. | Compl. / Ex[1]. | Date | Forum (+ Speaker) | Statement |
|---|---|---|---|---|
| 40 | ¶ 206 / Ex. 27 at 14 | Oct. 24, 2013 | Conference Call (Burns) | "It's hard to do. It's hard to stand [MMIS systems] up. I'm very pleased that we've actually been able to stand up exchanges and MMIS system actually operating, taking customers' calls, et cetera. It costs a little bit more than we thought[ i]t would cost and that's one of the pressures that we saw in third [quarter] and we'll see a little bit in fourth but we have done it now." |
| 41 | ¶ 206 / Ex. 27 at 14 | Oct. 24, 2013 | Conference Call (Burns) | "And so the bulk of the investment won't have to change. We have to modify for every engagement a little bit of the system but not as big a modification as before and that's one of the things that we are learning." |
| 42 | ¶ 206 / Ex. 27 at 14 | Oct. 24, 2013 | Conference Call (Burns) | "I think other people are learning it as well. So I'm actually pleased with healthcare. It's a big piece of our business and I think we have some proof points that'll show it will be good on a go-forward basis as well." |
| 43 | ¶ 207 / Ex. 27 at 18 | Oct. 24, 2013 | Conference Call (Burns) | "All of the numbers look good from a go-forward basis, from a revenue perspective in Services, across all of the businesses." |

| No. | Compl. / Ex[1]. | Date | Forum (+ Speaker) | Statement |
|---|---|---|---|---|
| 44 | ¶ 212 / Ex. 30 at 6 | Dec. 3, 2013 | Credit Suisse Conference (Mikells) | "[W]e pointed out this, both at our Investor Conference and on our third quarter conference call, standing up new platforms is tough, right? I don't think Xerox is the only folks who have experience. It was a little tougher than we initially anticipated. We had to spend a little bit more money getting new platforms stood up. . . . We have other platforms in the health care space, specifically, our new Medicaid Management Information platform that we're deploying at certain states. So we've deployed in New Hampshire. We've deployed in Alaska. We've got 3 others underway. We're bidding on a number of others. And whenever you stand up a big new platform, it's relatively expensive the first time you stand it up. You then build scale, you build experience, you get more efficient, more cost effective at it each time you stand it up. So I think, for us, the good news is, we've had to stand up several new platforms in 2013. I'd expect that we will get more efficient as we now stand them for up for the third and the fourth time into 2014." |
| 45 | ¶ 213 / Ex. 31 at 15 | Jan. 24, 2014 | Conference Call (Burns) | "[G]overnment healthcare is an area that we're not – we're making progress. We're really focused, as I said, in responding to the first question on making sure that we get this right and we do not, like I said, put any additional risk or pressure on any state. But as we do that, we are stabilizing more and more." |
| 46 | ¶ 213 / Ex. 31 at 15 | Jan. 24, 2014 | Conference Call (Burns) | "And so throughout 2014, this significant investment that we're making – that we made in 2013 and in the tail-end of 2012, should start to pay off with more accretive performance – accretive results to the company." |
| 47 | ¶ 151 / Ex. 52 at 3 | Mar. 11, 2014 | Unalleged (Mikells) | "And so last year, we implemented our new MMIS platform, which we call Health Enterprise, in both Alaska and New Hampshire." |
| 48 | ¶ 217 / Ex. 34 at 4 | Apr. 22, 2014 | Conference Call (Burns) | "[W]e came up short in Services margins, which I know is an area of keen focus for investors and I can assure everyone an area of intense focus internally." |

| No. | Compl. / Ex[1]. | Date | Forum (+ Speaker) | Statement |
|---|---|---|---|---|
| 49 | ¶ 218 / Ex. 34 at 6 | Apr. 22, 2014 | Conference Call (Mikells) | "We're enhancing our program management under a single point of accountability that also serves to enable quicker learnings across different implementations of the same platform. We know it's going to take us longer and will cost us more to get these implementations right, and we're committed to do that in support of both our current and future customers." |
| 50 | ¶¶ 157, 167, 219-20 / Ex. 34 at 10-11 | Apr. 22, 2014 | Conference Call (Burns) | "We've been engaged in [California] for many years, and California is going fairly well, and MMIS is actually going pretty well and we're now at the point where we're starting to lean out our implementation on California and drive it to increased profitability. . . . [O]n MMIS it is literally just about continuing on the improvement path that we're on, which is very good already and driving towards profitability. So [MMIS is] a good market, a growing market, and one that I don't think that we can actually step away from. I know that we can't step away from because we have a history of success in this business." |
| 51 | ¶ 225 / Ex. 34 at 5-6 | Apr. 22, 2014 | Not alleged | "The work involved with implementing these new platforms is significant and we faced greater challenges than anticipated getting new clients to a good level of operating performance and then costing down the ongoing maintenance of the program. While we're making progress on improving our operational performance, it's costing more than we expected. And it's going to take us more time before we can lean out the resources supporting these projects." |
| 52 | ¶ 227 / Ex. 37 at 15 | July 25, 2014 | Conference Call (Burns) | "I don't think that we are not focused more – or focused a lot on the commercial side, we are. But we also – the government healthcare market is a very attractive market. We went through one cycle when this market started many, many years ago, that showed that we could invest in the new platform, stand that platform up, and have it last for many, many years, and continue to drive growth on the top line and profitability on the bottom line. That remains our expectation." |

| No. | Compl. / Ex[1]. | Date | Forum (+ Speaker) | Statement |
|---|---|---|---|---|
| 53 | ¶¶ 169, 227 / Ex. 37 at 15 | July 25, 2014 | Conference Call (Burns) | "And if you look at some of the contracts that are more mature, moving towards more maturity, California for example, we have been able to literally move that contract from investment phase to flat profitability, now to looking for growing profitability in a very predictable kind of a standard way. It took a little bit longer, but on a go-forward basis, California is going to be beautiful and we expect as we implement New York to be beautiful as well." |
| 54 | ¶ 230 / Ex. 37 at 5 | July 25, 2014 | Not alleged | "[W]e continue to incur higher costs associated with launching our new Medicaid platform and getting it to operational maturity." |
| 55 | ¶ 228 / Ex. 40 at 8 | Sept. 2, 2014 | Citi Conference (Zapfel) | "[O]bviously, we are going to leverage what we've learned in some of our startup difficulties elsewhere. So that's a big thing, obviously, if we look ahead to New York. But I think on our existing contracts, we've got a good path to work through kind of the final touches on some of the implementations and then get to a steady state model that then we can live with." |
| 56 | ¶ 233 / Ex. 41 at 4 | Oct. 22, 2014 | Conference Call (Mikells) | "Within government healthcare, we are making good progress but expense levels are still high as we continue to invest to improve the performance of the first platform implementation of our new Medicaid platform. These impacts were more contained in the third quarter but are still a headwind year-over-year." |
| 57 | ¶ 234 / Ex. 41 at 16 | Oct. 22, 2014 | Conference Call (Burns) | "[The Medicaid costs] have been a big headwind for us. A major portion of the shortage that we see in margins is driven by the Medicaid investments but we are seeing sequential improvement in those investments even though they are high." |

| No. | Compl. / Ex[1]. | Date | Forum (+ Speaker) | Statement |
|---|---|---|---|---|
| 58 | ¶ 234 / Ex. 41 at 16 | Oct. 22, 2014 | Conference Call (Burns) | "The investments have been incredibly large. I will just point to the impairment that we took last quarter which was $20 million. If we look at this year over year, it has been a big headwind for us every single quarter. I mean in total, we are probably approaching a $100 million number year-over-year. It has been a huge investment for us and it has been a big expense year-over-year.<br><br>Now as we look forward right to 2015, the fact that we have invested so much in 2014 should help us in 2015 which doesn't at all suggest that we are not going to need to continue some level of higher investment as we have a few more implementations that are still underway. But from a year-over-year basis, this should start to become a tailwind for us." |
| 59 | ¶ 237 / Ex. 43 at 11 | Nov. 11, 2014 | Xerox Annual Conference (Zapfel) | "Now, our big focus is driving substantial improvement in our operating margins and a big component of that is our government healthcare business. I'll talk about that at some length today. But we've made progress both operationally in terms of solidifying the enterprise MMIS platform and financially in our third quarter results in GHS [Government Healthcare Solutions] showed an uptick even without kind of normalizing for the second quarter impairment that many of you are familiar with." |
| 60 | ¶¶ 158, 238 / Ex. 44 at 12 | Nov. 11, 2014 | Xerox Annual Conference (Zapfel) | "Defendant Zapfel's presentation included a slide on the status of the Company's Health Enterprise implementations, which represented that such implementations were 'performing well,' with respect to New Hampshire and Alaska, and 'progressing well overall,' with respect to California." |

| No. | Compl. / Ex[1]. | Date | Forum (+ Speaker) | Statement |
|-----|-----|-----|-----|-----|
| 61 | ¶ 239 / Ex. 43 at 18 | Nov. 11, 2014 | Xerox Annual Conference (Zapfel) | "So health enterprise in the new – the new Medicaid management platform is really a big, big investment for Xerox. And we've been – we've been at this and building it up over time.<br><br>What I wanted to – and so we have spent time on the earnings calls this year on, you know, we're not quite making our targets and this has been – this has been an area where we've made incremental investments because we want to make sure that we – you know, we've delivered to the key clients that we support and again, long term, this has been a very, very good historic franchise for us and we believe it will be one in the future.<br><br>Now, in my view, we're making visible progress here. From a platform development, making the delivery milestones, code quality standpoint, we've made major investments this year. We're starting to see good progress. . . .<br><br>So, you know, pretty good – you know, pretty good success story with our – you know, with our first client [New Hampshire]. After some burning issues that we – you know, that we faced in Alaska, our operating performance today is solid.<br><br>California has had released one, implemented in the past 30 days. We just check pointed with them, I guess end of last week, and, you know, a very, very, very positive start. Both – you know, we're working closely with both North Dakota and Montana as they get ready for, you know, implementations in 2015 and beyond." |

| No. | Compl. / Ex[1]. | Date | Forum (+ Speaker) | Statement |
|-----|-----------------|------|-------------------|-----------|
| 62 | ¶ 240 / Ex. 43 at 32 | Nov. 11, 2014 | Xerox Annual Conference (Zapfel) | "[T]he thing I would share would be we have had erosion as we've been pretty visible about this year in terms of our GHS profitability as we've been investing in the enterprise platform and in a handful of states where we had things that we just had to get over in 2014.<br><br>The 25 to 50 basis points would recover back, I mean, if you just choose kind of a midpoints all around to 40 for the midpoint for math simplicity would basically get back half of the deterioration that we've experienced this year.<br><br>A reasonable portion of that is not having another big impairment charge, which we had associated with Nevada and which is kind of completely behind us. So in the rest it really is around and we feel like we've got a good handle on this executing the handful of states that I showed on the map that you looked at. So each one of these things every day, you're working with the state. None of them are perfectly predictable for the next 13.5 months, but we think that we've got a good line of sight and a good set of plans to get back at least half of that margin deterioration that we had in 2014, and that puts the business overall at kind of plus or minus C- levelish." |
| 63 | ¶ 241 / Ex. 43 at 35 | Nov. 11, 2014 | Xerox Annual Conference (Zapfel) | "I would say from a risk standpoint, in any Services business, there is always the risk that there are some client situation that seems like everything is going great, and all of a sudden you're like – holly molly [sic], I got a big problem here, so we don't anticipate that." |
| 64 | ¶ 243 / Ex. 45 at 3 | Jan. 30, 2015 | Conference Call (Burns) | "We've made progress improving our government healthcare business, and in 2014, we committed resources to maturing our MMIS enterprise platform. While we still have work to do, the hard work of the team is paying off. We remain bullish about this market and its opportunities for us." |

| No. | Compl. / Ex[1]. | Date | Forum (+ Speaker) | Statement |
|---|---|---|---|---|
| 65 | ¶ 244 / Ex. 45 at 6 | Jan. 30, 2015 | Conference Call (Mikells) | "Our results in government healthcare were in line with our expectations and we're seeing positive results from our investments to mature the platform and improve our operational performance. We're confident we're on the right track and we started some work ahead of finalizing the New York Medicaid contract to ensure we get off to the right start there." |
| 66 | ¶ 245 / Ex. 45 at 19 | Jan. 30, 2015 | Conference Call (Zapfel) | "Relative to the problem contract question, I would say we've made real progress in terms of the new systems implementations. We've got a strong team that we've added in 2014 that's really been driving that. So you can never say never in terms of an issue in a given implementation. But overall, we've made very good progress there and we're optimistic that we won't have big financial hits as a result of future problem contracts." |
| 67 | ¶ 248 / Ex. 48 at 4 | Apr. 24, 2015 | Conference Call (Mikells) | "[W]e failed to accurately call the incremental financial pressure we're experiencing in our Government Healthcare business from the rollout of our Health Enterprise Medicaid platform. Our delivery quality and operating performance continue to improve, but the financials were a clear signal that we have more work ahead." |
| 68 | ¶ 249 / Ex. 48 at 13 | Apr. 24, 2015 | Conference Call (Mikells) | "[P]art of the reason earlier I talked about the fact that this area gets less risky for us as we complete more and more of these implementations with the states where we signed contracts three plus years ago. Once we get beyond the implementation, right, then the economics move to, I'll call it, the regular Medicaid transaction processing. Right? And in addition to that, we typically, and even in the couple of clients that we've already cut over with the new platform, we typically have the opportunity to then do add-on things and get additional revenue from those clients, which we have been successfully doing and will continue to do." |

| No. | Compl. / Ex[1]. | Date | Forum (+ Speaker) | Statement |
|-----|------------------|------|-------------------|-----------|
| 69 | ¶ 250 / Ex. 48 at 5 | Apr. 24, 2015 | Conference Call (Mikells) | "Operationally, the platform is performing well in the states where it's been rolled out and we're progressing on the implementations in other states. However, we have more work ahead to turnaround the financial performance. We're taking a number of additional actions to improve the picture and have adjusted our expectations to reflect what we believe is required to meet our customer commitment. This is the main driver of our revised Services margin guidance . . . ." |
| 70 | ¶ 251 / Ex. 48 at 17 | Apr. 24, 2015 | Conference Call (Mikells) | "[W]e're pretty close to the finish line on that one. And the closer you get to the finish line, basically, the less risk you have. We talked about California and we made a big adjustment for California. Last year, we actually made an adjustment for the one other state that hasn't been cut over yet, so we had sort of resized what we thought our cost expectations were going to be. So I would characterize as we've already taken a hit on California, we've adjusted the other state that hasn't yet been implemented and we're close on the one that we're going to cut over this year." |